PELLETTIERI, RABSTEIN & ALTMAN
Arthur Penn (AP 2952)
Christine F. Lewis (CL 5685)
790 Woodlane Road
Mt. Holly, New Jersey 08060
 (609) 267-3390

Attorney for Plaintiff
 (Additional Counsel Listed on Signature Page)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THOMAS J. DEBENEDICTIS | : | |
| on behalf of himself and all others | : | Civil Action No. 04-404 (JLL) |
| similarly situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CLASS ACTION |
| MERRILL LYNCH & CO., INC.; | : | |
| MERRILL LYNCH, PIERCE, | : | |
| FENNER & SMITH INCORPORATED; | : | |
| MERRILL LYNCH GROUP, INC.; | : | |
| FAM DISTRIBUTORS, INC.; | : | |
| MERRILL LYNCH INVESTMENT | : | JURY TRIAL DEMANDED |
| MANAGERS, L.P.; | : | |
| FUND ASSET | : | |
| MANAGEMENT, L.P.; and | : | |
| PRINCETON SERVICES, INC. | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

Plaintiff, Thomas J. DeBenedictis ("Plaintiff" or "DeBenedictis"), who resides at 1310

Junonia Street, Sanibel FL 33957, individually and on behalf of all those similarly situated,

alleges, based upon personal knowledge as to himself and his own acts and, as to other matters,

based on information and belief derived from the investigation of counsel (which included a

review of documents filed by defendants and their affiliates with the Securities and Exchange Commission ("SEC"), various news reports and articles and other publicly available information) as follows:

<u>**INTRODUCTION AND OVERVIEW**</u>

1.      Merrill Lynch & Co., Inc. ("Merrill Lynch"), through affiliates, sponsors  a large number of proprietary mutual funds.  These proprietary funds are sold primarily through Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("MLPF&S"), a registered broker -dealer controlled by Merrill Lynch.  Many of the funds that Merrill Lynch sponsors are what are known as multiple class funds; potential investors are offered different Classes of Shares in the same investment portfolio.  The different Classes of Shares in each multiple class fund share the same investments, but they use different methods to collect sales charges from investors.  The three methods used to collect sales charges are:

- front-end loads, which are deducted at the time of purchase;

- contingent deferred sales loads ("CDSLs"), which are back -end loads that are deducted if the shares are redeemed within a specified time after they are purchased; and

- Rule 12b-1 fees, which are periodically deducted from the assets of the fund to compensate for distribution expenses, reducing the net asset value of an investor's shares in the fund.

Because all of the Share Classes for each fund are invested in the same portfolio, the difference in what the investor earns is the result of the load and expense structure of the Share Class he buys.

2.      This a securities class action brought under the Securities Act of 1933 (the

'Securities Act') and the S ecurities Exchange Act of 1934 (the 'Exchange Act') on behalf of

certain purchasers of Class B Shares issued by certain mutual funds affiliated with Merrill

Lynch.  Specifically, this action is brought on behalf of purchasers who qualified for the discount

on front-end load Shares that would apply to an investment of $100,000 or more and who

purchased Class B Shares with a maximum CDSL of 4.00% in multiple class mutual funds

affilated with Merrill Lynch between January 30, 1999 and December 31, 2003 (the 'P roposed

Class Period'), as well as a subclass of these purchasers who made purchases pursuant to a

Registration Statement that was the subject of a post-effective amendment between January 30,

2001 and December 31, 2003.  These purchasers of Class B Shares were induced to purchase

Shares that have higher expenses and lower yields than available alternatives by reason of the

wrongful acts of the defendants as set forth herein.  The multiple class mutual funds that are the

subject of this amended complaint are referred to as the 'Merrill Lynch Funds," and the

distinguishing characteristic of the Merrill Lynch Funds is the 4.00% maximum CDSL that

applied to their Class B Shares.[1]

3.      The rationale for multiple class funds is that they provide investors with choices

on how to pay sales charges.  While multiple class funds offer different ways to pay sales

charges, they also have the potential to cause confusion among investors.  In a speech delivered

---

[1]      Some multiple class funds that Merrill Lynch sponsored issued Class B Shares that had a
smaller maximu n CDSL of 1.00%. These funds, which typically invested in shorter duration fixed
income instruments, are not the subject of this action. Merrill Lynch also sponsors other types of
investment vehicles such as closed      -end funds and unit investment trusts th       at are not the subject of
this action. A listing of all of the Merrill Lynch Funds, which is based upon counsel's investigation
to date, is attached hereto as Exhibit A. This list is believed to be complete, based upon our
investigation to date, but to            the extent a multiple class open          -end management investment company
affiliated with Merrill Lynch sold Class B Shares that were subject to a maximun CDSL of 4.00%
during the Proposed Class Period, it is intended to be included within the scope of this case,                    even if
it does not appear on Exhibit A.

to the Investment Company Institute on May 15, 1998, Arthur Levitt, then-Chairman of the SEC, questioned the effectiveness of mutual funds' disclosures concerning the different share classes and their expense structures:

> Do you really expect investors to understand the alphabet soup of A, B, C, D, I, Y, and Z shares?  To figure out what combination of front-end loads, CDSLs, 12b-1 charges, commissions, and who knows what else they're paying?

(http://www.sec.gov.news/speeches/speecharchive/1998/spch212.txt.)

4.      Between January 30, 1999 (the beginning of the Proposed Class Period) and April 2003, each of the Merrill Lynch Funds offered four Classes of Shares: Class A, Class B, Class C, and Class D, which were described in the Registration Statements, Prospectuses, and Statements of Additional Information for the Merrill Lynch Funds.  This system was referred to as the Merrill Lynch Select Pricing[SM] System.

5.      Under the Merrill Lynch Select Pricing[SM] System as it existed prior to April 14, 2003, Class A Shares (which had restricted availability) and Class D Shares (which were unrestricted) both carried a front-end load that decreased in percentage with larger investments based upon standardized discounts; Class D Shares in the Merrill Lynch Funds were similar in structure to Class A Shares in other multiple class funds.[2]

6.      Throughout the Proposed Class Period, Class B and Class C Shares in the Merrill Lynch Funds were similar in structure to the Class B and Class C Shares issued by other multiple class funds; they each carried a CDSL which would apply if the shares were redeemed within a specific number of years after they were purchased.  The percentage amount of the CDSL did not decrease with larger investments.  Because the CDSL for Class B Shares and Class C Shares

---

[2]      In April 2003, defendants reclassified Class A Shares and Class D Shares without altering the economic substance of the four existing share classes; this was done to make the share classes for the Merrill Lynch Funds similar to those of other multiple class funds.  Class D Shares were renamed Class A and Class A Shares were renamed Class I.  For clarity, plaintiff will rely upon the original share classifications in this Amended Complaint.

would only apply if they were redeemed within a certain number of years of purchase, they carried Rule 12b-1 fees to pay the sales charges associated with their sale. The percentage amount of the Rule 12b-1 fees on Class B and Class C Shares stayed the same no matter how much was invested. As a result of these Rule 12b-1 fees, Class B and Class C Shares had materially higher annual expenses than Class A and Class D Shares.

7.     Throughout the Proposed Class Period, for investors who qualified for the reduced sales charges that would apply to an investment of $100,000 or more in Class A and Class D Shares, Class B Shares issued by the Merrill Lynch Funds were an inferior investment choice because they are outperformed over short holding periods by Class C Shares (which have a lower CDSL that is applicable for a shorter period of time) and over longer holding periods by Class A and Class D Shares (which have materially lower expenses). Merrill Lynch, MLPF&S, and the registered representatives who sell the Shares, however, enjoy greater earnings from sales of Class B Shares to these investors, as the commission revenue on Class A and Class D Shares decreases with larger investments, but the Rule 12b-1 fees charged to purchasers of Class B Shares do not. Further, the investment advisers for the funds benefit from sales of Class B Shares because they are compensated based upon the amount of the assets that they manage, and an investment in Class B Shares places more assets in a fund than the same investment in Class A or Class D Shares would.

8.     Defendants have structured the Registration Statements, Prospectuses and Statements of Additional Information for the Merrill Lynch Funds to focus the potential investors' attention on the financial incentives that the registered representatives affiliated with MLPF&S have in the sale of Class A and Class D Shares; however, they obscured the financial incentives that these brokers have in connection with the sale of Class B Shares, failing to

disclose the potential conflict of interest that they have in connection with large investments that would qualify for a discounted front-end load on Class A or Class D Shares.

9.       The Prospectuses, Statements of Additional Information, and Registration Statements pursuant to which the Merrill Lynch Mutual Funds were offered to the investing public uniformly omit to state the material fact that investing in Class B Shares never makes economic sense for investors who qualified for the reduced sales charges that would apply to an investment of $100,000 or more in Class A or Class D Shares.  Further, they failed to disclose the material fact that in the context of sales of Class B Shares to investors that would qualify for reductions in the front-end load on Class A or Class D Shares, MLPF&S and its registered representatives have a conflict of interest as they will receive greater compensation from sale of Class B Shares than Class A or Class D Shares.

## JURISDICTION AND VENUE

10.       This Court has jurisdiction over this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337.

11.       Venue is proper in this Court under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391, as the Merrill Lynch Funds are based here, and their misleading disclosures were disseminated from this district.

## PARTIES

12.       Plaintiff Thomas J. DeBenedictis ('Plaintiff' or 'DeBenedictis') is an individual who has been appointed by the Court as Lead Plaintiff pursuant to 15 U.S.C. §§ 77z-1(a)(3)(B), 78u-4(a)(3)(B).

13.     During the Proposed Class Period, Plaintiff DeBenedictis invested in Class B Shares subject to a 4.00% maximum CDSL issued by various Merrill Lynch Funds at times when he qualified to purchase front-end load Shares at the reduced sales charges applicable to an investment of $100,000 or more.

14.     Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") is a Delaware Corporation with its principal place of business in New York, New York.  Defendant Merrill Lynch is a holding company that, through its subsidiaries and affiliates, provides broker-dealer, financing, advisory, wealth management, asset management, insurance, lending and related products and services on a global basis.

15.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("MLPF&S") is a Delaware Corporation with its principal place of business in New York, New York.  Defendant MLPF&S is a broker and dealer in securities registered with the SEC, and is a wholly-owned subsidiary of Merrill Lynch.

16.     Merrill Lynch Group, Inc. ("Merrill Lynch Group" ) is a Delaware Corporation with its principal place of business in New York, New York.  Merrill Lynch Group is a wholly-owned subsidiary of Merrill Lynch.

17.     Defendant FAM Distributors, Inc., ("FAM Distributors") is a Delaware Corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  FAM  Distributors is an indirect wholly-owned subsidiary of Defendant Merrill Lynch, and a wholly-owned subsidiary of Merrill Lynch Group.  FAM Distributors serves as the distributor for the Merrill Lynch Funds.  FAM Distributors previously did business as Princeton Funds Distributor, Inc. and as Merrill Lynch Funds Distributor, Inc.

18.     Defendant Merrill Lynch Investment Managers, L.P. ("ML Investment Managers") is a limited partnership formed under Delaware law with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Defendant ML Investment Managers is an investment adviser, registered with the SEC pursuant to the Investment Advisers Act of 1940.  Defendant Merrill Lynch is the sole limited partner in ML Investment Managers.  ML Investment Managers previously did business as Merrill Lynch Asset Management, L.P.

19.     Defendant Fund Asset Management, L.P. ("Fund Asset Management") is a limited partnership formed under the law of Delaware with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Defendant Fund Asset Management is an investment adviser registered with the SEC under the Investment Advisers Act of 1940.  Defendant Merrill Lynch is the sole limited partner in Fund Asset Management.

20.     Defendant Princeton Services, Inc. ("Princeton Services") is a Delaware Corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Defendant Princeton Services is an indirect wholly-owned subsidiary of Merrill Lynch and a wholly-owned subsidiary of Merrill Lynch Group.  Princeton Services serves as the general partner for defendants ML Investment Managers and Fund Asset Management.  Princeton Services previously did business as ML Investment Management, Inc.

## FACTUAL BACKGROUND

### Regulatory Background for Multiple Class Funds

21.     In technical terms, mutual funds are a type of management investment company; their shares are subject to registration under the Securities Act and the Investment Company Act of 1940 (the "Investment Company Act"), 15 U.S.C. §§ 80a -1, *et seq.*

22.     Under Section 5(a) of the Investment Company Act, management investment companies are divided into two types: open-end and closed-end; an open-end investment company is one which issues shares that are redeemable, as mutual funds do.  15 U.S.C. § 80a-5(a)(1).  A closed-end investment company, in contrast, does not issue redeemable shares.

23.     The Investment Company Act initially banned the use of fund assets to pay distribution expenses, and distribution costs were typically paid through the imposition of a front-end load.  In the late 1970s, however, the mutual fund industry asked the SEC to allow advisers to use fund assets to pay distribution expenses; the rationale behind the proposal was that net cash outflows experienced by the industry were resulting in steadily higher expenses for the remaining investors in funds.   (L. Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses, and Returns* at 6 (Working Paper April 26, 2004)(available at http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf)).

24.     In 1980, the SEC promulgated Rule 12b-1 under the Investment Company Act, 17 C.F.R. § 270.12b-1, which authorized open-end management investment companies to pay distribution expenses out of their assets under certain circumstances.  One requirement under Rule 12b-1 is that the independent directors of the fund decide, in their reasonable business judgment, that there is a reasonable likelihood that the imposition of 12b-1 fees will benefit the fund and its shareholders.  17 C.F.R. § 270.12b-1(e).  The authorization of Rule 12b-1 fees ultimately resulted in the development of multiple class funds.

25.     Shortly after Rule 12b-1 became effective, the SEC began processing exemptive orders that authorized mutual funds to employ CDSLs, the type of back-end load employed by Merrill Lynch and many other fund companies in Class B Shares.  A 1992 report from the SEC's

Division of Investment Management explained the relationship between CDSLs and Rule 12b-1

fees as follows:

> CDSLs are "contingent" since they are paid only on redemptions that occur within
> a specified period after purchase and may be expressed as a percentage of the
> original price, or more typically, the redemption proceeds.  Almost since rule 12b-
> 1's inception, CDSLs have been used in combination with plans of distribution
> under the rule (a "spread load") as an alternative to high front -end sales loads.
> For example, instead of a fund charging a 6% front-end load, it could recoup
> roughly the same amount through a combination of an annual 1% rule 12b-1 fee
> and a CDSL of 6% that declined 1% per year until it reached zero at the end of the
> sixth year.  CDSLs protect underwriters from early redemptions as the high initial
> outlays in commissions to a sales force are recouped over time through the rule
> 12b-1 fees.  To some degree, spread loads have replaced high front-end loads, but
> they have also been criticized as "hidden loads" because they permit funds to
> impose high sales costs without the visibility of front-end loads.

(*Protecting Investors: A Half Century of Investment Company Regulation* at 294 (May

1992)(footnotes omitted)).

     26.    In 1988, the SEC issued a proposed rule that would codify the standards for

CDSLs developed through exemptive orders.  The release for the proposed rule described the

background to CDSLs as follows:

> Mutual funds engaged (sic) in a continuous public offering of redeemable
> securities.   Until fairly recently, most of the sales and promotional expenses
> associated with this offering were passed on to fund investors in the form of a
> sales charge or "sales load" paid by the investor at the time fund shares were
> purchased and expressed as a percentage of the public offering price of the shares.
> Funds that sold their shares to the public without a sales load formerly represented
> only a small portion of the industry. However, the number and asset size of so-
> called "no -load" funds incre ased dramatically in the 1970's.  This increased
> competition from no-load funds and a perceived resistance among mutual fund
> investors to products that charge front-end sales loads have prompted load funds
> to develop alternative methods of distribution financing, such as the imposition of
> sales loads payable other than at the time of purchase.

(*Exemptions for Certain Registered Open-End Management Investment Companies to Impose*

*Deferred Sales Loads,* Investment Company Act Release No. 16619, 53 Fed. Reg. 45275, 45276-

77 (Nov. 9, 1988)(footnotes omitted)).  The proposed rule, Rule 6c-10, was formally

promulgated in 1995.  17 C.F.R. § 270.6c-10.

27.     In 1993, the SEC issued a proposed rule that would codify the standards for

multiple class funds developed through exemptive orders.  The release described the background

for the proposed rule as follows:

> Investment company sponsors seeking to implement multiple class arrangements
> have asserted that the arrangements offer a number of benefits.  Multiple classes
> avoid the duplicative portfolio and fund management costs that are required by
> "clone funds" and thus may be a less expensive alternative to the creation of these
> funds. Moreover, multiple classes may enable funds to attract larger asset bases,
> which, in turn, may permit them to spread fixed costs over more shares, qualify
> for discounts in advisory fees known as "breakpoints," and otherwise experience
> economies of scale, all of which may lower per share fees and expenses. Funds
> also have maintained that a larger asset base permits greater portfolio liquidity
> and diversification.

(*Exemption for Open-End Management Investment Companies Issuing Multiple Classes of*

*Shares; Disclosure by Multiple Classes and Master-Feeder Funds*, Investment Company Act

Release No. 19955, 58 Fed. Reg. 68074, 68077 (Dec. 23, 1993)(footnotes omitted)).  The

proposed rule, Rule 18f-3, was formally promulgated in 1995.  17 C.F.R. § 270.18f-3.

**Structure of the Merrill Lynch Funds**

28.     Each of the Merrill Lynch Funds is an open-end management investment company registered with the SEC, and each has filed a Registration Statement for its shares on Form N-1A under the Securities Act and the Investment Company Act.  Each Registration Statement is comprised of three parts: the Prospectus (which is furnished to investors); the Statement of Additional Information (which investors receive if they request it); and other information (which is generally not furnished to investors).  Each of the Merrill Lynch Funds periodically files a post-effective amendment to its Registration Statement with the SEC, thereby registering additional shares and updating the Prospectus and Statement of Additional Information.  These periodic amendments are typically filed annually, following the conclusion of the audits of the financial statements of the Merrill Lynch Funds.  The Merrill Lynch Funds have staggered fiscal years so that they periodically amend their Registration Statements at different points in the calendar year.

29.     Under Section 5(a)(1) of the Investment Company Act, 15 U.S.C. § 80a-5(a)(1), an open-ended investment company is one which issues shares that are redeemable.  Shares issued by the Merrill Lynch Funds are redeemable at their net asset value, subject to any applicable CDSL.

30.     Each Merrill Lynch Fund is organized either as a single entity with a board of directors overseeing the fund, or under a so-called master-feeder structure in which the particular Merrill Lynch Fund has an associated trust, and invests all of its assets into that trust, which in turn invests those assets in accordance with the fund's investment objectives.

**Managerial Arrangements**

31.     Each of the Merrill Lynch Funds is managed by Fund Asset Management or ML Investment Managers, which are compensated for their services through management fees (and in some cases administrative fees) that are calculated based upon a percentage of assets under management.

32.     Historically, Fund Asset Management and ML Investment  Managers operated under advisory contracts that obligated them to handle the investments of the funds which they managed and to provide a variety of managerial and administrative services as well, in return for the asset-based management fee (the 'Management Agreements').  The Management Agreements were highly standardized, with the principal variation being the amount of the fee. The Management Agreements required the relevant investment adviser (i) to 'perform (or arrange for the performance by affiliates of ) the management and administrative services necessary for the operation of the Fund," such as administering shareholder accounts; and (ii) to 'provide the Fund with office space, facilities, equipment and necessary personnel and such other services" considered necessary or useful.  Further, these agreements also granted the adviser with the authority to act on behalf of the particular fund and 'conduct relations with custodians, depositories, transfer agents, dividend disbursing agents, other shareholder servicing agents, accountants, attorneys, underwriters, brokers and dealers, corporate fiduciaries, insurers, banks, and such other persons in any such other capacity deemed to be necessary or desirable." (*See, e.g.,* Merrill Lynch Eurofund, Form N-1A, Amendment No. 14,  Ex. 99.5(a)(Feb. 27, 1996); Merrill Lynch Dragon Fund, Form N-1A, Amendment No. 6,  Ex. 99.5(a)(April 27, 1995); Merrill Lynch Global Allocation Fund, Amendment No. 12, Ex. 99.5(a) (Feb. 27, 1996); Merrill Lynch Global Growth Fund, Amendment No. 1, (Sept. 10, 1997)).

33.     Funds that operate under a master-feeder structure have two agreements: a Management Agreement pursuant to which the manager handles the investment of moneys in the associated trust in return for a management fee calculated on the basis of a percentage of the assets in the trust associated with the fund; and an administration agreement pursuant to which it provides administrative services for an annual fee calculated on the basis of a percentage of the fund's assets.  (*See, e.g.,* Merrill Lynch U.S. High Yield Fund, Form N-1A, Amendment No. 7 (July 11, 2001)("The  Trust has agreed to pay the Manager an investment management fee at the annual rate of 0.35% of the average daily net assets of the Trust.  The Fund has agreed to pay the Manager an administrative fee at the annual rate of 0.25% of the average daily net assets of the Fund.")).

34.     The form of administration agreement (the "Administration Agreement") used in master-feeder fund structures grants the relevant investment adviser with the same broad administrative powers and duties that the advisers have in single entity fund structures.  Specifically, these agreements called for the relevant investment advisor  (i) to "perform (or arrange for the performance by affiliates of ) the management and administrative services necessary for the operation of the Fund," such as administering shareholder accounts; and (ii) to "provide the Fund with office space, facilities, equipment and necessary personnel and such other services" as the adviser (subject to the review of the particular fund's directors) considered necessary or useful.  Further, these agreements also granted the adviser with the authority to act on behalf of the particular fund and "conduct relations with custodians, depositories, transfer agents, dividend disbursing agents, other shareholder servicing agents, accountants, attorneys, underwriters, brokers and dealers, corporate fiduciaries, insurers, banks, and such other persons in any such other capacity deemed to be necessary or desirable."  (*See, e.g.,* Merrill Lynch Focus

Twenty Fund, Form N-1A, Amendment No. 3, Ex. 8(c) (March 20, 2001)).   The Administration

Agreements were highly standardized; as a consequence, it was not uncommon for one of the

Merrill Lynch Funds to incorporate into a Registration Statement by reference an agreement filed

as an exhibit to another fund's Registration Statement.  (*See, e.g.,* Merrill Lynch U.S. High Yield

Fund, Form N-1A, Amendment No. 7, Ex. 8(a) (July 11, 2001)(incorporating by reference form

of administration agreeement from Merrill Lynch Focus Twenty Fund, Form N-1A, Amendment

No. 3, Ex. 8(c) (March 20, 2001)).

35.    By reason of these Management Agreements and Administration Agreements,

defendants ML Investment Advisers and Fund Asset Management exercise control over the day-

to-day operation of the Merrill Lynch Funds.

**Directors and Officers of the Merrill Lynch Funds**

36.    Each of the Merrill Lynch Funds has a Board of Directors, which consists of one

director who is an interested person under the Investment Company Act and who is an officer of

Fund Asset Management, ML Investment Managers and Princeton Services.  Since 1999, the

interested director for each of the Merrill Lynch Funds has been Terry K. Glenn, who, according

to an amendment to the Registration Statement for the Merrill Lynch U.S. High Yield Fund filed

on July 28, 2003, had held the following positions:

- President and Chairman of the funds advised by ML Investment Managers and Fund
  Asset Management since 1999;

- Chairman (Americas Region) of Merrill Lynch Investment Managers from 2000-
  2002;

- Executive Vice President of Merrill Lynch Investment Managers and Fund  Asset
  Managers from 1983 to 2002;

- President of FAM Distributors from 1986 to 2002 and Director of FAM Distributors from 1991 to 2002;

- Executive Vice President and Director of Princeton Services from 1988 to 2002;

- President of Princeton Administrators, L.P. from 1988 to 2002;

- Director of Financial Data Services, Inc. from 1985 to 2000.

37.     The Board of Directors for the Merrill Lynch Funds also include directors who are classified by defendants as "non-interested." Many of the Merrill Lynch Funds shares common board members, and the "non-interested" directors earn substantial sums from their service on the boards of the Merrill Lynch Funds.  For example, according to an amendment to the Registration Statement for the Merrill Lynch Global Allocation Fund filed February 20, 2003, that fund had seven "non-interested" directors, each of whom sat on the boards of 45 registered investment companies managed by ML Investment Managers or Fund Asset Management, and each of whom had received annual aggregate compensation from those posts in the prior calendar year as follows:

- Ronald W. Forbes-$305,400;

- Cynthia A. Montgomery-$266,400;

- Charles C. Reilly-$308,400;

- Kevin A. Ryan-$266,400;

- Roscoe S. Suddarth-$266,400;

- Richard R. West-$275,400;

- Edward D. Zinbarg-$266,400.

37.     All of the officers of all of the Merrill Lynch Funds are also officers of Fund Asset Management, ML Investment Managers, or both.

**Distribution Arrangements for Sale of the Shares**

38.     To sell their Shares to the public, the Merrill Lynch Funds entered into
distribution agreements with defendant FAM Distributors (the "Distribution Agreements").
These Distribution Agreements permitted FAM Distributors to purchase Shares of any Class
issued by the Merrill Lynch Funds at net asset value and to sell the shares to qualified investors
and through financial intermediaries at the public offering price set forth in the Prospectus and
Statement Of Additional Information applicable to each of the Merrill Lynch Funds.  (*See, e.g.,*
Merrill Lynch Americas Income Fund, Form N-1A, Amendment No. 13, Ex. 5 (June 21, 2000)).
The Distribution Agreements between the Merrill Lynch Funds and FAM Distributors authorized
FAM Distributors to enter into sub-agreements with broker-dealers for the sale of Shares of the
Merrill Lynch Funds and "to fix therein the portion of the sales charge that may be allocated to
the financial intermediaries on such terms and conditions as the Distributor deems necessary or
appropriate; provided, however, that the Distributor shall periodically inform the Directors of the
nature and substance of such agreements." (*Id.*).  The Distribution Agreements were highly
standardized;  as a consequence, it was not uncommon for one of the Merrill Lynch Funds to
incorporate into a Registration Statement by reference an agreement filed as an exhibit to another
fund's Registration Statement.  (*See, e.g.,* Merrill Lynch Global Allocation Fund, Form N-1A,
Amendment No. 21 (Feb. 20, 2003)(incorporating by reference form of distribution agreement
from Merrill Lynch Americas Income Fund, Form N-1A, Amendment No. 13, Ex. 5 (June 21,
2000)); Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 29 (July 12,
2001)(incorporating by reference form of distribution agreement from Merrill Lynch Balanced
Capital Fund, Amendment No. 28, Ex. 5 (June 30, 2000)).

39.     Each of the Merrill Lynch Funds has established distribution plans pursuant to Rule 12b-1, 17 C.F.R. § 270.12b-1 (the "Distribution Plans"), authorizing the payment of service and distribution fees out of the assets of the Merrill Lynch Funds for particular Classes of Shares that carry Rule 12b-1 fees; each of the Share Classes that carry Rule 12b-1 fees has a separate Distribution Plan.  For Class B Shares in the Merrill Lynch Funds, the Distribution Plans authorized FAM Distributors to enter into sub-agrements with broker-dealers and provide for the payment to FAM Distributors of a service fee (for account maintenance) and a distribution fee. The Distribution Plans for Class B Shares authorized FAM Distributors to reallocate all or a portion of its service and distribution fees to broker-dealers with whom it has entered into sub-agreements.  (*See, e.g.,* Merrill Lynch Focus Twenty Fund, Form N-1A, Amendment No. 2, Ex. 99.13(a)(Dec. 21, 1999)). The Distribution Plans for Class B Shares authorized the payment of distribution fees on account of "sales commissions to financial consultants for selling Class B shares of the Fund, compensation, sales incentives, and payments to sales and marketing personnel," along with other promotional expenses.  (*Id.*).  The Distribution Plans were highly standardized; as a consequence, it was not uncommon for one of the Merrill Lynch Funds to incorporate into a Registration Statement by reference a Distribution Plan filed as an exhibit to another fund's Registration Statement.  (*See, e.g.,* Merrill Lynch Dragon Fund, Form N-1A, Amendment  No. 14 (April 6, 2001)(incorporating by reference form of Amended and Restated Class B Distribution Plan from Merrill Lynch Americas Income Fund, Form N-1A, Amendment No. 13, Ex. 13 (June 21, 2000)); Merrill Lynch Global Allocation Fund, Form N-1A, Amendment No. 21 (February 20, 2003)(same; Merrill Lynch Equity Income Fund, Form N-1A, Amendment No. 21 (Nov. 12, 2002)(incorporating form of Amended and Restated Class B

Distribution Plan from Merrill Lynch Emerging Markets Debt Fund, Form N-1A, Amendment

No. 13 (June 21, 2000))).

40.      Each of the Merrill Lynch Funds offers its Shares for sale through defendant

MLPF&S in accordance with their Distribution Agreement with FAM Distributors, their

Distribution Plans and sub-agreements entered into between FAM Distributors and MLPF&S.

MLPF&S employs registered representatives, whom it refers to as Financial Advisors ("Merrill

Lynch FAs"), who then market the Shares of the Merrill Lynch Funds to investors.

### Overview of Share Class Structure

41.      Prior to April 14, 2003, each of the Merrill Lynch Funds offered four alternative

Classes of Shares:  Class A Shares, Class B Shares, Class C Shares, and Class D Shares.  After

April 14, 2003, each of the Merrill Lynch Funds offered five Classes of Shares:  Class A Shares

(formerly known as Class D Shares), Class B Shares, Class C Shares, Class I Shares (formerly

known as Class A Shares) and Class R Shares.  For clarity, Plaintiff will continue to refer to the

various share classes by their historical names; Class R Shares were restricted to retirement plans

and are not relevant to this action.  Each of the Merrill Lynch Funds provided for automatic

reinvestment of dividends, although investors had the option to receive their dividends in cash.

Absent an election to receive dividends in cash, each investor would then receive dividends

periodically in the form of new Shares of the particular Class which he had purchased.

42.      At all times relevant to this action, the Registration Statements and Prospectuses

pursuant to which the Merrill Lynch Funds were offered to the public presented the relevant load

and expense data for the Classes of Shares offered by the Merrill Lynch Funds in a uniform

manner, subject only to variations in the front-end load and Rule 12b-1 distribution fees between

funds invested in equities and funds invested in fixed income instruments, and variations in the total annual expenses applicable to each of the Merrill Lynch Funds.

**Front-End Loads**

43.     Class A Shares and Class D Shares both carried front-end loads.  These charges applied to the initial investment, but not to reinvested dividends.  The maximum front-end load on Merrill Lynch Funds that invested in equities was 5.25%, while the maximum front-end load for Merrill Lynch Funds which invested in fixed income instruments was 4%.[3]  Class A Shares had restricted availability, while Class D Shares were generally available.

44.     Throughout the Proposed Class Period, the front-end load on Class A and Class D Shares was subject to breakpoints.  The Merrill Lynch Funds used identical breakpoint schedules, with one set of breakpoints that applied to funds that invest in equities, and another that applied to funds that invest in fixed income instruments.

45.     Throughout the Proposed Class Period, the standardized breakpoint schedule for Class A and Class D Shares in Merrill Lynch Funds that invested in equities was as follows:

| YOUR INVESTMENT | AS A % OF OFFERING PRICE | AS A % OF YOUR INVESTMENT | DEALER COMPENSATION AS A % OF OFFERING PRICE |
|---|---|---|---|
| Less than $25,000 | 5.25% | 5.54% | 5.00% |
| $25,000 but less than $50,000 | 4.75% | 4.99% | 4.50% |

---

[3]     Certain of the funds sponsored by Merrill Lynch that invest in fixed income instruments with shorter durations, including the Merrill Lynch Bond Fund Intermediate Portfolio and the Merrill Lynch Municipal Intermediate Term Fund, carry a lower front end load of 1.0% on Class A and Class D Shares; these funds also carry a back end load of 1.0% on Class B Shares, and these funds are not the subject of this action.  *See* note 1 *supra.*

| | | | |
|---|---|---|---|
| $50,000 but less than $100,00 | 4.00% | 4.17% | 3.75% |
| $100,000 but less than $250,000 | 3.00% | 3.09% | 2.75% |
| $250,000 but less than $1,000,000 | 2.00% | 2.04% | 1.80% |
| $1,000,000 and over | 0.00% | 0.00% | 0.00% |

(*See, e.g.,* Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 32 (July 18, 2003)).

46.    Investors with existing holdings in Merrill Lynch Funds would also qualify for breakpoints under a right of accumulation, which permits the investor to pay the sales charge that would apply to the cost or value (whichever is higher) of all Shares the investor owns in Merrill Lynch Funds.  Investors could also qualify for the same breakpoints by executing a letter of intent, in which they agreed to buy a certain number of Shares over a specific time period.

47.    Each of the Registration Statements and Prospectuses pursuant to which the Merrill Lynch Funds that invest in equities offered their shares to the public during the Proposed Class Period contained the standardized breakpoint schedule.

48.    Throughout Proposed Class Period, the standardized breakpoint schedule for Class A and Class D shares in the Merrill Lynch Funds that invested in fixed income instruments was as follows:

| YOUR INVESTMENT | AS A % OF OFFERING | AS A % OF YOUR | DEALER COMPENSATION AS A % OF OFFERING PRICE |
|---|---|---|---|

| | **PRICE** | **INVESTMENT** | |
|---|---|---|---|
| Less than $25,000 | 4.00% | 4.17% | 3.75% |
| $25,000 but less than $50,000 | 3.75% | 3.90% | 3.50% |
| $50,000 but less than $100,00 | 3.25% | 3.36% | 3.00% |
| $100,000 but less than $250,000 | 2.50% | 2.56% | 2.25% |
| $250,000 but less than $1,000,000 | 1.50% | 1.52% | 1.25% |
| $1,000,000 and over | 0.00% | 0.00% | 0.00% |

(*See, e.g.,* Merrill Lynch U.S. High Yield Fund, Form N-1A, Amendment No. 7 (July 11, 2001)).

49.     All of the Registration Statements and Prospectuses pursuant to which the Merrill Lynch Funds that invested in fixed income instruments offered their Shares to the public during the Proposed Class Period contained the foregoing breakpoint schedule.[4]

50.     Investors who purchased Shares in the Merrill Lynch Funds that invest in fixed income instruments could also qualify for breakpoints based upon their existing holdings under a right of accumulation, which permits the investor to pay the sales charge that would apply to the cost or value (whichever is higher) of all Shares the investor owns in Merrill Lynch Funds. Investors could also qualify for the same breakpoints by executing a letter of intent, in which they agreed to buy a certain number of Shares over a specific time period.

**Dealer Compensation from Front-End Load Shares**

---

[4]     The foregoing breakpoint schedule did not apply to certain funds sponsored by Merrill Lynch that invested in fixed income instruments of limited duration, which have a lower front end load with different breakpoints; these funds also carried a back end load of 1.0% on Class B Shares, and are not the subject of this action.     *See* note 1, *supra.*

51.     Dealer compensation from front-end load Shares in the Merrill Lynch Funds is highly transparent.  As the breakpoint schedules show, the percentage of revenue that MLPF&S received from sales of Class A and Class D Shares decreased as customers qualify for breakpoints; the percentage of each sale that Merrill Lynch FAs receive as a commission also decreased as the size of the investment increases.

52.     Dealer compensation at the time of sale of Merrill Lynch Funds that invest in equity  securities was 5% for purchases of less than $25,000; 4.5% for purchases of more than $25,000 but less than $50,000; 3.75% for purchases of more $50,000 but less than $100,000; 2.75% for purchases of more than $100,000 but less than $250,000; and 1.8% for purchases of more $250,000 but less than $1 million.[5]

53.     Dealer compensation at the time of sale of Merrill Lynch Funds that invest in fixed income investments was 3.75% for purchases of less than $25,000; 3.5% for purchases of more than $25,000 but less than $50,000; 3.0% for purchases of more $50,000 but less than $100,000; 2.25% for purchases of more than $100,000 but less than $250,000; and 1.25% for purchases of more $250,000 but less than $1 million.[6]

### CDSLs

54.     Class B Shares and Class C Shares in Merrill Lynch Funds carried a type of back-end load known as a CDSL, and which defendants referred to as a contingent deferred sales charge.  The CDSL on Class B shares did not vary with the size of the investment, and it is the same for all of the Merrill Lynch Funds.  The standard CDSLs for Class B Shares in the Merrill

---

[5]     For purchases of $1,000,000 or more, the broker is compensated directly by the fund manager, however, if the shares are redeemed within one year after purchase, a deferred sales charge may be assessed to the customer of up to 1%.

[6]     For purchases of $1,000,000 or more, the broker is compensated directly by the fund manager, however, if the shares are redeemed within one year after purchase, a deferred sales charge may be assessed to the customer of up to 1%.

Lynch Funds is 4%.[7]  CDSLs did not apply to shares acquired through reinvested dividends. While the back-end load on Class B Shares did not decrease with the size of the investment, it did decrease over time.

55.      Prior to June 1, 2001, the CDSL on Class B Shares in the vast majority Merrill Lynch Funds that invested in equities was eliminated if the Shares were redeemed more than four years after they were purchased; a small minority of Merrill Lynch Funds that invested in equities, including Merrill Lynch International Fund, Merrill Lynch International Value, Merrill Lynch Pan-European Fund, and Merrill Lynch Small Cap Growth had a back end load that was eliminated after six years.  Beginning after June 1, 2001, the duration of the back-end load was extended for the rest of the Merrill Lynch Funds, and the back-end load on Class B Shares in all Merrill Lynch Funds that invest in equities was eliminated if they were redeemed more than six years after they were purchased.

56.      The  Merrill Lynch Funds that invest in fixed income instruments utilized the same back-end load structure as the Merrill Lynch Funds that invest in equities, with the CDSL on Class B Shares ending after four years from purchase for Shares purchased prior to June 1, 2001 and after six years for Shares purchased after that date.  For the vast majority of Class B Shares purchased prior to June 1, 2001, the reduction in back-end load on Class B Shares was governed by the following standardized schedule:

---

[7]      Certain funds sponsored by Merrill Lynch that invest in fixed income instruments with shorter durations, including the Merrill Lynch Bond Fund Intermediate Portfolio and the Merrill Lynch Municipal Intermediate Term Fund, carried a lower CDSL of 1.0% on Class B shares that ended after the expiration of the three years from the date the Class B Shares are purchased. These funds are not the subject of this action.      *See* note 1, *supra*.

| YEARS SINCE PURCHASE | SALES CHARGE |
|---|---|
| 0-1 | 4% |
| 1-2 | 3% |
| 2-3 | 2% |
| 3-4 | 1% |
| 4 and thereafter | 0% |

(*See, e.g.,* Merrill Lynch Balanced Capital Fund, Form N-1A, Amendment No. 26 (June 26, 2000)).

57.     Prior to June 1, 2001, the vast majority of the Registration Statements and Prospectuses pursuant to which the Merrill Lynch Funds offered their shares to the public contained the foregoing schedule for the CDSL, with the exception of certain equity funds with a longer duration for the back-end load.

58.     Commencing in  June 2001, the Merrill Lynch Funds began to adopt the following standarized schedule to govern the CDSL on Class B Shares:

| YEARS SINCE PURCHASE | SALES CHARGE |
|---|---|
| 0-1 | 4% |
| 1-2 | 4% |
| 2-3 | 3% |
| 3-4 | 3% |
| 4–5 | 2% |

| | |
|---|---|
| 5–6 | 1% |
| 6 and thereafter | 0% |

(*See, e.g.,* Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 7 (Dec. 11, 2001)).

59.     Commencing on or about June 1, 2001, the Registration Statements and Prospectuses pursuant to which the Merrill Lynch Funds offered their Shares to the public were amended to adopt the foregoing standardized back-end load schedule.

60.     Class B Shares in the Merrill Lynch Funds convert into Class D Shares after they are held for a period of time, typically eight years for funds that invest in equities and ten years for funds that invest in fixed income investments.  (*See, e.g.,* Merrill Lynch Dragon Fund, Form N-1A, Amendment No. 14 (April 6, 2001)('Class B shares of  a fixed income  fund typically convert approximately ten years after purchase compared to approximately eight years for equity funds.')).

61.     At all times relevant to this action, Class C Shares in all of the Merrill Lynch Funds carried a CDSL of 1% which applied if the Shares were redeemed within one year after they were purchased.  Class C Shares are not convertible.

**Dealer Compensation from Class B Shares**

62.     Dealer compensation from Class B Shares is less transparent that the compensation from front-end load Shares.  Funds are advanced to pay brokerage commissions, which are then recouped through CDSLs (if the Shares are redeemed within the requisite number of years) and Rule 12b-1 distribution fees. This was described in the Statements of Additional Information contained in the Registration Statements for the Merrill Lynch Funds substantially as follows:

Merrill Lynch compensates its Financial Advisors for selling Class B and Class C shares at the time of purchase from its own funds. Proceeds from the CDSC and the distribution fee are paid to the Distributor and are used by the Distributor to defray the expenses of securities dealers or other financial intermediaries (including Merrill Lynch) related to providing distribution-related services to each Fund in connection with the sale of the Class B and Class C shares. The combination of the CDSC and the ongoing distribution fee facilitates the ability of each Fund to sell the Class B and Class C shares without a sales charge being deducted at the time of purchase. See "Distribu tion Plans" below. Imposition of the CDSC and the distribution fee on Class B and Class C shares is limited by the NASD asset-based sales charge rule. See "Limitations on the Payment of Deferred Sales Charges" below.

(Merrill Lynch Global Technology Fund, Form N-1A, Amendment No. 8 (July 25, 2003); *see also* Merrill Lynch Dragon Fund, Form N-1A, Amendment No. 10 (February 26, 1999)(stating substantial equivalent while referring to registered representatives as "financial consultants" rather than "financial advisors")).

63.     According to a former Merrill Lynch assistant branch manager and registered representative, the percentage of revenue that MLPF&S receives from the sale of Class B Shares does not decrease with larger investments, and the percentage of compensation that Merrill Lynch FAs receive from sales of Class B Shares does not change.  Merrill Lynch FAs receive a flat percentage in gross sales credit on the sale of Class B Shares that corresponds to the amount they would receive for a sale of Class A or Class D Shares at the maximum load.  As a consequence, Merrill Lynch FAs can receive more in commissions through a sale of a large block of Class B Shares than they could receive from the sale of the same amount of Class A or Class D Shares, thereby creating a conflict of interest.

### Management Fees, Rule 12b-1 Fees, and Other Expenses

64.     In addition to the sales loads, the returns that investors receive from the various Share Classes of the Merrill Lynch Funds are affected by the annual expenses associated with

ownership of a particular Class.  These expenses, which are deducted from the assets owned by each of the Merrill Lynch Funds, fall into three categories:

      a.    management fees (and, where applicable, administrative fees) payable to each fund's investment adviser;

      b.    Rule 12b-1 distribution and/or service fees; and

      c.    other expenses.

65.    All Share Classes pay identical management and administrative fees.

66.    The front-end load Shares (Class A and Class D) have materially lower annual expenses than the back-end load Shares (Class B and Class C).

67.    In all of the Merrill Lynch Funds, Class A Shares were not subject to Rule 12b-1 distribution and service fees, and carried the lowest level of other expenses.

68.    In all of the Merrill Lynch Funds, Class D Shares were subject to an annual Rule 12b-1 service fee; specifically, they were subject to a 0.25% account maintenance fee.  Class D Shares were not subject to Rule 12b-1 distribution fees.  Class D Shares frequently carried a slightly higher level of other expenses than Class A Shares.  They carry lower other expenses than either Class B Shares or Class C Shares.  Class D Shares purchased through dividend reinvestment are not subject to a sales load but still carry the lower expenses associated with Class D Shares.

69.    In the Merrill Lynch Funds that invest in equities, Class B Shares were subject to annual Rule 12b-1 distribution and service fees; they were subject to a 0.75% distribution fee, and a 0.25% account maintenance fee.  Class B Shares generally also carried a slightly higher level of other expenses than Class A Shares or Class D Shares.  Class B Shares purchased

through dividend reinvestment were not subject to the CDSL, but were subject to the higher expenses of Class B Shares, including higher Rule 12b-1 fees.

70.     In the Merrill Lynch Funds that invest in equities, Class C Shares were subject to annual Rule 12b-1 distribution and service fees.  Class C Shares paid an account maintenance fee of 0.25%, and generally carried a distribution fee of 0.75%.  These Class C Shares carried a slightly higher level of other expenses than Class B Shares, typically one or two basis points (0.01%-0.02%).  Class C Shares purchased through dividend reinvestment were not subject to the CDSL, but were subject to the higher expenses of Class C Shares, including higher Rule 12b-1 fees.

71.     In the Merrill Lynch Funds that invest in fixed income instruments, Class B Shares were subject to annual Rule 12b-1 distribution and service fees.  Class B Shares paid an account maintenance fee of 0.25% and carried a distribution fee of 0.50%.  Class B Shares purchased through dividend reinvestment were not subject to the CDSL, but were subject to the higher expenses of Class B Shares, including higher Rule 12b-1 fees.

72.     In the Merrill Lynch Funds that invest in fixed income instruments, Class C Shares are subject to annual Rule 12b-1 distribution and service fees.  Class C Shares paid an account maintenance fee of 0.25% and carried a distribution fee of 0.55%.  Class C Shares purchased through dividend reinvestment were not subject to the CDSL, but were subject to the higher expenses of Class C Shares, including higher Rule 12b-1 fees.

73.     The overall effect of the different expense ratios applied to the different Classes of Shares issued by the Merrill Lynch Funds is as follows:

a.      Class A Shares always carry the lowest expense ratio, and their annual expenses are generally at least 25 basis points (0.25%) lower than Class D Shares and at least 75 basis points (0.75%) lower than either Class B Shares or Class C Shares;

b.      Class B Shares generally have the second highest annual expense ratio; they generally carry an expense ratio that is 1 to 5 basis points (0.01%-0.05%) lower than Class C Shares.  In Merrill Lynch Funds that invest in equities, Class B Shares carry an expense ratio that is at least 1% higher than Class A Shares and at least 75 basis points (0.75%) higher than Class D Shares, and in Merrill Lynch Funds that invest in fixed income instruments, Class B Shares carry an expense ratio that is at least 75 basis points (0.75%) higher than Class A shares and at least 50 basis points (0.50%) higher than Class D Shares;

c.      Class C Shares generally carry the highest annual expense ratio, however, the difference in total annual expenses between Class C Shares and Class B Shares is modest, generally between 1 and 5 basis points (0.01%-0.05%);

d.      Class D Shares carry the second lowest annual expense ratio; they are always subject to at least 75 basis points (0.75%) less in annual expenses than Class B Shares (for funds that invest in equities), at least 50 basis points (0.50%) less in annual expenses than Class B Shares (for funds that invest in fixed income instruments), and they always have annual expenses of approximately 25 basis points (0.25%) more than Class A Shares.

**Implications of Load and Expense Data for Various Share Classes**

74.      The differences in the expenses associated with the different Share Classes will significantly affect the earnings that the investor obtains from the particular fund in which he invests.  As the General Accounting Office has noted:

The annual fees that investors pay can significantly affect investment returns over the long term.  For example, over a 20-year period a $10,000 investment in a fund

earning 8 percent annually and with a 1-percent expense ratio, would be worth $38,122; but with a 2-percent expense ratio it would be worth $31,117.

(*Mutual Fund Fees--Additional Disclosure Could Encourage Price Competition*, GAO/GGD-00-126 at 28 (June 2000)(hereinafter "June 2000 GAO Report")) .

75.     For the Merrill Lynch Funds, the differences in their load and expense structures have direct implications for the returns an investor receives.  For an investment in any amount, the interrelationship of the load and expense structure is as follows:

- Class A Shares will always outperform Class D Shares, because they have identical load structures, but Class A Shares carry lower expenses, as they do not have the Rule 12b-1 service fee of 0.25% per annum carried by Class D Shares;

- Over short holding periods, Class C Shares will outperform Class B Shares because they have a lower CDSL of shorter duration, while carrying only marginally higher expenses;

- Over long holding periods, Class A Shares and Class D Shares will outperform Class B Shares and Class C Shares because they have lower expenses.

76.     Breakpoints that reduce the front-end load on Class A Shares and Class D Shares will shorten the time period for which Class A Shares must be held before they outperform Class B Shares and Class C Shares; as the amount invested and the discount on the front-end load increases, the period that front-end load Shares must be held before they outperform back-end load Shares decreases.  Because of this, for larger investments that would qualify for the discount on front-end load Shares applicable to an investment of $100,000 or more, Class B Shares do not make economic sense, as they are outperformed over longer holding periods by Class D Shares and over shorter periods by Class C Shares.

**Investor Perception of Load and Expense Data**

77.     While the financial returns from mutual funds are directly affected by both loads and annual expenses, regulators, industry officials and academicians have all recognized that there are differences in how investors perceive loads and annual expenses.

78.     In 2000, the General Accounting Office noted that mutual fund investors did not give significant weight to the level of annual expenses in selecting mutual funds:

> Investors themselves have indicated that other factors take precedence over fees when they evaluate mutual funds.  To assess the extent to which investors consider fee information when selecting and evaluating mutual funds, we consulted a wide variety of sources, including academic literature, industry research firms and other industry experts, mutual fund advisers, industry associations, and regulators.  Our review of this information revealed that when evaluating funds, investors generally gave greater consideration to several other factors before considering fund fees.  The primary factor investors used in selecting mutual funds was generally the funds' performance.  Other factors also given greater consideration than fees included the fund manager or company characteristics, the investments made by funds, or fund risk levels.

(June 2000 GAO Report at 72).

79.     In contrast, the GAO noted that mutual fund investors were highly sensitive to front-end loads:

> Although investors do not appear to give primary consideration to the fees funds charge as a percentage of fund assets, they are aware of loads.  Many officials we interviewed attributed load declines to investor awareness.
>
> Various studies have documented the fact that the share of funds charging front-end loads has been declining over time.   For example, one industry research organization reported that the share of front-end load fund sales had gone from 90 percent of sales by third-party sales forces (such as broker-dealers) in 1990 to about 38 percent by 1998.

(*Id.* at 74).  After noting trends towards increased direct sales of no-load funds and towards decreases in the typical percentage charged as a front-end load, the GAO commented on the industry's perceptions of investors' relative sensitivity to front -end loads and annual expenses:

> Investor awareness was the reason industry participants cited for investor resistance to paying loads and the overall decline in loads.  According to some

industry participants, investors had become increasingly resistant to paying higher front-end loads.  **An industry expert told us that investors are generally more concerned about the concept of the front-end load because they "see it occur" when the amount is deducted from their initial investments on their account statements.  Operating expense fees, on the other hand, are deducted from fund assets rather than the individual investor's account**.  Research findings indicate that investors continue to resist load charges.  For example, officials from one industry research organization told us their research found that up to a third of mutual fund investors would never be willing to pay a load or commission when buying a fund.  In another research organization's survey, only 4 percent of over 4,000 investors and potential investors queried cited mutual fund loads as their preferred means of paying for investment advice.

(*Id.* at 75-76 (emphasis supplied)).  The GAO's findings were consistent with both prior and subsequent research.

80.     In 1996, the SEC and the Office of the Comptroller of the Currency (which has regulatory authority over the sale of mutual funds by national banks) reported on the results of a survey that they had jointly conducted into mutual fund investors and their knowledge of the relevant facts about their investments, which was described by the Comptroller in testimony before Congress as follows:

The purpose of the survey was to gain a better understanding of the demographic, financial, and fund ownership characteristics of mutual fund investors, and discover how these characteristics vary by sales channel.  Also, the economists designed the survey to provide data on mutual fund investors'  familiarity with the costs and investment risks associated with mutual funds, and the information sources investors use to learn about costs and investment risks.  Finally, the OCC and SEC economists went beyond questions solely related to mutual funds and attempted to assess the broader financial literacy among investors. . . .

       . . .

In general, the survey results indicated that the level of investor knowledge about expense ratios, loads, and fees could be improved. . . ., only 19 percent of respondents gave an estimate of the expenses for their largest mutual fund, but 43 percent of those who were unable to provide an estimate replied that they knew a fund's expenses at the time of purchase.  In addition, 70 percent were familiar with the term "sales load."  Survey respondents appeared to be less aware of the negative relationship that typically occurs between fund expenses and fund

returns.  Only 16 percent of the survey respondents believed that higher expenses led to lower than average fund returns.

(Testimony of Eugene A. Ludwig before the Subcommittee on Capital Markets, Securities, and Government-Sponsored Enterprises of the Committee On Banking and Financial Services of the U. S. House of Representatives (June 26, 1996)(available at http://www.occ.treas.gov/ftp/release/96-77.txt)).

81.     Subsequent to the joint survey of mutual fund investors conducted by the SEC and the OCC, the SEC instituted a variety of reforms in the manner in which prospectuses for mutual funds addressed annual fund expenses.  Concerns about the effectiveness of mutual fund disclosures of annual expenses continued to persist, however, notwithstanding the changes in prospectus format adopted by the SEC.

82.     After the GAO issued its June 2000 report on mutual fund fees, the Division of Investment Management issued a report on mutual fund fees and expenses, which recommended, among other things, that the SEC consider additional forms of annual expense disclosure and reexamine the structure of Rule 12b-1, which authorizes the payment of certain types of distribution expenses out of fund assets.  (*Division of Investment Management: Report on Mutual Fund Fees and Expenses*  (Dec. 2000)(http://www.sec.gov/news/studies/feestudy.htm)).

83.     A recent academic study posited that investors are more sensitive to front-end loads than they are to the cost of sales charges assessed through Rule 12b-1 fees:

> We analyze the fees charged by mutual funds over the last several decades.  Mutual funds have dramatically changed the way that they charge expenses.  The proportion of diversified U.S. equity mutual fund assets invested in front-end load funds has dropped from 91 percent in 1962 to 35 percent in 1999 (see Figure 1).  In contrast, asset weighted operating expenses for these funds increased by more than 60 percent—from 54 basis points in 1962 to 90 basis points in 1999 (see Figure 2), despite the great increase in total assets under management.  In addition to documenting these facts, which are interesting on their own, we argue that the most plausible explanation for this change over time

is investor learning.  Investors have learned by experience to avoid mutual fund expenses.  However, they have learned more quickly about front-end load fees, which are large salient one-time fees, than operating expenses, which are smaller ongoing fees that are easily masked by the volatility of equity returns.

(B. Barber, T. Odean & L. Zheng, *Out of Sight, Out of Mind: The Effects of Expenses on Mutual Fund Flows,* at 1 (December 2003)(Working Paper)(copy available through http://papers.ssrn.com/sol3/papers.cfm?abstract_id=496315)).

84.     Academic studies in the field of marketing have concluded that minor deductions from paychecks or incremental increases in existing expenditures face the least consumer resistance:

The principle of cancellation states that losses will be integrated with larger gains where plausible.  The best example of this is withholding from paychecks.  In the present frame-work, the least aversive type of loss is the reduction of a large gain.  This concept seems to have been widely applied by governments.  Income taxes would be perceived as much more aversive (in addition to being harder to collect) if the whole tax bill were due in April.  The implication for sellers is that every effort should be made to set up a payroll withdrawal option.  Probably the best way to market dental insurance, for example, would be to sell it as an option to group health insurance through employers.  If the employee already pays for some share of the health insurance then the extra premium would be framed as an increase in an existing deduction; this is the ultimate arrangement for a seller.

(Richard Thaler, *Mental Accounting and Consumer Choice,* 4 Marketing Science 199, 209 (1985)).

85.     Recent academic research has concluded that this marketing principle is particularly applicable to how investors treat front-end loads and fund expenses.  After examining data that suggested that mutual fund investors are far more averse to front-end loads than to higher expenses, the author concluded:

Investors appear to make substantial cognitive errors when evaluating a fund's fee structure.  Disclosure requirements that allow greater transparency into the cost of owning the shares of a mutual fund would likely lead to better investment decisions.  Seemingly small differences in fees can lead to very

> substantial differences in total asset value over time horizons of 2 or 3 decades. Given that mutual funds are popular investment instruments for retirement savings accounts, these long horizon effects are important. This problem becomes particularly acute under the often discussed scenario of a partially privatized Social Security system in which individuals would exercise a greater degree of control over their retirement accounts and ultimately their returns. If the U.S. Social Security system moves in this direction, it would be beneficial to direct resources into developing fee information disclosure formats that make the true long-term cost of mutual fund ownership accessible and vivid to investors.

(Ronald T. Wilcox, *Bargain Hunting or Star Gazing? Investors' Preferences for Stock Mutual Funds,* 76 Journal of Business 645, 658 (2003)). The author specifically noted that highly educated individuals who were generally knowledgeable about financial matters were particularly prone to overemphasize front-end loads and pay insufficient attention to fund expenses such as Rule 12b-1 fees:

> Finally, the research indicates that the people who are particularly vulnerable to making poor decisions are not those one would intuitively expect. Indeed, highly educated consumers and those who demonstrated greater knowledge of basic finance made poorer, not better, decisions than their less financially savvy counterparts.

(*Id.*).

86.    In June 2003, the GAO issued another report on the effectiveness of mutual fund expense disclosures, which commented as follows:

> Changes in the ways that investors pay for mutual fund shares have produced benefits for investors but also raise concerns over their transparency. In 1980, an SEC rule was adopted to allow mutual funds to begin using fund assets to pay the distribution expenses, which included marketing expenses and compensation for the financial professionals who sell fund shares. Although rule 12b-1 was originally envisioned as providing funds a temporary means of increasing fund assets, the fees charged under this rule have instead evolved into an alternative way for investors to pay for the services of broker-dealers and other financial intermediaries from whom they purchase fund shares. Concerns exist over whether funds with 12b-1 fees are more costly to investors and whether current disclosures are sufficiently transparent to allow investors to determine the extent to which their particular broker-dealer representative or other financial professionals they use receive these payments.

(*Mutual Funds: Greater Transparency Needed in Disclosures to Investors,* GAO-03-763 at 4

(June 2003)(hereinafter "June 2003 GAO Report")).

        87.    An  economist in the SEC's Office of Economic Analysis recently issued a

working paper that questioned the use of Rule 12b-1 fees to pay distribution expenses:

> There are several differences between loads and 12b-1 fees that make 12b-1 plans an inappropriate means for investors to pay load fees.  First, there is a significant difference in the level of transparency between loads and 12b-1 fees.  The load charge is clearly stated on the confirmation statement that the investor receives from his broker.  Alternatively, the investor is never explicitly told the amount of 12b-1 fees that he has paid, annually or in the aggregate.  As shown in Barber, Odean and Zheng (2002), investors are significantly less sensitive to operating expenses that are hidden in volatile returns than they are to "salient-in-your-face expenses."  Thus investors may not choose the class that maximizes their expected holding period returns because of their different perceptions of the fees.
>
> Second, 12b-1 plans provide investors with less control over the amount that they ultimately pay for distribution than loads.  Loads are a fixed amount charged at the account level, and each investor pays only for his costs.  On the other hand, 12b-1 fees are charged annually at the fund level, and investors may pay for other investors' costs.  Because 12b-1 fees are charged for as long as the investors stays (sic) in the fund, the aggregate amount that investors pay increases as their holding period increases and typically as their asset levels rise.  . . .
>
> Finally, conflicts of interest between fund advisers and shareholders that do not exist for loads exist under 12b-1 plans.  Almost all share classes charge some 12b-1 fee.  Given the lack of evidence that these fees benefit shareholders in any other way, one has to question whether the level of 12b-1 fees are in the best interest of shareholders.  The opacity of the fees makes it difficult for shareholders to monitor this conflict themselves.

(L. Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of*

*Fund Flows, Expenses, and Returns* at 5-6 (footnotes omitted)).

        88.    The SEC has concluded that investors need improved disclosure about

distribution-related costs and the conflicts of interest that they create, and issued a notice of

proposed rule making relating to amendments to existing rules governing disclosures by broker-

dealers "regarding the costs and conflicts of interest that arise from the distribution of mutual

fund shares." (*Confirmation Requirements and Point of Sale Disclosure Requirements for Transaction in Certain Mutual Funds and Other Securities, and Other Confrmation Requirement Amendments and Amendments to the Registration Form of Mutual Funds,* Investment Company Act Release No. 26341 69 Fed. Reg. 6347, 6348 (Feb. 10, 2004)). In the release, the SEC outlined the problem as follows:

> Mutual fund investors may, directly or indirectly, incur distribution-related costs that can reduce their investment returns. The type and amount of those costs often vary among funds and among share classes issued in the same fund. Some mutual funds issue share classes that impose sales fees, or loads, on investors when they purchase the fund shares ("front-end" sales loads). Mutual funds may also sell share classes with sales loads that investors must pay when they redeem fund shares ("deferred" or "back-end" sales loads). The amount of the deferred sales load, generally calculated as the lesser for a percentage of the initial investment or the account's value upon redemption, typically declines each year that the investor holds the shares, and eventually disappears entirely. Some mutual funds also use their assets to pay distribution-related expenses, including compensation of broker-dealers in connection with distributing fund shares, under plans adopted pursuant to rule 12b-1 under the Investment Company Act ("12b-1 fees"). Sales loads and asset-based sales charges and service fees reduce the returns that investors earn on their mutual fund investments. Not all mutual funds are sold subject to front-end or deferred sales loads or impose asset-based sales charges and service fees.

> .  .  .

> As discussed in detail below, broker-dealers that sell mutual fund shares to customers may participate in distribution arrangements that create conflicts of interest for the broker-dealers as well as their personnel.

(69 Fed. Reg. at 6440-41 (footnotes omitted)). As an example, the SEC specifically cited situations in which individual registered representatives of broker-dealers "may also receive higher commissions when they sell a particular class of shares within a fund than they would if they sold the same dollar amount of another share class within that same fund." (*Id.* at 6441 (footnote omitted)). In a letter dated April 12, 2004, the Securities Industry Association, a trade group for the securities industry to which Merrill Lynch belongs, commented that it concurred

'with the Commission's general goal that investors should have information about differential compensation practices that may affect the incentives of registered representatives." (Letter from George R. Kramer to Jonathan G. Katz (April 12, 2004)).

### Defendants' Financial Interests in the Sale of Class B Shares

89.     Defendants ML Investment Managers and Fund Asset Management are both compensated under advisory arrangements that provide compensation through fees calculated as an annual percentage of each fund's average daily net assets under management.  For example, according to an amendment to the Registration Statement for Merrill Lynch Dragon Fund filed on April 6, 2001, ML Investment Managers was compensated at an annual rate of 1% of average net daily assets under management.  According to an amendment to the Registration Statement for Merrill Lynch U.S. High Yield Fund filed on July 11, 2001, Fund Asset Management was compensated at an annual rate of 0.35% of the average daily net assets in the trust associated with that fund for its advisory services, and received an administrative fee of of 0.25% of the average daily net assets in that fund for the various administrative services provided to the fund.

90.     In some funds, the rate is subject to reduction when assets under management reach a certain level.  For example, according to an amendment to the Registration Statement for the Merrill Lynch Global Allocation Fund filed on February 20, 2003, ML Investment Managers was compensated at an annual rate of  0.75% of average daily assets but had agreed to voluntariily limit its to 0.75% of the first 2.5 billion dollars under management, 0.70% of the amount between 2.5 and  5.0 billion; 0.65% of amount between 5.0 billion and 7.5 billion; 0.625% of the amount between 7.5 billion and 10 billion and 0.60% of the amount exceeding 10 billion dollars.

91.     Mutual fund management expenses are subject to economies of scale; the expenses for paying personnel to manage the fund's investments, for research and for related costs do not increase in direct proportion to the amount of assets under management.   The GAO has specifically found that mutual fund advisers enjoy economies of scale:

> Industry officials we interviewed also generally agreed that mutual fund operations experience economies of scale.  An official at a money management firm whose customers invest in mutual funds to us that mutual fund advisers' operations are subject to large economies of scale, and additional investor inflows result in little additional cost.  Officials of the fund advisers we interviewed also agreed that their operations experienced economies of scale.

(June 2000 GAO Report at 34).

92.     The existence of economies of scale means that an investment adviser's profit margin will increase as funds under management increase.  Because of this factor, and the fact that the management fee is expressed as percentage of the average net daily assets under mangement, defendants ML Investment Managers and Fund Asset Management benefit from having more assets invested in their funds.  Sales of back-end load Shares benefit these defendants because they increase the amount of assets invested in the fund from a particular investment.

93.     For example, if an investor with $150,000 to invest selected front-end load Shares in one of the Merrill Lynch Funds that invests in equity securities, the amount of assets under management would increase by $145,500, as the investment would be subject to a 3.00% front-end load.  The same $150,000 invested in Class B Shares or Class C Shares would increase the assets under management by $150,000 because there is no front end load.  As a result, Fund Asset Management and ML Investment Managers have an economic interest in having Class B and Class C Shares sold in greater volumes than Class A and Class D Shares because the volume of assets under management will increase and their fee revenues and profits will increase.

Merrill Lynch, Merill Lynch Group, and Princeton Services, as their parents, economically

benefit from their enhanced revenues and profitability.

94.    MLPF&S and the Merrill Lynch FAs benefit from the sale of Class B Shares to

investors who would be entitled to a breakpoint on front-end load Shares because, as outlined

above, the commissions on front-end load Shares decrease with larger investments, but the

commission does not decrease for larger investments in Class B and Class C Shares.  Merrill

Lynch, as the parent of MLPF&S, benefits economically from the increased revenue that

MLPF&S derives when a customer who would qualify for breakpoints on front-end load Shares

purchases Class B or Class C Shares.

95.    Most if not all of the Rule 12b-1 fees collected from the Merrill Lynch Funds

under their Distribution Plan for Class B Shares are paid to MLPF&S.  According to an

amendment to the Registration Statement for Merrill Lynch Small Cap Value Fund filed July 21,

2001, for the fiscal year ended ended March 21, 2001, that fund paid FAM Distributors a total of

$5,267,059 in Rule 12b-1 fees under the Class B Distribution Plan, all of which was paid to

MLPF&S.  Other funds exhibited similar experience.  Merrill Lynch Dragon Fund paid a total of

$1,914,566 to FAM Distributors under the Class B Distribution Plan in the fiscal year ended

December 31, 2000, all of which was disbursed to MLPF&S.  (Merrill Lynch Dragon Fund,

Form N-1A, Amendment No. 14 (April 6, 2001); *see also* Merrill Lynch U.S. High Yield Fund,

Form N-1A, Amendment No. 7 (July 11, 2001)(In fiscal year ended March 31, 2001, a total of

$2,986,605 collected by FAM Distributors under Class B Distribution Plan and entire amount

disbursed to MLPF&S); Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 7

(Dec. 11, 2001)(For fiscal year ended August 31, 2001, fund paid FAM Distributor a total of

$15,662,835 in Rule 12b-1 fees under the Class B Distribution Plan, all of which was paid to

MLPF&S); Merrill Lynch Global Allocation Fund, Form N-1A, Amendment No. 18 (Feb. 8, 2001)(In fiscal year ended October 31, 2000, a total of $41,543,514 was disbursed by the fund under the Class B Distribution Plan, all of which was ultimately paid to MLPF&S)).

96.     The sums that MLPF&S has collected by means of Class B Distribution Plans for the Merrill Lynch Funds substantially exceed the amounts which it has paid out to compensate the Merrill Lynch FAs who sell Class B Shares.  For example, according to an amendment to the Registration Statement for the Merrill Lynch Global Growth Fund filed on December 4, 2003, the revenues Merrill Lynch had collected under the Class B Distribution funds from the commencement of the offering of Class B Shares in the fund to August 21, 2003 exceeded its direct cash distribution expenses by $64,208,890.  Other funds show a similar pattern.  (*See* Merrill Lynch Global Allocation Fund, Form N-1A, Amenment No. 21 (Feb. 20, 2003)("As of October 31, 2002, direct cash distribution revenues for the period since the commencement of operations of Class B shares exceeded direct cash distribution expenses by $556,921,853"); Merrill Lynch International Equity Fund, Form N-1A, Amendment No. 17 (Sept. 22, 2003)("As of May 31, 2003, direct cash distribution revenues for the period since the commencement of operations of Class B shares exceeded direct cash distribution expenses by $31,629,203"); Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 32 (July 18, 2003)("As of March 31, 2003, direct cash distribution revenues for the period since the commencement of operations of Class B shares exceeded direct cash distribution expenses by $33,736,713")).

**Defendants' Sales of Class B Shares of the Funds**

97.     The defendants have sold large numbers of Class B Shares to the investing public. According to an amendment to the Registration Statement filed for the Merrill Lynch U.S. High

Yield Fund filed on August 31, 2000, that fund had Shares outstanding as of March 31, 2000 as follows:

| | |
|---|---|
| Class A | 1,382,966 |
| Class B | 57,718,444 |
| Class C | 11,373,921 |
| Class D | 7,553,904. |

98.     According to an amendment to the Registration Statement filed for the Merrill Lynch Global Growth Fund on December 1, 2000, that fund had Shares outstanding as of August 31, 2000 as follows:

| | |
|---|---|
| Class A | 16,015,791 |
| Class B | 129,163,230 |
| Class C | 23,857,377 |
| Class D | 28,491,533. |

99.     According to an amendment to the Registration Statement for the Merrill Lynch Dragon Fund filed on March 22, 2000, that fund had Shares outstanding as of December 31, 1999 as follows:

| | |
|---|---|
| Class A | 2,622,901 |
| Class B | 22,077,635 |
| Class C | 2,129,026 |
| Class D | 7,177,419. |

100.     According to an amendment to the Registration Statement for the Merrill Lynch Global Allocation Fund filed on February 1, 2000, that fund had Shares outstanding as of October 31, 1999 as follows:

| | |
|---|---|
| Class A | 88,239,373 |
| Class B | 309,636,594 |
| Class C | 22,493,181 |
| Class D | 83,260,724. |

101.    According to an amendment to the Registration Statement for the Merrill Lynch Global Small Cap Fund filed on October 11, 2000, that fund had Shares outstanding as of June 30, 2000 as follows:

| | |
|---|---|
| Class A | 1,917,548 |
| Class B | 5,022,356 |
| Class C | 1,088,755 |
| Class D | 1,361,948. |

102.    According to an amendment to the Registration Statement for the Merrill Lynch Global Value Fund filed on April 20, 2000, that fund had Shares outstanding as of December 31, 1999 as follows:

| | |
|---|---|
| Class A | 13,281,215 |
| Class B | 125,391,911 |
| Class C | 22,349,705 |
| Class D | 28,531,791. |

**How Other Fund Families Deal With Large Blocks of Class B Shares**

103.    Because the breakpoints that are available on larger investments in front-end load Shares undercut the economic rationale for back-end load Shares, other fund sponsors and their affiliates have taken specific measures to assure that investors are directed to the Share Class that is appropriate to the amount that they are investing.  The measures employed include specific

prospectus disclosures, and policies barring investments over set thresholds.  For example,

Oppenheimer Funds, Inc., a fund sponsor with a number of multiple class funds that it markets

through independent broker-dealers, utilizes language in its prospectus to highlight the issue:

> Which Class of Shares Should You Choose?  Once you decide that the Fund is an appropriate  investment for you, the decision as to which class of shares is best suited to your needs depends on a number of factors that you should discuss with your financial advisor.  Some factors to consider are how much you plan to invest and how long you plan to hold your investment.  If your goals and objectives change over time and you plan to purchase additional shares, you should re-evaluate those factors to see if you should consider another class of shares.  The Fund' s operating costs that apply to a class of shares and the  effect of the different types of sales charges on your investment will vary your investment results over time.

> The discussion below is not intended to be investment advice or a recommendation, because each investor' s financial considerations are different.  You should review these factors with your financial  advisor.  The discussion below assumes that you will purchase only one class of shares, and not a combination of shares of different classes.

> •      How Long Do You Expect to Hold Your Investment?  While future financial needs cannot be  predicted with certainty, knowing how long you expect to hold your investment will assist you in selecting the appropriate class of shares.  Because of the effect of class-based expenses, your choice will also depend on how much you plan to invest.  **For  example, the  reduced sales charges available for larger purchases of Class A shares may, over time, offset the effect of paying an initial sales charge on your investment, compared to the effect over time of higher class-based expenses on shares of Class B or Class C.**

> •      Investing for the Short Term.  **If you have a relatively short-term investment horizon  (that is, you plan to hold your shares for not more than six years), you should probably consider purchasing Class A or Class C shares rather than Class B shares.  That is because of the effect of the Class B contingent deferred sales charge if you redeem within six years,  as well as the effect of the Class B asset-based sales charge on the  investment return for that class in the short-term.  Class C shares might be the  appropriate choice (especially for investments of less than $100,000), because there is no initial sales charge on Class C shares, and the contingent deferred sales charge does not apply to amounts you sell after holding them one year**.

> **However,  if you plan to invest more than $100,000 for the shorter term, then as your investment horizon increases toward six years, Class C**

**shares might not be as advantageous as Class A shares.  That is because the annual asset-based sales charge on Class C shares will have a greater impact on your account over the longer term than the reduced front-end sales charge available for larger purchases of Class A shares.**

(Oppenheimer Discovery Fund, Form N-1A, Amendment No. 25 (Jan. 28, 1999)(emphasis

supplied)).

104.    Similarly, from at least December 1998, Prudential Investment Fund Management

LLC, the investment manager for a number of multiple class mutual funds affiliated with

Prudential Securities, Inc., included an explanation of the relationship between loads and

expenses in the Statement of Additional Information for its funds:

SELECTING A PURCHASE ALTERNATIVE

The following is provided to assist you in determining which method of purchase best suits your individual circumstances and is based on current fees and expenses being charged to the Fund:

**If you intend to hold your investment in the Fund for less than 4 years and do not  qualify for a reduced sales charge on Class A shares, since Class A shares are subject to a maximum  initial sales charge of 4% and Class B shares are subject to a CDSC of 5% which  declines to zero over a 6-year period,  you should consider purchasing Class C shares over either Class A or Class B shares.**

If you intend to hold your investment for more than 4 years,  but less than 5 years, and do not qualify for a reduced sales charge on Class A shares, the sales charges and cumulative annual distribution-related fees would be approximately the same for Class A, Class B and Class C shares.  However, you should consider purchasing Class B shares over Class A shares or Class C shares because  all of your money would be invested initially in the case of Class B shares.

**If you intend to hold your investment for longer than 5 years, you should consider purchasing Class A shares over either Class B or Class C shares. This is because the maximum sales charge plus the cumulative annual distribution-related fee on Class A shares would be less than those of the Class B or Class C shares.**

**If you qualify for a reduced sales charge on Class A shares, it may be more advantageous for you to purchase Class A shares over either Class B or Class C shares regardless of how long you intend to hold your investment.**

However, unlike Class B shares, you would not have all of your money invested initially because the sales charge on Class A shares is deducted at the time of purchase.

**If you do not qualify for a reduced sales charge on Class A shares and you purchase Class B or Class C shares, you would have to hold your investment for more than 6 years in the case of Class B shares and for more than 5 years in the case of Class C shares for the higher cumulative annual distribution-related fee on those shares plus, in the case of Class C shares, the 1% initial sales charge to exceed the initial sales charge plus cumulative annual distribution-related fees on Class A shares.** This does not take into account the time value of money, which further reduces the impact of the higher Class B or Class C distribution-related fee on the investment, fluctuations in NAV, the effect of the return on the investment over this period of time or redemptions when the CDSC is applicable.

(Prudential High Yield Fund, Form N-1A, Amendment No. 30 (Dec. 31, 1998)(emphasis supplied)).

105.    Putnam Management, a fund sponsor with a number of multiple class funds that it markets through independent broker-dealers, has had a long standing policy of limiting orders for large blocks of Class B Shares, which is prominently featured in its prospectus.  (*See, e.g.,* Putnam Voyager Fund II, Form N-1A, Amendment No. 9 (February 25, 1999)('Orders for class B shares for more than $250,000 are treated as orders for class A shares or refused.')). Currently, Putnam refuses orders for Class B Shares in amounts of $100,000 or more.  (*See, e.g.,* Putnam Classic Equity Funds, Form N-1A, Amendment No. 11 (March 29, 2004)('Orders for class B shares of one or more Putnam funds will be treated as orders for class A shares or refused when the total value of the purchase, plus existing account balances that are eligible to be linked under a right of accumulation of class A shares, is $100,000 or more.')).

106.    On July 17, 2001, *The Wall Street Journal* ran a story describing a new policy at Prudential Securities in which brokers were instructed to limit sales of Class B mutual fund shares to clients investing 100,000 dollars or less in an individual fund.  The story quoted

Prudential spokesperson Susan Altran as follows: "'In most cases, we found that it's better for the client economically,' to buy A-class shares when investing more than $100,000." The story indicated that Merrill Lynch addressed this issue through 'broker training and education." An unnamed Merrill Lynch spokesman was quoted as stating that "[w]e continue to take suitability issues very seriously.'"

107.    Commencing in or about June, 2001, the registration statements and prospectuses for multiple class mutual funds affiliated with Prudential were modified to alert investors that 'if you are purchasing Class B shares in an amount of $100,000 or more, you should consult your financial adviser to determine whether other share classes are more beneficial given your circumstances." (*See, e.g.,* Prudential Europe Growth Fund, Form N-1A, Amendment No.15 (June 29, 2001)).

108.    In or about 2001, the multiple class mutual funds advised by Morgan Stanley Investment Advisors, Inc., an affiliate of Morgan Stanley & Co., Inc., adopted a policy of limiting Class B sales to amounts of less than $100,000, and the various Morgan Stanley affiliated funds, in the course of amending their registration statements, noted this policy in their prospectuses. (*See, e.g.,* Morgan Stanley European Growth Fund, Inc., Form N-1A, Amendment No. 16 (December 28, 2001)('The Fund will generally not accept a purchase order for Class B shares in the amount of $100,000 or more.'); Morgan Stanley Equity Fund, Form N-1A, Amendment No. 5 (July 30, 2002)(same)).

109.    Not until 2003 did Merrill Lynch create a system for screening large orders of mutual funds;  a December 1, 2003 article published by Securities Data Publishing in *On Wall Street* indicated that the new system went into operation in June, 2003.  According to a Merrill Lynch broker quoted in the story, "'[i]f you do a $100,000 C-share ticket, it will ask you why,'

presumably because the A shares would be cheaper." The story indicated that Smith Barney had instituted a similar system.

### Recent Scrutiny of Sales of Class B Shares

110.    Recently, Class B Shares have begun to receive scrutiny questioning whether they are economically sound investments.  Initial scrutiny focused upon individual sales by individual firms, while more recent revelations call into question the inherent economic rationale for Class B Shares.

111.    In or about April  2001, the National Association of Securities Dealers instituted an enforcement action against Stifel Nicholas & Co., one of its registered representatives and his supervisor arising out of sales of large blocks of Class B Shares in mutual funds.  The NASD described the charges as follows:

> Mutual funds can be offered for sale to investors in different classes. In this case, the Class A shares incurred a front-end sales load, but had lower on-going expenses than Class B shares. Customers who purchased Class B shares did not pay a sales charge at the time of purchase, but may have paid a charge when they sold their shares, unless the held them for six years. B Shares also incurred higher on-going distribution expenses than Class A shares.

> Over a two-year period, NASD Regulation found that Grimes engaged in a pattern of making unsuitable recommendations of Class B shares to customers. He recommended that each of 15 customers purchase over $250,000 in Class B shares, when it would have been more cost-effective for those customers to purchase of Class A shares. In fact, the fund had a maximum purchase limitation of $250,000 in Class B shares. NASD Regulation found that recommendations to purchase over $250,000 in Class B shares exceeded the maximum purchase limitation and were unsuitable in light of the amount sold, the sales and distribution charges incurred and because the customers could have purchased the A Shares with substantially lower sales charges. Stifel failed to supervise by not having a system in place to detect sales in excess of the maximum purchase limits on the funds it sold.

> NASD Regulation found that Stifel and Grimes earned sales commissions of over $290,000 or four percent of the purchase on the sale of Class B shares. The sales commissions would have been less than half this amount had they sold Class A shares.

In another instance, NASD Regulation found that Grimes recommended to 29 customers that they liquidate another mutual fund and purchase, in the aggregate, over $500,000 of Class B shares. Again, the customers were eligible to purchase Class A shares, the more cost-effective purchase at the time because of a temporary marketing promotion offered by the fund that eliminated a sales load at either the time of purchase or the time of sale. Stifel and Grimes earned $21,000 on the sale of these Class B shares, and would not have earned any sales commission had they sold Class A shares.

(NASD Press Release, April 18, 2001).

112.     In August, 2002, the NASD affirmed regulatory sanctions against a registered representative affiliated with Southmark, Inc. arising out of sales of large blocks of Class B Shares in multiple class mutual funds. *Dep't of Enforcement v. Belden,* C05010012 (NASD August 1, 2002).

113.     In October 2002, the NASD announced that it was instituting disciplinary proceedings, charging the owner of a broker-dealer with securities fraud and other violations.  It described the charges as follows:

The complaint alleges that during the last several years, Eberhard committed securities fraud in connection with scores of mutual fund transactions. Among other abuses, Eberhard engaged in a pattern of short-term trading of mutual funds and purchasing large volumes of class B mutual fund shares. NASD's review of the accounts revealed patterns of improper short-term trading of mutual funds in order to maximize commissions.

Through large purchases of class B shares, Eberhard kept his customers from taking advantage of the lower sales charges available through different classes of funds. In one customer's account, a mutual fund position was held for just 10 days. In another customer's accounts, despite a $250,000 purchase limit on class B shares imposed by the mutual fund distributor, Eberhard effected total purchases of more than $700,000 of class B shares of the fund.

(NASD Press Release, October 18, 2002).

114.     In or about June 2003, the NASD censured and fined a registered broker dealer and its chairman for sales of large blocks of Class B shares of mutual funds.  The NASD described its action as follows:

In the enforcement action, NASD found that from June 1998 through May 2002, MPV violated NASD's suitability rules by recommending purchases of large volumes of Class B shares of mutual funds in the accounts of 21 MPV customers totaling approximately $9.3 million. The large purchases of Class B shares deprived customers of the lower or potentially lower sales charges available through Class A shares of the same funds.

While Class A shares typically involve a front-end sales charge, these fund shares also typically incur lower ongoing charges and there is no contingent deferred sales charge upon the sale of the shares. Class B mutual fund shares generally do not incur a front-end sales charge, but generally are subject to higher ongoing charges and a contingent deferred sales charge upon the sale of shares.

In one instance, a broker recommended the purchase of Class B shares of mutual funds in four different fund families for a single customer's account in lieu of the less costly Class A shares. The positions accumulated in these shares in each of the fund families ranged from $375,000 to $650,000.

NASD also found that MPV and its Chairman and supervisory principal, James C. McLaughlin, failed to establish, maintain and enforce an adequate supervisory system that would have detected and prevented the unsuitable large Class B share positions.

(NASD Press Release, June 25, 2003).  The release indicated that the action was "part of a larger, ongoing focus of NASD on the sale of Class B mutual fund shares.  In the last two years NASD has brought more than half a dozen significant enforcement cases involving sales violations of Class B shares." (*Id.*).

115.    On or about June 25, 2003, the NASD also issued an investor alert, raising the question whether investors were buying Class B Shares in circumstances where they were not cost-effective.  In its alert, the NASD stated as follows:

Buying mutual funds through a broker or other investment professional usually means choosing among different mutual fund classes. The only differences among these classes is how much you will pay in expenses and how much your broker will be paid for selling you the fund.

NASD is issuing this Alert because we are concerned that investors may purchase Class B mutual fund shares when it would have been more cost-effective for those investors to purchase a different class of shares.

Before purchasing Class B mutual fund shares, you should determine whether this investment is in your interest, and not just in the interest of your broker or adviser who may receive higher commissions from the sale of Class B shares than other classes of fund shares.

Class B shares do not impose a front-end sales charge, but they may charge higher expenses that investors are assessed over the lifetime of their investment in a fund as compared to Class A shares. Class B shares also normally impose a **contingent deferred sales charge (CDSC)**, which you pay if you sell your shares within a certain number of years.

In addition, investors who purchase Class B shares cannot take advantage of breakpoint discounts available on large purchases of Class A shares. NASD is continuing a comprehensive review of Class B shares sales practices, and in recent years, NASD has investigated abuses regarding the unsuitability of large sales of Class B shares to investors.

(NASD Investor Alert, *Class B Mutual Funds, Do They Make the Grade?*

http://www.nasd.com/Investor/Alerts/alert_classb_funds.htm)(emphasis in the original)).

116.   On July 10, 2003, the SEC issued a release describing two enforcement actions that it brought arising from sales of mutual funds at Prudential Securities, Inc.  The commission instituted separate actions against Prudential, and against two individuals; the focus of both actions was improper sale of back-end load mutual fund shares to investors who qualified for breakpoints on front-end load shares. Prudential was charged with a failure to supervise its registered representatives; although it had policies to preclude inappropriate sales of large blocks of B Shares, it had inadequate systems to monitor compliance with its policies.  (SEC Release No. 2003-82).

117.   In connection with its proceeding against Prudential, the SEC made the following administrative findings with Prudential's consent:

For each class of shares, a mutual fund uses a different method to collect sales charges from investors. Class A fund shares are subject to an initial sales charge ("front-end load"). Since the sales fee is paid up front, Class A shares incur smaller "rule 12b-1 fees," a fee the investor pays to the mutual fund specifically to

compensate for distribution costs, including commissions paid to the broker-dealers and their registered representatives selling fund shares. Class B shares, by contrast, are not subject to an up-front sales charge. Instead, they become subject to a sales charge (a "contingent deferred sales charge" or "CDSC") only if, and when, they are redeemed before the end of a specified holding period (six years in this case). The amount of the CDSC declines as a percentage of the account's value over the six-year holding period specified in each fund's prospectus (5%, 4%, 3%, 2%, 1% and 1%). Class B shares usually automatically convert to Class A shares after a specified number of years (seven years in this case). Because Class B share investors only pay a CDSC, if any, at the time that they redeem their shares, the funds charge Class B share investors higher rule 12b-1 fees to defray distribution expenses associated with Class B shares.

      7.    Discounts on front-end loads are available for large purchases of Class A shares. The amount of the discount often increases at specified, increasing investment levels, or "breakpoints." (In this case, the first breakpoint is $50,000.) Investors may also qualify for breakpoint discounts pursuant to a "letter of intent," an agreement to make multiple purchases of Class A shares issued by PSI funds over a 13-month period which, when aggregated, equal an amount that qualifies for a breakpoint discount. Breakpoints are also available through "rights of accumulation," under which an investor, or an eligible group of related investors (*e.g.*, the customer, the customer's spouse and minor children), may aggregate the value of their existing holdings of shares of PSI funds with the amount of the contemplated new investment to determine the reduced sales charge applicable to that purchase of Class A shares.

      8.    The lower rule 12b-1 fees and breakpoint discounts associated with Class A shares mean that the rate of return over time is generally higher with Class A shares than with Class B shares. Thus, an investor who qualifies for breakpoints or rights of accumulation may be financially better off investing in Class A shares. Breakpoint discounts are *not* available for purchases of Class B shares regardless of the size of the investment. Because Class B shares do not offer breakpoint discounts, brokers usually earn higher commissions on large Class B share investments than on Class A share purchases of the same amount.

(*In re Prudential Securities, Inc.,* Securities Exchange Act Rel. No. 48149, ¶¶ 6-8).

     118.    The findings also described Prudential's internal controls over sales of Class B

shares as follows:

PSI had in place policies and procedures that specifically addressed sales of mutual fund shares. Pursuant to these policies and procedures, PSI directed that each registered representative "advise the client of the availability of the multiple classes and fully explain the terms of the different financing methods prior to purchase." Various factors to be considered in assessing which class was most

suitable for the customer included the amount of the sales charge and whether the customer qualified for a reduction in the charge based upon breakpoints, rights of accumulation and/or letters of intent. PSI further required that the branch office manager approve all purchases greater than $100,000. Pursuant to PSI's policies and procedures, the branch office manager was charged with the responsibility of considering these factors in deciding whether to approve these transactions.

. . .

15.    During the relevant period, PSI's branch office managers were solely responsible for ensuring that registered representatives followed the firm's mutual fund policies and procedures. However, PSI failed to establish any system to effectively monitor actual compliance with its policies and procedures concerning sales of Class B shares, such as monitoring tools or reports.

. . .

17.    In July 2001, following completion of an internal review, PSI revised its mutual fund policies and procedures and implemented systems to monitor compliance with them. It now prohibits purchases of more than $100,000 in Class B shares by customers unless certain specific exceptions apply. It instituted a "hard block" in its computer system that prevents the execution of Class B share purchases in amounts over $100,000. The firm also developed new exception reports designed to detect Class B share transactions at just below the $100,000 limit or transactions aggregating more than $100,000 over a relatively short period of time.

(*Id*. ¶¶ 12, 15, 17).

119.    On August 12, 2003, the NASD announced that it had instituted five new enforcement actions over improper sales of large volumes of Class B shares.  Its press release announcing the action stated as follows:

NASD today announced five new enforcement actions as part of its ongoing focus on the sale of Class B mutual fund shares. Four of these cases are settlements in which the individuals agreed to suspensions from the securities industry for up to nine months, and fines totaling almost $120,000. The fifth action is a complaint where the broker is contesting the charges.

In each of the settled cases, the brokers violated NASD's suitability rule by recommending their customers purchase of B share mutual funds instead of A shares. The purchase of A shares would have eliminated or reduced front-end sales charges through breakpoint discounts available at various dollar amounts;

resulted lower ongoing expenses than those available through B shares; and would have avoided the contingent deferred sales charges associated with B shares. The differences between A and B share mutual funds are explained more fully in an Investor Alert recently published by NASD: <u>Investor Alert - Class B Mutual Fund Shares: Do They Make the Grade?</u>

"In recommending mutual funds with different classes to investors, the broker must put his customer first. It is critical that a broker consider the costs of A shares versus B shares for the customer, and not the profit for the broker," said Mary L. Schapiro, NASD Vice Chairman and President of Regulatory Policy and Oversight. "NASD will continue to bring sales practice cases such as these when investors are sold mutual fund products that are unsuitable."

(NASD Press Release, August 12, 2003).

120.    On or about October 20, 2003, Standard & Poor's issued a press release describing a review it had conducted of the performance of multiple share classes in mutual funds.  The study concluded that over a variety of holding periods, Class A Shares and Class C Shares were superior to Class B Shares.  The press release referring to the study stated as follows:

Standard & Poor's today released the results of its review into the performance of multi-share classes of mutual funds. According to data queried from Standard & Poor's database of over 15,000 domestic mutual funds, Class B shares (as adjusted for sales charges) consistently underperformed Class A shares over a three-, five-, and ten-year period through the end of September, and underperformed Class C shares over a three- and five-year period and matched performance over a ten-year period.

121.    On November 17, 2003, the SEC announced that it had instituted and resolved an enforcement action against Morgan Stanley DW Inc. over mutual fund sales practices, including improper sales of large blocks of Class B Shares in its proprietary mutual funds.  The Commission's release described the issue of sales of Class B Shares as follows:

Morgan Stanley also failed to adequately disclose at the point of sale the higher fees associated with large ($100,000 or greater) purchases of Class B shares of certain of its proprietary mutual funds. In connection with its recommendation to customers to purchase certain Class B shares, Morgan Stanley did not adequately

inform customers at the point of sale that large purchases of such shares were subject to higher fees. Significantly, Morgan Stanley also failed to explain to customers that those fees could have a negative impact on customers'   investment returns.

(Release No. 2003-159).  The SEC's press release also indicated that Morgan Stanley's sales force stood to earn more from sales of Class B Shares in large lots than from sales of Class A Shares.  (*Id*.).

122.   In the Order instituting the administrative proceeding, the SEC made the following findings with Morgan Stanley's consent:

28.   Since 2000, Morgan Stanley DW has sold more than sixty individual funds offered by Morgan Stanley Funds. The funds are offered in different classes of shares, representing interests in the same mutual fund assets. Each share class (A, B, C and D) has different features, including differences in sales loads to purchase the shares, annual fees, and considerations to determine whether a particular class of shares may be more appropriate for certain customers.

29.   The different share classes and their respective features are described in Morgan Stanley Funds prospectuses. In particular, Class A shares of equity funds are subject to a front-end load of 5.25% at the time of purchase for purchases of $25,000 and less. The front-end load is decreased for larger purchases at specified investment increments or "breakpoints." For instance, amounts between $25,000 and $49,999 are subject to an initial sales charge of 4.75%. An investment between $50,000 and $99,999 reduces the sales charge to 4%; between $100,000 and $249,999 reduces the sales charges to 3%; between $250,000 and $499,999 reduces the sales charge to 2.5%; between $500,000 and $999,999 reduces the sales charge to 2%; and there is no sales charge for an investment of $1 million or more.

30.   In contrast, investors who purchase Class B shares pay no front-end load. Rather, Class B shares become subject to the CDSC, only if they are redeemed before the end of a six-year holding period. The amount of the CDSC declines as a percentage of the account's value over the six-year holding period (5%, 4%, 3%, 2%, 2%, and 1%). Class B shares automatically convert to Class A shares in the month following the ten-year anniversary of their purchase. In contrast to Class A shares, breakpoint discounts are not available for purchases of Class B shares, regardless of the size of the investments, and the annual 12b-1 fee is significantly higher: a maximum of 1% for Class B shares as compared to .25% for Class A equity funds.

31.     The prospectuses of Morgan Stanley Funds contain two tables that illustrate the impact of costs on the investment. These tables compare the costs of all classes of shares over one year, three years, five years and ten years, assuming a hypothetical investment of $10,000 and return of 5% per year and a hypothetical investment decision to either hold or sell the investment at the end of each period. The 2001 Information Fund prospectus, for example, demonstrates generally that, based on these assumptions, for a $10,000 investment, where the investor sold the shares at the end of each period, Class A shares had lower total costs than Class B shares.

32.     The compensation that FAs receive for the sale of Class B shares is higher than for Class A shares. Specifically, for Class B shares, Morgan Stanley DW FAs received gross sales credits at the time of purchase of 5% for all amounts, until a March 2002 policy and procedures change described below, thereby making it more lucrative for the FAs to sell Class B, rather than Class A, shares. For Class A shares, the FAs'   compensation decreases similar to the breakpoint discounts, with the FAs receiving a gross sales credit at the time of sale of equity funds of 5% for purchases of less than $25,000; 4.5% for purchases between $25,000 - $49,999; 3.75% for purchases between $50,000 - $99,999; 2.75% for purchases between $100,000 - $249,999; 2.25% for purchases between $250,000 - $499,999; 1.8% for purchases between $500,000 - $999,999; and 1% for purchases of $1 million and above.

33.     Morgan Stanley DW did not have a policy restricting large purchases of Class B shares by its customers until October 1, 2001. At that time, the firm implemented a policy whereby "[t]he Morgan Stanley Funds generally will not accept purchase orders for Class B shares in amounts of $100,000 or greater. Purchases of $100,000 or greater but less than $1 million generally can be made only in Class A or Class C shares." Moreover, according to the Morgan Stanley Funds Multi-Class Manual, also dated October 1, 2001, "[a]ggregate purchases of $100,000 or greater in Class B shares of Morgan Stanley Funds require the Branch Manager to first discuss the intended investment with the prospective investor to ensure that the investor understands the relative fees, expenses and features of the different classes."

(*In re Morgan Stanley DW, Inc.,* Securities Exchange Act Release No. 48789, ¶¶ 28-33(footnotes

omitted).

## Plaintiff's Specific Purchases

123.    On February 1, 1999, plaintiff DeBenedictis invested $54,036.94 in Class B

Shares of Merrill Lynch Global Growth, a multiple class mutual fund managed by defendant ML

Investment Managers through his brokerage accounts at defendant MLPF&S, acquiring

approximately 4096.81 Shares at approximately $13.19 per Share.  The Class B Shares acquired in this transaction were subject to a 4.00% maximum CDSL.  At the time of this purchase, Plaintiff was qualified to acquire front-end load Shares at the breakpoint associated with an investment of $100,000 or more by reason of his existing holdings in the Merrill Lynch Funds.

124.   On January 7, 2000, Plaintiff invested another $150,033.32 in Class B Shares of Merrill Lynch Global Growth Fund through his brokerage accounts at defendant MLPF&S, acquiring approximately 8914 Shares at approximately $16.83 per Share.  The Class B Shares acquired in this transaction were subject to a 4.00% maximum CDSL.  At the time of this purchase, Plaintiff was qualified to acquire front-end load Shares at the breakpoint associated with an investment of $100,000 or more by reason of his existing holdings in the Merrill Lynch Funds.

125.   On January 24, 2001, Plaintiff invested $175,919.00 in Class B Shares of Merrill Lynch U.S. High Yield Fund, a multiple class mutual fund managed by defendant Fund Asset Management, through his brokerage accounts at defendant MLPF&S, acquiring approximately 24,755.16 Shares at approximately $7.07 per Share.  The Class B Shares acquired in this transaction were subject to a 4.00% maximum CDSL.  At the time of this purchase, Plaintiff was qualified to acquire front-end load Shares at the breakpoint associated with an investment of $100,000 or more by reason of his existing holdings in the Merrill Lynch Funds.

126.   On September 3, 2001, Plaintiff invested $135,043.00 in Class B Shares of Merrill Lynch Small Cap Value, a multiple class mutual fund managed by defendant Fund Asset Management, through his brokerage accounts at defendant MLPF&S, acquiring approximately 6363.95 Shares at approximately $21.22 per Share.  The Class B Shares acquired in this transaction were subject to a 4.00% maximum CDSL.  At the time of this purchase, Plaintiff was

qualified to acquire front-end load Shares at the breakpoint associated with an investment of $100,000 or more by reason of his existing holdings in the Merrill Lynch Funds.  These Shares were registered with the SEC pursuant to an amendment to the Registration Statement filed on behalf of the Merrill Lynch Small Cap Value Fund on July 12, 2001.  (Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 29 (July 12, 2001)).

127.    During the five years preceding the filing of this action, Plaintiff purchased Class B Shares each quarter, pursuant to dividend reinvestment programs in various Merrill Lynch Funds, including the Merrill Lynch Global Growth Fund, Merrill Lynch U.S. High Yield Fund, Merrill Lynch Small Cap Value Fund, Merrill Lynch Dragon Fund, and Merrill Lynch Bond Fund-High Income Portfolio.

**Statements Contained in the Registration Statements and Prospectuses**

128.    Throughout the Proposed Class Period, the Merrill Lynch Funds utilized standardized Registration Statements, Prospectuses and Statements of Additional Information that employed standardized disclosures to describe the relevant Share Classes.  Each Registration Statement was comprised of three sections: a Prospectus, a Statement of Additional Information and a section providing other information.   Each of the Registration Statements and amendments thereto filed with the SEC by the Merrill Lynch Funds during the Proposed Class Period was prepared under the supervision of their investment adviser pursuant to their Management Agreeements and, where applicable, Administration Agreements.  Each listed an in-house attorney affiliated with either Fund Asset Management or ML Investment Managers on the cover page.

129.    Each Registration Statement, Prospectus and Statement of Additional Information filed with the SEC during the Proposed Class Period used placement and emphasis to cast the

Class B Shares in an unduly positive light, particulary by emphasizing that a purchase of back-end load shares would put "all the investor's dollars to work," by casting the decision of the appropriate share class as matter of what the investor "prefers," rather than economic substance, and by asserting that the higher Rule 12b-1 fees associated with back-end load shares could be offset by any gains earned by the fund, when in fact the amount of the fees escalated as an investor's assets grew.

130.    Each Prospectus commenced with a summary of the investment objectives, strategies and risks associated with the particular fund, which was followed by bar graph and table depicting the fund's performance over time.   The bar chart reflected the performance of the Class B Shares;  the chart indicated that it did not account for all sales charges and that lower returns would result if it did. The table provided a comparison of the performance of the various share classes over various time periods.

131.    The next section of the Prospectus provided a summary of the various types of fees and expenses (i.e. front-end load, CDSL, Rule 12b-1 fee, management fee, other expenses) associated with an investment in the Share Classes issued by the fund.   This section furnished a description of the types of fees and expenses and then summarized them in a tabular format to illustrate the difference in fees and expenses by Share Class.

132.    Immediately following the table listing the different expense categories by share class, each prospectus contained a table illustrating the effect of the different expenses structures for the various share classes for an investment of $10,000 dollars, assuming a 5% annual return and no change in the amount of expenses.   The chart was in the format set forth below, which is derived from an amendment to the registration statement for the Merill Lynch Global Growth Fund filed with the SEC on December 11, 2001:

These examples are intended to help you compare the cost of investing in the Fund with the cost of investing in other mutual funds.

These examples assume that you invest $10,000 in the Fund for the time periods indicated, that your investment has a 5% return each year, that you pay the sales charges, if any, that apply to the particular class and that the Fund's operating expenses remain the same. This assumption is not meant to indicate you will receive a 5% annual rate of return. Your annual return may be more or less than the 5% used in this example. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

EXPENSES IF YOU <u>DID</u> REDEEM YOUR SHARES:

|         | 1 Year | 3 Years | 5 Years | 10 Years |
|---------|--------|---------|---------|----------|
| Class A | $615   | $806    | $1,013  | $1,608   |
| Class B | $598   | $912    | $1,252  | $2,080*  |
| Class C | $299   | $615    | $1,057  | $2,285   |
| Class D | $639   | $880    | $1,140  | $1,882   |

EXPENSES IF YOU <u>DID NOT</u> REDEEM YOUR SHARES:

|         | 1 Year | 3 Years | 5 Years | 10 Years |
|---------|--------|---------|---------|----------|
| Class A | $615   | $806    | $1,013  | $1,608   |
| Class B | $198   | $612    | $1,052  | $2,080*  |
| Class C | $199   | $615    | $1,057  | $2,285   |
| Class D | $639   | $880    | $1,140  | $1,882   |

   * Assumes conversion to Class D shares approximately eight years after purchase. See
     note (b) to the Fees and Expenses table above.

This tabular presentation is required under Form N-1A.  The same table in the same format

appeared in every prospectus for each of the Merrill Lynch Funds during the Proposed Class

Period; the only variation was in the dollar amounts, which were tied to each particular fund's

actual expenses, the duration of the CDSL, the conversion date for Class B Shares, which was

eight years for equity funds, and ten years for funds that invested in fixed income instruments;

and, commencing in April 2003, the reclassification of the Shares.  (*See* Merrill Lynch U.S. High

Yield Fund, Form N-1A, Amendment No. 10 (July 28, 2003); Merrill Lynch Small Cap Value

Fund, Form N-1A, Amendment No. 28 (Sept. 1, 2000); Merrill Lynch Dragon Fund, Form N-

1A, Amendment No. 10 (Feb. 26, 1999)).

      133.    Over long holding periods, Class A Shares and Class D Shares outperform Class

B and Class C Shares because the Class A and Class D Shares carry lower annual expenses.

Breakpoints on larger investments in Class A and Class D Shares have the effect of shortening

the holding period needed before Class A and Class D Shares outperform Class B and Class C

Shares.  In preparing the Prospectuses for the Merrill Lynch Funds, the defendants elected not to

emphasize the material fact that breakpoints on front-end load shares would result in a material

reduction in investor expense, making front-end load shares a more appropriate choice for

investors who would qualify for the discount on the front-end load that would apply for an

investment of $100,000 or more.  In the 1988 release announcing the effectiveness of the most

recent amendment to the form specifically noted that funds could highlight the impact of reduced

front-end sales loads in a brief narrative following the table, but the Prospectuses for the Merrill

Lynch Funds did not do so.  (*Consolidated Disclosure of Mutual Fund Expenses,* Investment

Company Act Rel. No. 16244,  53 Fed. Reg. 3192, 3193 (Feb. 4, 1998)).   By failing to highlight the impact of reduced front-end loads in the most logical place in the Prospectus, defendants cast the Class B Shares in an unduly positive light, rendering the discussion of the expense structure for the Shares materially misleading.

134.    Immediately following the fee and expense illustration, each Prospectus contained a lengthy description of the fund's investment personnel, objectives and practices, along  with a description of specific types of risk that the particular fund was subject to, such as market and selection risk, foreign market risk, foreign economy risk, credit risk, interest rate risk, and currency risk.

135.    At all times relevant to this action, the Registration Statements and Prospectuses pursuant to which the Merrill Lynch Funds offered their Shares to the public described the relevant considerations that were material to a decision of the appropriate Share Class to purchase substantially as follows:

> The Fund offers four share classes, each with its own sales charges and expense structure, allowing you to invest in the way that best suits your needs.  Each share class represents an ownership interest in the same investment portfolio.  When you choose your class of shares you should consider the size of your investment and how long you plan to hold your shares.  You Merrill Lynch Financial Advisor can help you determine which share class is best suited to your personal financial goals.

> For example, if you select Class A or Class D shares, you pay a sales charge at the time of purchase.  If you buy class D shares, you also pay an ongoing account maintenance fee of 0.25%.  You may be eligible for a sales charge reduction or waiver.

> . . .

> If you select Class B or Class C Shares, you will invest the full amount of your purchase price but you will subject to a distribution fee of [X]% and an account maintenance fee of [Y]%.  Because these fees are paid out of the funds' assets on an ongoing basis, over time these fees increase the cost of your investment and

may cost you more than paying other types of sales charges.  In addition, you may be subject to a deferred sales charge when you sell Class B or Class C Shares.

(*See, e.g.,* Merrill Lynch U.S. High Yield Fund, Inc., Form N-1A, amendment no. 7 (July 11, 2001); *see also* Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 9 (Dec. 4, 2003)(stating equivalent while reflecting reclassification of Class A and Class D Shares and addition of Class R); Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 30 (July 25, 2002)(stating equivalent); Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 5 (Dec. 7, 1999)(stating equivalent)).

136.    This section of the Prospecus was materially misleading because it placed undue emphasis on the fact that an investment in back-end load Shares would result in the investment of the entire amount in the fund without highlighting the material fact that breakpoints on front-end load shares would result in substantial savings on overall expenses that would quickly eliminate any putative advantage attached to the fact that back-end load Shares resulted in the investment of a larger sum in the fund.  Further, this section of the Prospectus was materially misleading as it failed to explain that the adverse effect of the higher Rule 12b-1 fees attached to Class B and Class C Shares would be compounded if dividends were reinvested and that the total amount of the Rule 12b-1 fees would increase to the extent that the investment yielded positive returns.

137.    Immediately following that textual disclosure, each Prospectus contained a table that summarized the relevant differences among the Share Classes.  This table was substantially in the format set forth below, which is derived from an amendment to the Registration Statement for the Merrill Lynch Small Cap Value Fund filed with the SEC on July 12, 2001:

**The table below summarizes key features of the Merrill Lynch Select Pricing ^{SM} System**.

|  | Class A | Class B | Class C | Class D |
|---|---|---|---|---|
| Availability? | Limited to certain investors including:<br>• Current Class A shareholders<br>• Certain Retirement Plans<br>• Participants in certain Merrill Lynch-sponsored programs<br>• Certain affiliates of Merrill Lynch, selected securities dealers and other financial intermediaries. | Generally available through Merrill Lynch. Limited availability through selected securities dealers and other financial intermediaries. | Generally available through Merrill Lynch. Limited availability through selected securities dealers and other financial intermediaries. | Generally available through Merrill Lynch. Limited availability through selected securities dealers and other financial intermediaries. |
| Initial Sales Charge? | Yes. Payable at time of purchase. Lower sales charges available for larger investments. | No. Entire purchase price is invested in shares of the Fund. | No. Entire purchase price is invested in shares of the Fund. | Yes. Payable at time of purchase. Lower sales charges available for larger investments. |

| Deferred Sales Charge? | No. (May be charged for purchases over $1 million that are redeemed within one year.) | Yes. Payable if you redeem within six years of purchase. | Yes. Payable if you redeem within one year of purchase. | No. (May be charged for purchases over $1 million that are redeemed within one year.) |
|---|---|---|---|---|
| Account Maintenance and Distribution Fees? | No. | 0.25% Account Maintenance Fee. 0.75% Distribution Fee. | 0.25% Account Maintenance Fee. 0.75% Distribution Fee. | 0.25% Account Maintenance Fee. No Distribution Fee. |
| Conversion to Class D shares? | No. | Yes, automatically after approximately eight years. | No. | No. |

138.     The foregoing table was substantially identical for all of the Merrill Lynch Funds throughout the Proposed Class Period.  There were a few differences: (i) the period in which the CDSL associated with Class B Shares was eliminated was originally four years and later changed to six, as noted above; (ii) bond funds had a lower Rule 12b-1 distribution fee, as outlined above; (iii) B Shares in bond funds converted to D Shares in ten years, rather than eight, as noted above; (iv) in April 2003, the Merrill Lynch Funds reclassified Class D Shares as Class A Shares and Class A Shares as Class I Shares.  (*See, e.g.,* Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 9 (Dec. 4, 2003); Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 30 (July 25, 2002); Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 5 (Dec. 7, 1999)).

139.     The foregoing table was materially misleading because it placed undue emphasis on the fact that an investment in Class B or Class C Shares meant the '[e]ntire purchase price is

invested in shares of the Fund," which served to cast the investment merits of Class B Shares in a falsely positive light.

140.     Immediately following the foregoing table, each Prospectus outlined the Right of Accumulation and Letter of Intent provisions applicable to Class A and Class D Shares, and then reproduced the relevant breakpoint schedule for the fund.  Each Prospectus then made a qualitative recommendation to prospective shareholders as follows: "If you decide to buy shares under the initial sales charge alternative and you are eligible to buy both Class A and Class D shares, you should buy Class A since Class D shares are subject to a 0.25% account maintenance fee, while Class A shares are not." (*See, e.g.,* Merrill Lynch Global Growth Fund, Inc., Form N-1A, Amendment No. 7 (December 11, 2001); *see also* Merrill Lynch U.S. High Yield Fund, Form N-1A, Amendment No. 10 (July 28, 2003); Merrill Lynch Global Growth Fund Form N-1A, Amendmnent No. 4 (Dec. 28, 1998)).  Although the defendants were aware that an investment in Class B Shares did not make economic sense for those who qualified for the discount on front-end load Shares applicable to an investment of $100,000 or more, they made no such qualitative disclosure.

141.     Each Prospectus then offered a more detailed description of the Class B and Class C Shares which included a statement substantially as follows:

> If you select Class B or Class C shares, you do not pay an initial sales charge at the time of purchase. However, if you redeem your Class B shares within [*N*] years after purchase or your Class C shares within one year after purchase, you may be required to pay a deferred sales charge. You will also pay distribution fees of [*X*]% on Class B shares and [*Y*]% on Class C shares and account maintenance fees of 0.25% on both Class B and Class C shares each year under distribution plans that the Fund has adopted under Rule 12b-1 of the Investment Company Act of 1940. Because these fees are paid out of the Fund's assets on an ongoing basis, over time these fees increase the cost of your investment and may cost you more than paying other types of sales charges. The Distributor uses the money that it receives from the deferred sales charges and the distribution fees to cover the costs of marketing, advertising and compensating the Merrill Lynch Financial

Advisor, selected securities dealer or other financial intermediary who assists you in purchasing Fund shares.

(*See, e.g.,* Merrill Lynch U.S. High Yield Fund, Inc., Form N-1A, Amendment No. 7 (July 11, 2001); *see also* Merrill Lynch Small Cap Value Fund, Form N-1A, Amendment No. 30 (July 25, 2002)(stating equivalent); Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 5 (Dec. 7, 1999)(stating equivalent while referring to registered representatives as "Financial Consultants" rather than "Financial Advisors")).

142.    This passage from the Prospectus was materially misleading because it failed to disclose the material fact that, as the amount of the available discount on front-end load shares increased,  the possiblility that an investment in Class B Shares would result in higher expenses shifted from a possibility to a certainty.  Further, this passage in the prospectus was materially misleading because it omitted to state the material fact that the adverse long term effect of the Rule 12b-1 fees would be compounded through reinvestment of dividends and that the total amount of Rule 12b-1 fees would increase to the extent that the fund had positive returns.  This language did not vary materially among the Merrill Lynch Funds, with the main variation appearing in the level of Rule 12b-1 fees and the duration of the CDSL.  Each Prospectus then reproduced the relevant schedule for the CDSL applicable to Class B Shares, as outlined above.

143.    Each Prospectus then provided a description of Class C Shares, which was followed by lengthy sections dealing with how to buy, sell, transfer and exchange Shares, pricing, payment of dividends and related matters.  The final sections of the Prospectus included a description of the relevant adviser who was responsible for managing the fund, the terms of their compensation, and financial highlights for recent performance.

144.    Each Registration Statement for the Merrill Lynch Funds also contained a Statement of Additional Information, which was not automatically provided to investors.  While

the organizational structure of the Statement of Additional Information changed over time, the

actual language used to describe the different share classes remained consistent throughout the

Proposed Class Period.

145.    Each Statement of Additional Information contained a discussion of the Class A

and Class D Shares, which was substantially in the following form:

> Investors who prefer an initial sales charge alternative may elect to purchase
> Class D shares or, if an eligible investor, Class A shares. Investors choosing the
> initial sales charge alternative who are eligible to purchase Class A shares should
> purchase Class A shares rather than Class D shares because there is an account
> maintenance fee imposed on Class D shares. Investors qualifying for significantly
> reduced initial sales charges may find the initial sales charge alternative
> particularly attractive because similar sales charge reductions are not available
> with respect to the deferred sales charges imposed in connection with purchases
> of Class B or Class C shares. Investors not qualifying for reduced initial sales
> charges who expect to maintain their investment for an extended period of time
> also may elect to purchase Class A or Class D shares, because over time the
> accumulated ongoing account maintenance and distribution fees on Class B or
> Class C shares may exceed the initial sales charges and, in the case of Class D
> shares, the account maintenance fee. Although some investors who previously
> purchased Class A shares may no longer be eligible to purchase Class A shares of
> other Select Pricing Funds, those previously purchased Class A shares, together
> with Class B, Class C and Class D share holdings, will count toward a right of
> accumulation which may qualify the investor for a reduced initial sales charge on
> new initial sales charge purchases. In addition, the ongoing Class B and Class C
> account maintenance and distribution fees will cause Class B and Class C shares
> to have higher expense ratios, pay lower dividends and have lower total returns
> than the initial sales charge shares. The ongoing Class D account maintenance
> fees will cause Class D shares to have a higher expense ratio, pay lower dividends
> and have a lower total return than Class A shares.

(*See, e.g.,* Merrill Lynch Global Growth Fund, Inc., Form N-1A, Amendment No. 7 (Dec. 11,

2001); *see also* Merrill Lynch U. S. High Yield Fund, Form N-1A, Amendment No. 10 (July 28,

2003)(stating equivalent while reflecting Share reclassification); Merrill Lynch U.S. High Yield

Fund, Form N-1A, Amendment No. 8 (July 25, 2002)(stating equivalent); Merrill Lynch Global

Growth Fund, Form N-1A, Amendment No. 5 (Dec. 7, 1999)(stating equvalent)).  This statement

was materially misleading as it cast the decision over whether to select front-end load Shares as a

matter of personal preference, rather than economic substance.  Further, this segment of the

Statement of Additional Information failed to disclose the material fact that as the amount of the

front-end load dropped through breakpoints, the prospect that the purchase of back-end load

Shares would result in the investor paying more in sales charges shifted from a possibility to a

certainty.

146.    Each Statement of Additional Information contained a discussion of Class B and

Class C shares, which was substantially in the following form:

> Investors choosing the deferred sales charge alternatives should consider Class B
> shares if they intend to hold their shares for an extended period of time and Class
> C shares if they are uncertain as to the length of time they intend to hold their
> assets in Select Pricing Funds.
>
> Because no initial sales charges are deducted at the time of the purchase, Class B
> and Class C shares provide the benefit of putting all of the investor's dollars to
> work from the time the investment is made. The deferred sales charge alternatives
> may be particularly appealing to investors that do not qualify for the reduction in
> initial sales charges. Both Class B and Class C shares are subject to ongoing
> account maintenance fees and distribution fees; however, the ongoing account
> maintenance and distribution fees potentially may be offset to the extent any
> return is realized on the additional funds initially invested in Class B or Class C
> shares. In addition, Class B shares will be converted into Class D shares of the
> Fund after a conversion period of approximately eight years, and thereafter
> investors will be subject to lower ongoing fees.

(*See, e.g.,* Merrill Lynch Global Allocation Fund, Inc., Form N-1A, Amendment No. 18 (Feb. 8,

2001); *see also* Merrill Lynch U.S. High Yield Fund, Form N-1A, Amendment No. 8 (July 25,

2002)(stating equivalent); Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 5

(Dec. 7, 1999)(stating equivalent)).

147.    This section of the Statement of Additional Information was materially

misleading because it cast Class B Shares in an unduly positive light by emphasizing the fact an

investment in back-end load Shares put "all of the investor's dollars to work," without

highlighting the material fact that breakpoints on front-end load Shares would result in

substantial savings on overall expenses that would quickly eliminate any putative advantage

attached to the fact that back-end load Shares resulted in the investment of a larger sum in the

fund.   Further, the statement that "ongoing account maintenance and distribution fees potentially

may be offset to the extent any return is realized on the additional funds initially invested in

Class B or Class C shares" was materially misleading because it (i) failed to highlight the

material fact that the availability of breakpoints on front-end load Shares would eliminate this

purported advantage; (ii) failed to qualify the positive tenor of the statement made by noting the

material fact that a positive return on an investment in Class B or Class C Shares would result in

the investor paying higher total Rule 12b-1 fees; and (iii) failed to qualify the positive tenor of

the statement made by noting the material fact that the adverse effect of higher Rule 12b-1 fees

would be compounded through reinvestment of dividends.

148.    The Statement of Additional Information uniformly stated as follows concerning

the compensation of MLPF&S and the Merrill Lynch FAs:

> Merrill Lynch compensates its Financial Advisors for selling Class B and Class C
> shares at the time of purchase from its own funds. Proceeds from the CDSC and
> the distribution fee are paid to the Distributor and are used by the Distributor to
> defray the expenses of securities dealers or other financial intermediaries
> (including Merrill Lynch) related to providing distribution-related services to each
> Fund in connection with the sale of the Class B and Class C shares. The
> combination of the CDSC and the ongoing distribution fee facilitates the ability of
> each Fund to sell the Class B and Class C shares without a sales charge being
> deducted at the time of purchase. See "Distribution Plans" below. Imposition of
> the CDSC and the distribution fee on Class B and Class C shares is limited by the
> NASD asset-based sales charge rule. See "Limitations on the Payment of
> Deferred Sales Charges" below.

(*See, e.g.,* Merrill Lynch Global Technology Fund, Form N-1A, Amendment No. 8 (July 25,

2003); Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 5 (Dec. 7, 1999)).

This statement was materially misleading as it omitted to state the material fact that MLPF&S

and its Merrill Lynch FAs would earn more on a large order of Class B Shares than they would on an order of the same size in Class A or Class D Shares, giving them a conflict of interest.

149.    For most of the Proposed Class Period, the only indication that provided any hint that the different Share Classes yielded different commissions for MLPF&S and the Merrill Lynch FAs was in a section of the Statement of Additional Information which explained that front-end loads, CDSLs and Rule 12b-1 fees all served the same basic purpose of compensating sales personnel.  At the end of that section came a cryptic statement that "sales personnel may receive different compensation for selling different classes of shares." ( *See, e.g.,* Merrill Lynch Global Growth Fund, Form N-1A, Amendment No. 7 (Dec. 11, 2001).  The specific statement and its surrounding context are set forth below:

> Investors should understand that the purpose and function of the initial sales charges with respect to the Class A and Class D shares are the same as those of the CDSCs and distribution fees with respect to the Class B and Class C shares in that the sales charges and distribution fees applicable to each class provide for the financing of the distribution of the shares of the Fund. The distribution-related revenues paid with respect to a class will not be used to finance the distribution expenditures of another class. Sales personnel may receive different compensation for selling different classes of shares.

(*Id.*).  This buried and opaque disclosure was insufficient to put a reasonable investor on notice that MLPF&S and the Merrill Lynch FAs had an actual conflict of interest in connection with sales of large blocks of Class B Shares.   Moreover, in 2003, the defendants eliminated this cryptic statement from the Statement of Additional Information.  (*See, e.g.,* Merrill Lynch U.S. High Yield Fund, Form N-1A, Amendment No. 10 (July 28, 2003)).

150.    For investors who qualified for the breakpoints associated with an investment of $100,000 or more in Class A or Class D Shares, Class B Shares do not represent a rational investment choice.  Over short holding periods, C Shares will generate greater redemption

proceeds while carrying immaterially smaller balances.  By the time that B Shares generate greater redemption proceeds than C Shares, they will be out-performed by Class A Shares and Class D Shares.  The Registration Statements, Prospectuses and Statements of Additional Information pursuant to which the Merrill Lynch Funds were offered to the public uniformly omitted to state the material fact that investors who qualified for a reduced  front-end load on Class A or Class D Shares associated with an investment of over $100,000 would not benefit from a purchase of Class B shares.  Further, the Registration Statements, Prospectuses and Statements of Additional Information uniformly failed to disclose the conflict of interest that MLPF&S and the Merrill Lynch FAs have due to the fact that they can earn a greater commission on sales of a large order of Class B Shares than they can earn on large investments in Class A or Class D Shares.

## CLASS ACTION ALLEGATIONS

151.    Plaintiff brings this action as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class (the 'Class') consisting of all persons who purchased Class B Shares subject to a maximum CDSL of 4.0% issued by an open-end investment company sponsored by Merrill Lynch and its affiliates during the period from January 30, 1999 through December 31, 2003 and who qualified for a reduced sales charge that would apply to an investment of over $100,000 in Class D Shares, and Plaintiff brings this action on behalf of a Subclass (the 'Securities Act Subclass') consisting of all persons who purchased Class B Shares subject to a maximum CDSL of 4.0% issued by an open-end investment company sponsored by Merrill Lynch and its affiliates pursuant to a Registration Statement that was the subject of a post-effective amendment during the period from January 30, 2001 through December 31, 2003 and who qualified for a reduced sales charge that would apply to an

investment of over $100,000 in Class D Shares.  Excluded from the Class and from the Securities

Act Subclass are the defendants, their affiliates, successors and assigns, officers and directors

and members of their immediate families.

152.    Both the Class and the Securities Act Subclass are so numerous that joinder of all

members is impracticable.  While the precise number of members is not known to Plaintiff at the

present time, millions of Class B Shares were sold in the Merrill Lynch Funds during the

relevant time period.

153.    There are questions of law or fact common to the Class and the Securities Act

Subclass, including the following:

a.    whether Class B Shares issued by the Merrill Lynch Funds were an

economically rational investment for investors who qualified for the discount on front-end load

Shares that would apply to an investment of $100,000 or more;

b.    whether the standardized Registration Statements, Prospectuses, and

Statements of Additional Information were materially misleading because they over-emphasized

the effect of front-end loads on returns while under-emphasizing the effect of Rule 12b-1 fees on

returns;

c.    whether the standardized Registration Statements, Prospectuses, and

Statements of Additional Information for the Merrill Lynch Funds omitted to state the material

fact that Class B Shares are inherently inferior Class A Shares, Class C Shares and Class D

Shares for investors who qualified for the discount on front-end load Shares that would apply to

an investment of $100,000 or more;

d.    whether the standardized Registration Statements, Prospectuses, and

Statements of Additional Information omitted to state the material fact that MLPF&S and the

Merrill Lynch FAs had a conflict of interest in connection with the sale of Shares in the Merrill

Lynch Funds to investors who would qualify for the discount on front-end load Shares that

would apply to an investment of $100,000 or more;

       e.    whether defendants FAM Distributors and MLPF&S violated Section 11

of the Securities Act;

       f.    whether defendants FAM Distributors and MLPF&S violated Section

12(2) of the Securities Act;

       g.    whether defendants violated Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder;

       h.    whether MLPF&S violated Section 10(b) of the Exchange Act and Rule

10b-10 promulgated thereunder;

       i.    whether the members of the Class and the Securities Act Subclass are

emtitled to rescission;

       j.    whether the members of the Class and the Securities Act Subclass have

sustained damages, and if so the proper measure of damages.

154.    Plaintiff's claims are typical of the claims of the members of the Class and the

Securities Act Subclass as he purchased Class B Shares in the Merrill Lynch Funds pursuant to

standardized Registration Statements, Prospectuses and Statements of Additional Information

that uniformly failed to disclose that the Class B Shares were an inferior investment to Class A

Shares, Class C Shares and Class D Shares for investors who qualified for the discount on front-

end load Shares that would apply to an investment of $100,000 or more.

155.    Plaintiff is a representative party who will fairly and adequately protect the

interests of the Class and the Securities Act Subclass; he has retained counsel who are

experienced and competent in both class actions and securities litigation, generally.  Plaintiff has

no interests which are contrary to or in conflict with those of the members of the Class and the

Securities Act Subclass.

156.    The questions of law and fact common to the members of the Class and the

Securities Act Subclass predominate over any questions which affect only individual members.

157.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy as many members of the Class and the Securities Act Subclass

will have damages arising from defendants' wrongful course of conduct which would not be

susceptible to individualized litigation because of the cost associated with complex litigation of

this kind.

**Post Class Period Disclosures**

158.    Commencing in or about January of 2004, defendants began to make changes in

certain of the disclosures made by the Merrill Lynch Funds in their Registration Statements and

Prospectuses.  An amendment to the Registration Statement for Merrill Lynch Global Financial

Services Fund filed on January 23, 2004 contained the following statement in the Prospectus:

> If you select Class B or Class C shares, you do not pay an initial sales charge at
> the time of purchase. However, if you redeem your Class B shares within six
> years after purchase or Class C shares within one year after purchase, you may be
> required to pay a deferred sales charge. You will also pay distribution fees of
> 0.75% and account maintenance fees of 0.25% each year under distribution plans
> that the Fund has adopted under Rule 12b-1. Because these fees are paid out of
> the Fund's assets on an ongoing basis, over time these fees increase the cost of
> your investment and may cost you more than paying other types of sales charges.
> The Distributor uses the money that it receives from the deferred sales charges
> and the distribution fees to cover the costs of marketing, advertising and
> compensating the Merrill Lynch Financial Advisor, selected securities dealer or
> other financial intermediary who assists you in purchasing Fund shares.
>
> **The Distributor currently pays a sales concession of 4.00% of the purchase
> price of Class B shares to dealers from its own resources at the time of sale.
> The Distributor also normally pays the 0.25% Class B account maintenance**

> **fee to dealers as an ongoing concession on a monthly basis. The Distributor normally retains the Class B shares distribution fee.**

(Merrill Lynch Global Financial Services Fund, Form N-1A, Amendment No. 7 (Jan. 23, 2004)(emphasis supplied)).  While not a model of clear disclosure, as it conflicts with the description of the way in which FAM Distributors disburses the Rule 12b-1 fees set forth in the Statement of Additional Information of the same Registration Statement and does not specifically highlight the conflict of interest crearted by this arrangement, this statement at least provides an investor with some degree of information about how MLPF&S and the Merrill Lynch FAs are compensated from sales of Class B Shares.  Other Merrill Lynch Funds have since filed amendments to their Registration Statements contaning the same disclosure.  (*See, e.g.,* Merrill Lynch Global Allocation Fund, Form N-1A, Amendment No. 22 (Feb. 17, 2004); Merrill Lynch Dragon Fund, Form N-1A, Amendment No. 17 (April 22, 2004)).  Not all of the Merrill Lynch Funds have filed an amendment to incorporate this language, although it appears that they will do so as the file their annual amendments to their Registration Statements.

<u>**COUNT I**</u>

(Violation of Section 11 of the Securities Act)

159.    Plaintiff DeBenedictis incorporates herein by reference the allegations contained in paragraphs 1 through 158 above as if fully set forth herein at length.  This Count is asserted under Section 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, on behalf of the Securities Act Subclass against defendants FAM Distributors, MLPF&S, Merrill Lynch and Merrill Lynch Group.

160.    The Prospectuses, Statements of Additional Information and Registration Statements for the Merrill Lynch Mutual Funds contained untrue statements and material fact

and omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading, as set forth above.

161.    Defendants FAM Distributors and MLPF&S served as underwriters for the Class B Shares issued by the Merrill Lynch Funds.

162.    Defendants Merrill Lynch and Merrill Lynch Group are controlling persons of defendant FAM Distributors under Section 15 of the Securities Act.   Defendant Merrill Lynch is also a controlling person of defendant  MLPF&S under Section 15 of the Securities Act.

163.    Plaintiff DeBenedictis and the members of the Securities Act Subclass were unaware of the aforesaid misrepresentations and omissions of material fact at the time they purchased their Shares and could not have discovered them by the exercise of reasonable diligence prior to their purchases.

164.    Plaintiff DeBenedictis and the members of the Securities Act Subclass were damaged as a result of defendants' misrepresentati ons and omissions of material fact as they have purchased Shares in the Merrill Lynch Funds that carry lower yields and are burdened with higher expenses.

165.    By virtue of the foregoing, defendants FAM Distributors and MLPF&S have violated Section 11 of the Securities Act and are liable to plaintiff DeBenedictis and the other members of the Securities Act Subclass, each of whom suffered damages as a result of such violations in an amount which cannot presently be determined.  Defendants Merrill Lynch and Merrill Lynch Group are liable to Plaintiff DeBenedictis and the other members of the Securities Act Subclass as controlling persons under Section 15 of the Securities Act.

166.    Under Section 24(e) of the Investment Company Act,  15 U.S.C. § 80a-24(e) and Item 512(a)(2) of Regulation S-K, 17 C.F.R. § 229.512(a)(2), this action is commenced within

three years of the *bona fide* public offering of the Shares and is also commenced within one year of the time any member of the Securities Act Subclass could have learned of the wrongs alleged herein.

167.    The first date when any member of the Securities Act Subclass could have learned of the wrongs alleged was October 20, 2003, when Standard & Poor's issued the press release describing the results of its study of the financial performance of Class B Shares.

## COUNT II

(Violation of Section 12(a)(2) of the Securities Act)

168.    Plaintiff DeBenedictis incorporates herein by reference the allegations contained in paragraphs 1 through 158 above as if fully set forth at length.  This Count is asserted under Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(a)(2), 77o, on behalf of the Securities Act Subclass against defendants FAM Distributors, MLPF&S, Merrill Lynch and Merrill Lynch Group.

169.    The Registration Statements, Prospectuses and Statements of Additional Information pursuant to which the Merrill Lynch Funds were offered contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made therein concerning the relative merits of Class B Shares issued by the Merrill Lynch Funds not misleading in light of the circumstances.

170.    Plaintiff DeBenedictis and the members of the Securities Act Subclass did not know of the material facts mistated in and omitted from the Registrations Statements, Prospectuses and Statements of Additional Information.

171.    Defendants FAM Distributors and MLPF&S were sellers of the Class B Shares purchased by the members of the Securities Act Subclass under Section 12 of the Securities Act.

FAM Distributors was a seller because it passed title to the Shares sold to the members of the Securities Act Subclass.  MLPF&S was a seller because it solicited the members of the Securities Act Subclass to purchase the Shares motivated, at least in part, by a desire to serve its own financial interests or those of the securities owner.  Defendants Merrill Lynch and Merrill Lynch Group were controlling persons of FAM Distributors under Section 15 of the Securities Act.  Defendant Merrill Lynch was a controlling person of MLPF&S under Section 15 of the Securities Act.

172.    By reason of their conduct as described above, defendants FAM Distributors and MLPF&S violated Section 12(a)(2) of the Securities Act causing injury to plaintiff DeBenedictis and the Securities Act Subclass in an amount that cannot presently be determined.  Defendants Merrill Lynch, and Merrill Lynch Group are jointly and severally liable as controlling persons under Section 15 of the Securities Act.

173.    This action is commenced within three years of the purchase of the Shares and within one year of the time any member of the Securities Act Subclass could have learned of the wrongs alleged herein.

174.    The first date when any member of the Securities Act Subclass could have learned of the wrongs alleged was October 20, 2003, when Standard & Poor's issued the press release describing the results of its study of the financial performance of Class B Shares.

175.    Plaintiff DeBenedictis and the members of the Securities Act Subclass hereby tender their Shares to the extent they still hold them; to the extent they do not they are entitled to rescissory damages.

## COUNT III

(For Violation of Section 10(b)
of the Exchange Act and

Rule 10b-5)

176.    Plaintiff DeBenedictis incorporates herein by reference the allegations contained in paragraphs 1 through 158 above as if fully set forth herein at length.  This Count is asserted under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of the Class against all defendants.

177.    Defendants had a pecuniary interest in the sale of the Class B Shares in the Merrill Lynch Funds, as follows:

•    MLPF&S benefited from sales of Class B Shares to the members of the Class because it earned more from sales of Class B Shares through Rule 12b-1 fees than it would have earned through commissions on sales of Class A or Class D Shares.

•    Merrill Lynch benefited from the increased revenues of MLPF&S because it is the parent of MLPF&S.

•    ML Investment Managers and Fund Asset Management benefited from the sale of Class B Shares to the members of the Class because sales of Class B Shares put more assets in the Merrill Lynch Funds than a comparable sale of Class A or Class D Shares would, thereby increasing assets under management and the fees collected by these defendants from the Merrill Lynch Funds.

•    Merrill Lynch, Merrill Lynch Group and Princeton Services benefited from the increased earnings of ML Investment Managers and Fund Asset Management because Princeton Services is the general partner of ML Investment Managers and Fund Asset Management, Merrill Lynch Group is its parent, and Merrill Lynch is

its ultimate parent.  Merrill Lynch also benefited as the limited partner of ML Investment Managers and Fund Asset Management.

178.    In connection with the offer and sale of securities, defendants intentionally or recklessly participated in a continuous course of conduct and employed devices, schemes or artifices to defraud members of the Class by portraying Class B Shares as a rational investment choice as compared to the purchase of Class A, Class C, or Class D Shares for investors who qualified for the discount on front-end load shares that would apply for an investment of $100,000 or more.

179.    In connection with the offer and sale of securities, defendants intentionally or recklessly omitted to state material facts necessary to make the statements made to Plaintiffs and the members of Class, in light of the circumstances under which they were made, not misleading. Specifically, defendants omitted to state the material fact that an investment in Class B Shares was economically irrational for investors who qualified for the discount on front-end load shares that would apply for an investment of $100,000 or more.  Further, defendants omitted to state the material fact that MLPF&S and the Merrill Lynch FAs had a conflict of interest in connection with sales of Class B Shares to the members of the Class as they earned more in commission income than they would have earned on an identical sale of Class A or Class D Shares.

180.    In connection with the offer and sale of securities, defendants intentionally engaged in acts, practices or a course of business which operated as a fraud or deceit on Plaintiffs and the members of the Class.

181.    Plaintiff and the other members of the Class were unaware of defendants' misconduct and of the misleading nature of the representations made in the Registration Statements, Prospectuses, and Statements of Additional Information pursuant to which the

Shares were sold and purchased the Shares relying upon the sufficency of the Registration Statements, Prospectuses, and Statements of Additional Information.

182.   Plaintiff and the other members of the Class have been damaged as a result of defendants' misconduct.

183.   Defendants are liable to Plaintiff and the members of the Class as primary violators or as control persons.

184.   Plaintiff and and the Class are entitled to rescission, damages or other appropriate relief.

## COUNT IV

(Violation of Section 10(b)
of the Exchange Act
and Rule 10b-10)

185.   Plaintiff DeBenedictis incorporates herein by reference the allegations contained in paragraphs 1 through 158 above as if fully set forth herein at length.  This Count is asserted under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-10 promulgated thereunder, 17 C.F.R. § 240.10b-10, on behalf of the Class against defendants MLPF&S and Merrill Lynch.

186.   Defendant MLPF&S is a registered broker-dealer subject to the requirements of Rule 10b-10 promulgated by the SEC under the Exchange Act.

187.   Pursuant to Rule 10b-10, MLPF&S was required, in connection with the sale of Shares in the Merrill Lynch Funds to the members of the Class to disclose both "[t]he amount of any remuneration received or to be received by the broker from such customer in connection with the transaction" and "[t]he source and amount of any other remuneration received or to be received by the broker in connection with the transaction . . . ."

188.     MLPF&S relied upon the Prospectuses for the Merrill Lynch Funds to fulfill its obligations under Rule 10b-10.  As the Prospectuses failed to disclose the precise amount that MLPF&S received pursuant to the sales of the Shares of the Merrill Lynch Funds to the members of the Class, and MLPF&S knew that they omitted this information, MLPF&S violated Section 10(b) of the Exchange Act and Rule 10b-10 thereunder.

189.     Merrill Lynch is liable for MLPF&S's violation of Rule 10b-10 as a control person under Section 20(a) of the Exchange Act.

190.     Plaintiff and the members of the Class are entitled to rescission, damages or other appropriate relief.

## JURY DEMAND

191.     Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the members of the Class and the Securities Act Subclass respectfully request that the Court enter judgment as follows:

a.     Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.     Appointing Plaintiff as the representative of the Class and the Securities Act Subclass and appointing his counsel as counsel to the Class and the Securities Act Subclass.

c.     Awarding Plaintiff and the Class compensatory damages or recsission;

d.     Awarding Plaintiff and the Securities Act Subclass compensatory damages or rescission;

e.      Awarding Plaintiff, the Class and the Securities Act Subclass the costs and expenses incurred in this litigation including reasonable attorneys' and expert witness fees; and

f.      Granting Plaintiff, the Class and the Securities Act Subclass such other and further relief as the Court deems just and proper.

Dated: July 9, 2004                    PELLETTIERI, RABSTEIN & ALTMAN


By:      _____/s/ Christine F. Lewis_____
         Arthur Penn (AP 2952)
         Christine F. Lewis (CL 5685)
         790 Woodlane Road
         Mt. Holly, New Jersey 08060
         (609) 267-3390

         CHIMICLES & TIKELLIS LLP
         James R. Malone, Jr.
         (JM 2058)
         (Appearing *Pro Hac Vice*)
         Kimberly M. Donaldson
         (KD 3893)
         (A Member of the Bar of this Court)
         361 West Lancaster Avenue
         Haverford, PA 19041
         (610) 642-8500
         **Plaintiffs' Lead Counsel**
              and
         Michael J. DeBenedictis
         (MD 8048)
         (A Member of the Bar of this Court)
         41 South Haddon Avenue
         Suite 5
         Hadddonfield, NJ 08033

         **Attorneys for Plaintiff, the Proposed Class and the Proposed Securities Act Subclass**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of July, 2004, I have caused true and correct copies of

the foregoing to be served via overnight courier, as follows:

Brian F. Amery
David Libowsky
BRESSLER, AMERY & ROSS P.C.
325 Columbia Turnpike
Florham Park, New Jersey 07932

Marc T.G. Dworsky
Dennis C. Brown
David H. Fry
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue - 35th Floor
Los Angeles, California 90071-1560

Jeffrey J. Greenbaum
Steven D. Gorelick
SILLS CUMMIS EPSTEIN & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400

Robert B. McCaw
Douglas Curtis
Robert W. Trenchard
Michael H. Park
WILMER CUTLER PICKERING HALE AND DORR, LLP
399 Park Avenue
New York, New York 10022

_____/s/ Christine F. Lewis_____
Christine F. Lewis