UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THOMAS J. DEBENEDICTIS                    :
on behalf of himself and all others
similarly situated                       :

      Plaintiffs,                        :        Civil Action No. 04-404 (JLL)

v.                                        :        Honorable Jose L. Linares

MERRILL LYNCH & CO., INC.;                :
MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED;                     :        Return Date: December 27, 2004
MERRILL LYNCH GROUP, INC.;
FAM DISTRIBUTORS, INC.; MERRILL :          Oral Argument Requested
LYNCH INVESTMENT MANAGERS,
L.P.; FUND ASSET MANAGERS, L.P.,          :
and PRINCETON SERVICES, INC.,

      Defendants.                        :

---

### BRIEF OF DEFENDANTS FAM DISTRIBUTORS, INC; MERRILL LYNCH INVESTMENT MANAGERS, L.P.; FUND ASSET MANAGEMENT, L.P.; AND PRINCETON SERVICES, INC. IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

---

SILLS CUMMIS EPSTEIN & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000

WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

Attorneys for Defendants
FAM Distributors, Inc.,
Merrill Lynch Investment Managers, L.P.,
Fund Asset Management, L.P. and
Princeton Services, Inc.

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 5

    I.    The Parties ................................................................................. 5

    II.    The Registration Statements And Their Disclosures
            About The Share Classes' Costs And Benefits ......................... 6

    III.    The Complaint .......................................................................... 10

ARGUMENT ...................................................................................................... 13

    I.    The Complaint Fails To State A Claim Because The
            Registration Statements Concededly Set Out The True
            Facts About Share Classes, And The Supposedly Omitted
            Information Is Simply Wrong As A Matter Of Mathematics. ............... 13

    II.    The Complaint Fails To State A Claim Because There Is
            No Duty To Provide Personalized Investment Advice In
            A Registration Statement. ........................................................ 19

        A.    SEC Policy Is To Require Advice About Suitability At
               The Point Of Sale, Not In A Registration Statement ................... 20

        B.    The Additional Disclosures Sought By Plaintiff,
               Even If True, Would Add Nothing Material
               To What Is Already Disclosed .................................................. 25

    III.    The Complaint Fails To State A Claim Because
            Plaintiff's Claims  Are Time Barred. ......................................... 31

    IV.    The Complaint Fails To State A Claim Because It Fails
            To Plead *Scienter* With The Particularity Required
            By The PSLRA For Section 10(b) Claims. ................................. 36

CONCLUSION ................................................................................................... 38

## TABLE OF AUTHORITIES

### CASES

Page

*Aaron v. SEC,*
  446 U.S. 680 (1980) ..................................................................................... 36

*In re Advanta Corp. Securities Litigation,*
  180 F.3d 525 (3d Cir. 1999) .................................................................... 18, 37

*Armstrong v. McAlpin,*
  699 F.2d 79 (2d Cir. 1983) ............................................................................. 31

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ...................................................................................... 24

*Benzon v. Morgan Stanley Distributors, Inc.,*
  No. 3:03-0159, 2004 WL 62747 (M.D. Tenn. Jan. 8, 2004) ............................. 4, 25-27, 30

*Board of Sch. Comm'rs v. Jacobs,*
  420 U.S. 128 (1975) ...................................................................................... 33

*In re Burlington Coat Factory Securities Litigation,*
  114 F.3d 1410 (3d Cir. 1997) ....................................................................... 5, 36

*In re Canandaigua Securities Litigation,*
  944 F. Supp. 1202 (S.D.N.Y. 1996) ................................................................. 38

*In re Carter-Wallace, Inc. Securities Litigation,*
  220 F.3d 36 (2d Cir. 2000) ............................................................................. 37

*Castillo v. Dean Witter Discover & Co.,*
  97 Civ. 1272 (RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998) ...................... 26

*Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.,*
  68 F. Supp. 2d 480 (D.N.J. 1999) ................................................................... 18

*Chiarella v. United States,*
  445 U.S. 222 (1980) ....................................................................................... 19

*In re Comshare Inc. Securities Litigation,*
  183 F.3d 542 (6th Cir. 1999) .......................................................................... 37

*Consolidated Gold Fields, PLC v. Anglo America Corp. of South Africa Ltd.,*
  713 F. Supp. 1457 (S.D.N.Y. 1989)................................................................ 24, 25, 29-30

*Data Probe Acquisition Corp. v. Datatab, Inc.,*
  722 F.2d 1 (2d Cir. 1983) ........................................................................................ 27

*In re Digital Island Securities Litigation,*
  223 F. Supp. 2d 546 (D. Del. 2002) ......................................................................... 37

*Dodds v. Cigna Security Inc.,*
  12 F.3d 346 (2d Cir. 1993) .......................................................................... 24, 31, 32

*Doug Grant, Inc. v. Greate Bay Casino Corp.,*
  232 F.3d 173 (3d Cir. 2000) .................................................................................... 14

*Eckstein v. Balcor Film Investors,*
  58 F.3d 1162 (7th Cir. 1995) ................................................................................... 32

*Farr v. Shearson Lehman Hutton, Inc.,*
  755 F. Supp. 1219 (S.D.N.Y. 1991) ......................................................................... 32

*Geiger v. Solomon-Page Group, Ltd.,*
  933 F. Supp. 1180 (S.D.N.Y. 1996) ......................................................................... 23

*Howell v. Mgmt. Assistance, Inc.,*
  519 F. Supp. 83 (S.D.N.Y. 1981) ............................................................................. 27

*Jackson National Life Insurance Co. v. Merrill Lynch & Co.,*
  32 F.3d 697 (2d Cir. 1994)....................................................................................... 32

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001) ..................................................................................... 38

*Menowitz v. Brown,*
  991 F.2d 36 (2d Cir. 1993)....................................................................................... 32

*Nelsen v. King County,*
  895 F.2d 1248 (9th Cir. 1990) ................................................................................. 33

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ................................................................................ 18-19

*Oran v. Stafford,*
  226 F.3d 275 (3d Cir. 2000)..................................................................................... 20

*Oxford Asset Mgmt. v. Jaharis*,
  297 F.3d 1182 (11th Cir. 2002) ............................................................... 19

*In re Party City Securities Litigation*,
  147 F. Supp. 2d 282 (D.N.J. 2001) .......................................................... 37

*Philadelphia v. Fleming Cos.*,
  264 F.3d 1245 (10th Cir. 2001) ............................................................... 23

*Pinter v. Dahl*,
  486 U.S. 622 (1988) .................................................................................. 25

*Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998) ....................................................................... 5

*In re Real Estate Associates Ltd. P'ship Litigation*,
  223 F. Supp. 2d 1109 (C.D. Cal. 2002) .................................................... 27

*Romani v. Shearson Lehman Hutton*,
  929 F.2d 875 (1st Cir. 1991) .................................................................... 19

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ..................................................................... 18

*SEC v. Texas Gulf Sulpher Co.*,
  401 F.2d 833 (2d Cir. 1968) ..................................................................... 25

*Shapiro v. UJB Financial Corp.*,
  964 F.2d 272 (3d Cir. 1992) ..................................................................... 18

*Shaw v. Digital Equipment Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ............................................................... 19-20

*In re Stac Electrics Securities Litigation*,
  89 F.3d 1399 (9th Cir. 1996) ................................................................... 18

*Stone v. Williams*,
  970 F.2d 1043 (2d Cir. 1992) ................................................................... 31

*Strougo v. Bear Stearns & Co.*,
  95 Civ. 6532(RPP), 1997 WL 458667 (S.D.N.Y. Aug. 11, 1997) ............ 6

*TSC Industrial, Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976) ................................................................24

*White v. Melton,*
   757 F. Supp. 267 (S.D.N.Y. 1991) ...........................................6

*Wilson v. Bernstock,*
   195 F. Supp. 2d 619 (D.N.J. 2002)...........................................5

## STATUTES AND RULES

15 U.S.C. § 77e(b)(2) ......................................................................6

15 U.S.C. § 77k .......................................................................13, 19

15 U.S.C. § 77*l*.........................................................................13, 19

15 U.S.C. § 77m ..........................................................................31

15 U.S.C. § 78j ............................................................................19

15 U.S.C. § 78u-4......................................................................5, 18, 36

28 U.S.C. § 1658(b) ......................................................................31

17 C.F.R. § 240.10b-5 ..................................................................13

Federal Rule of Civil Procedure 9(b) .....................................14, 17-19

## REGULATORY MATERIALS

*Confirmation Requirements and Point of Sale Disclosure*
   *Requirements for Transactions in Certain Mutual Funds*
   *and Other Securities, and Other Confirmation Requirement*
   *Amendments, and Amendments to the Registration Form for*
   *Mutual Funds,* 69 Fed. Reg. 6438 (proposed Feb. 10, 2004) ...................23, 30

*Exemption for Open-End Management Investment Companies*
   *Issuing Multiple Classes of Shares; Disclosure by Multiple*
   *Class and Master-Feeder Funds; Class Voting on Distribution*
   *Plans,* 60 Fed. Reg. 11,876  (Mar. 2, 1995)................................ 21, 22

*Registration Form Used by Open-End Management Investment Companies,* 62 Fed. Reg. 10,898 (proposed Mar. 10, 1997) ...........................................22

*Registration Form Used by Open-End Management Investment Companies,* 63 Fed. Reg. 13,916 (Mar. 23, 1998) ...................................................... 21, 22

*Registration Form Used by Open-End Management Investment Companies; Guidelines,* 48 Fed. Reg. 37,928 (Aug. 22, 1983)......................................... 21

## PRELIMINARY STATEMENT

This case purports to be a class action about allegedly inadequate prospectus disclosure by mutual fund managers and distributors. In essence, Plaintiff claims that mutual fund prospectuses that complied fully with all SEC requirements and contained ample truthful and accurate information to enable all investors to make informed decisions respecting share class selection should have contained specific additional disclosures applicable only to large investors, like Plaintiff. As shown below, the allegedly omitted information would have been inaccurate; there is in any event no duty to include such information in prospectuses; and Plaintiff's claims are barred by the applicable statute of limitations.

Movants are mutual fund managers and distributors affiliated with Merrill Lynch & Co., Inc. ("ML & Co."). Movants participate in preparing registration statements ("Registration Statements") that are filed with the Securities and Exchange Commission (the "SEC") in connection with certain mutual funds that Movants advise (the "Funds"). As shown below, the Registration Statements disclose all the necessary information mandated by the SEC to guide investors considering investing in the Funds. Investors purchasing Fund shares predominantly do so through their brokers, not directly with Movants.

Among other things, the Registration Statements describe the "Merrill Lynch Select Pricing System," which explains in detail the differences among the Funds' different share classes. As is common among mutual funds, the Funds offer different share classes — B, C and D[1] — which afford investors a choice in how they pay the

---

[1] As noted in the Amended Class Action Complaint (the "Complaint"), the share classification scheme was reorganized in April 2003. Like the Complaint, this brief employs the prior classification scheme to avoid confusion. (Complaint ¶ 5 n.2.) In

expenses associated with their Fund investments. D shares impose a sales charge at the time they are bought (a "front-end load") and a small annual fee (called a "12b-1" fee after the SEC rule permitting it); B and C shares impose a sales charge, if at all, at the time they are sold (a "back-end load"), and have a somewhat higher annual 12b-1 fee than D shares.

Plaintiff complains that since February 1, 1999 he has bought over $500,000 of B shares from his broker at Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S") when, in retrospect, C or D shares would have proved more beneficial. He seeks to undo his own investment decisions. To do so, he combs the Registration Statements in search of a claim that he was "misled." Plaintiff's problem, however, is that the descriptions of the different share classes in the Registration Statements are all true. Indeed, he nowhere denies that the Registration Statements provide — truthfully — all material information necessary to enable any reasonable investor to decide which share class best suits his or her needs. Thus, Plaintiff is left to argue that the Registration Statements should have provided additional advice focused on wealthy investors like him — specifically, that B shares purportedly "never make economic sense" for people investing over $100,000. (Complaint ¶ 9.) He seeks to assert this claim on behalf of a class of all Fund purchasers of B shares in amounts over $100,000. His claim fails and should be dismissed under Fed. R. Civ. P. 12(b)(6), as a matter of law, for several reasons.

*First*, the Complaint cannot satisfy the most basic element of a disclosure claim — a misstatement or omission of material *fact*. Plaintiff effectively *concedes*

---

addition, because A shares are only available to limited groups of investors, this brief focuses on B, C and D shares.

that the Registration Statements do not misstate any material fact, and that they describe truthfully the material financial characteristics of the share classes. Worse yet, the asserted information that Plaintiff claims was omitted — that B shares are irrational in amounts over $100,000 — is neither a "fact" nor "true," but rather a theory that flows from a demonstrable failure in logic.

The sole basis for Plaintiff's hypothesis that B Shares "never make economic sense" is that, for investments over $100,000, "they are out-performed over longer holding periods by Class D Shares and over shorter periods by Class C Shares." (Complaint ¶ 76.) As we show below, however, while C or D shares may allegedly be superior to B shares for an investor who definitely knows how long he will hold his shares, an investor who, like most investors, is uncertain about his holding period might reasonably opt for a middle course (*i.e.,* B Shares), thus passing up the potentially "best" result in order to avoid the potentially worst result should his prediction prove wrong (*i.e.,* of opting for D Shares but deciding or needing to sell early, or opting for C Shares but deciding instead to hold long term). And, further, Plaintiff's theory entirely ignores that sales charges for B shares can be waived in certain circumstances, as is made clear in the Registration Statements. So the entire basis of the Complaint is shown to be wrong as a matter of mathematics.

***Second***, even if, contrary to reality, the allegedly omitted information were correct, Movants were under no legal duty to disclose it in the Registration Statements. SEC regulations and policy, as well as the applicable case law, confirm that: (1) Registration Statement disclosure is confined to precisely the sort of basic financial facts that were undisputedly disclosed here; and (2) disclosure of particularized advice to an individual investor, focusing on his or her unique

3

circumstances and needs, should be made by the broker at the point of sale, not in the Registration Statement. These principles accord with common sense. They are rooted in the recognition that it is impossible for Registration Statements to provide tailored investment advice for every conceivable subgroup of investors, of different ages, needs, aspirations and risk tolerances, even if it were possible to predict and account for all their endless permutations. The SEC has designed the form of the Registration Statements to educate the average investor, not to overwhelm all investors with particularized advice tailored to individual sub-groups.

Indeed, a very similar class action was dismissed earlier this year in *Benzon v. Morgan Stanley Distributors, Inc.*, No. 3:03-0159, 2004 WL 62747 (M.D. Tenn. Jan. 8, 2004) (attached as Appendix A), on the ground that there is no duty to disclose in a Registration Statement particularized investment advice of the very kind at issue here. *Benzon* alone is fatal to Plaintiff's claims.

***Third***, Plaintiff's claims are also time-barred. The longest applicable limitations period is two years. Plaintiff and purported class members were on inquiry — if not actual — notice of their alleged claims more than two years before the filing of this suit from the Registration Statements themselves and from public debate about the very issues that Plaintiff raises. Indeed, Plaintiff, recognizing the existence of a statute of limitations issue, tries to assert that it was only the latest of the public reports that put him on meaningful notice of his claims. That position is contrary to controlling law.

***Finally***, Plaintiff's securities fraud claim is defective for the additional reason that it fails to allege facts giving rise to any inference, much less a strong inference, of

*scienter,* as is required under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*

## STATEMENT OF FACTS

This Statement of Facts is based on the Complaint and documents cognizable on this motion, including the Registration Statements and other documents relied on in the Complaint.[2] Relevant portions of these documents are attached as exhibits to the accompanying Declaration of Robert Trenchard ("Trenchard Decl.").

### I.     The Parties

Movants are the managers of the Funds' portfolios, Merrill Lynch Investment Managers, L.P. (f/k/a Merrill Lynch Asset Management, L.P.), and Fund Asset Management, L.P.; the managers' general partner, Princeton Services, Inc.; and the distributor and underwriter of the Funds, FAM Distributors, Inc. ("FAM Distributors," or the "Distributor") (f/k/a Merrill Lynch Funds Distributor, Inc.). The other defendants include two direct and indirect parent companies of Movants, ML & Co., and the Merrill Lynch Group, Inc., both named as purported "control persons" (Complaint ¶¶ 162, 171); and MLPF&S, a registered broker-dealer that acted as Plaintiff's broker with respect to his purchases of Fund shares pursuant to a dealership agreement with the Movants (*id.* ¶ 38). These affiliates have filed their own motion to dismiss, and also have joined in the instant motion.

---

[2] On this motion, the Court may consider documents incorporated by reference or relied on in the Complaint. *Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir. 1998); *In re Burlington Coat Factory Secs. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997). The Court may also take judicial notice of and consider documents filed with the SEC, as matters of public record. *See, e.g., Wilson v. Bernstock,* 195 F. Supp. 2d 619, 623-24 (D.N.J. 2002).

Plaintiff DeBenedictis claims he bought over $500,000 of B shares in five

Funds between February 1999 and August 2001 through his broker at MLPF&S. (*Id.*

¶¶ 123-27.) He purports to assert claims on behalf of a class of persons who bought B

shares in the Funds in amounts over $100,000. (*Id.* ¶¶ 2, 151.)

## II.    The Registration Statements And Their Disclosures About The Share Classes' Costs And Benefits

Each Fund files a Registration Statement with the SEC before selling any

shares, and files periodic amendments thereafter. (*Id.* ¶ 28.) Among other things, the

Registration Statement describes a Fund's investment strategy (*see, e.g.*, Dec. 29,

1998 Global Growth Fund Prospectus,[3] Trenchard Decl. Ex. A ("Prospectus, Ex. A")

at 3, 6, using the Registration Statement for the Global Growth Fund, in which

Plaintiff allegedly invested, for illustration purposes),[4] its risks (*id.* at 7-14), and its

distribution and management arrangements (Dec. 29, 1998 Global Growth Fund

SAI,[5] Trenchard Decl. Ex. B ("SAI, Ex. B") at 12, 22-24). It also describes in detail the

---

[3] The Global Growth Fund Registration Statement was filed on September 10, 1997 and was amended thereafter. Plaintiff alleges that, on February 1, 1999, he purchased B shares of the Global Growth Fund in an amount that would have qualified him for a volume discount (called a "breakpoint") at the $100,000 level on D shares. Complaint ¶ 123.) Thus, this brief cites to the December 29, 1998 Prospectus and Statement of Additional Information ("SAI") (Trenchard Decl. Exs. A, B), which were the documents pursuant to which Plaintiff made this purchase.

[4] Plaintiff alleges the Registration Statements for all Funds are materially identical. (Complaint ¶ 42.)

[5] The Registration Statement is comprised of two documents — the Prospectus, which is given to each investor (15 U.S.C. § 77e(b)(2)), and the SAI, which is provided only upon request, as well as exhibits to those documents. As a matter of law, the SAI is deemed incorporated into the Prospectus. *See White v. Melton*, 757 F. Supp. 267, 271 (S.D.N.Y. 1991); *Strougo v. Bear Stearns & Co.*, 95 Civ. 6532(RPP), 1997 WL 458667, at *5, n.3 (S.D.N.Y. Aug. 11, 1997). This brief's usage of the term, Registration Statement, encompasses both the Prospectus and the SAI.

Fund's share classification scheme, known as the "Merrill Lynch Select Pricing System," including the key attributes of the different share classes and a checklist of factors for investors to consider in choosing among share classes.

**The Basic Facts About Share Classes:** The Registration Statements explain that while each share class represents the same ownership interest in the Fund (Prospectus, Ex. A at 15), the classes differ in how investors pay for the costs associated with such investments. The Registration Statements devote several pages to explaining these differences. For example, pages 4 and 16 of the Registration Statement for the Global Growth Fund summarize and compare the different share classes' costs in two charts. (*Id.* at 4, 16.) Following the first chart is an SEC-mandated illustration of the costs associated with each share class for different holding periods based on a hypothetical $10,000 investment. (*Id.* at 5.) Surrounding the second chart is a detailed, six-page narrative describing the financial and other differences among share classes. (*Id.* at 15-20.) These same issues receive an additional ten pages of detailed treatment in the accompanying SAI. (SAI, Ex. B at 14-22.)

By way of example, for equity funds[6] the main quantitative differences in share classes are as follows:

- **B shares** have no initial sales charge, but instead have a back-end charge (known as a contingent deferred sales charge, or CDSC) of 4% if the shares are sold within the first year, declining 1% per year thereafter

---

[6] The Registration Statements for fixed-income (bond) Funds provide similar information, although the costs of those Funds differ in ways not material here. (*See, e.g.*, Sept. 1, 2000 U.S. High Yield Fund Prospectus, Trenchard Decl. Ex. C at 19-23; Complaint ¶¶ 48-50, 56.)

to 0% after four years.[7] (Prospectus, Ex. A at 19.) In addition, B shares charge 1% in annual 12b-1 fees for eight years, then convert into D shares with an annual 12b-1 fee of 0.25%. (*Id.* at 18, 20.)

- **C shares**, like B shares, have no initial sales charge, but instead impose a CDSC of 1% if sold within the first year of purchase, and no sales charge thereafter. In addition, C shares charge 1% in annual 12b-1 fees for as long as the shares are held, as C shares never convert to D shares. (*Id.* at 20.)

- **D shares** have an up-front charge (or "load") starting at 5.25%, which is reduced to 4.75% for investments at or above $25,000 (known as a "breakpoint"), 4% at $50,000, 3% at $100,000, 2% at $250,000, and 0% for investments of $1 million or more. (*Id.* at 17.) D shares also charge 0.25% in annual 12b-1 fees. (*Id.* at 18.)

The Registration Statement also identifies when sales charges might be "reduced or waived." (*Id.* at 17-20.) The deferred sales charges on B Shares may be reduced or waived in connection with, among other things, "[c]ertain post-retirement withdrawals from an IRA or other retirement plan if you are over 59 1/2 years old," and "[w]ithdrawals resulting from shareholder death or disability." (*Id.* at 19.) Different conditions are listed for the other share classes. (*Id.* at 17-18, 20.) And the SAI provides more information and offers toll-free numbers for investors to call for still more information. (*See, e.g.*, SAI, Ex. B at 20-21.)

**The Investor Checklist:** Nothing in the Registration Statement purports to give investors specific investment advice about the merits of one share class or another. On the contrary, the Registration Statement emphasizes that the investor, and not any of the Movants, is responsible for this analysis: "After determining which classes you are eligible to buy, decide which class best suits your needs." (Prospectus, Ex. A at 4.) To further inform this choice, however, the Registration Statement

---

[7] For shares bought after June 1, 2001, the sales charge on B shares disappears after six years. This difference is not material for purposes of this motion.

provides a detailed checklist of trade-offs that an investor should weigh in selecting a share class.

Thus, the Registration Statement says that, starting with "the size of [the] investment" and "how long [the investor] plan[s] to hold [the] shares" (*id.* at 15), investors should consider two other factors especially pertinent here:

- ✓ **Up-Front Charges vs. Back-End Charges Plus Annual Fees**: The Registration Statement urges investors to focus on the different impact of a front-end charge (D shares) versus a back-end charge plus higher annual fees (B and C shares). For instance: "Investors ... may elect to purchase ... Class D shares, because over time the accumulated ongoing account maintenance and distribution fees on Class B ... shares may exceed the initial sales charges and ... account maintenance fee [for D shares]." (SAI, Ex. B at 15.) Other similar warnings are at pages 4, 15 and 18 of the Prospectus.

- ✓ **Breakpoint Discounts vs. No Discounts**: The Registration Statement similarly urges investors to focus on the potential effect of breakpoint discounts, which are not available for B shares. "Investors qualifying for significantly reduced initial sales charges may find the initial sales charge alternative particularly attractive because similar sales charge reductions are not available with respect to the deferred sales charges ... of Class B ... shares." (*Id.* at 15.)

As shown further below (pages 15-16), these basic disclosures allow a reasonable investor to compare the costs and benefits of each share class in light of that investor's age, needs, investment amount, investment purpose, expected holding period, and view about the prospects of the Fund. Moreover, the checklist draws the investor's attention to precisely the issues that underlie Plaintiff's claim here.

**Financial Advisors And Their Compensation**: For those who want more help — besides the Prospectus, the SAI, and the toll-free advice phone line — the Registration Statement specifically advises investors to speak with their financial advisors to "determine which share class is best suited to your personal financial goals." (Prospectus, Ex. A at 15; *see also id.* at 4.)

9

The Registration Statement does not speculate about how brokerage houses selling the funds might decide to compensate their employees with respect to sales of different share classes. It does explain, however, that brokers do receive compensation for their sales; where the money to pay such compensation comes from;[8] and that "[s]ales personnel may receive different compensation for selling different classes of shares" (SAI, Ex. B at 14), thus putting investors on notice of the possibility that differential compensation of brokers might affect the advice brokers might give.[9]

## III.    The Complaint

Plaintiff asserts claims under (1) Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "'33 Act") against FAM Distributors and MLPF&S as alleged "underwriters" (Complaint ¶¶ 159, 161, 165, 168, 172); (2) Section 15 of the '33 Act against ML & Co. and Merrill Lynch Group, Inc., as "controlling persons" (*id.* ¶¶ 159, 162, 165, 168, 171); (3) Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act"), and Rule 10b-5 thereunder, against all defendants (*id.* ¶¶ 176-184); (4) Section

---

[8] It explains that, for B shares, "[t]he Distributor uses the money that it receives from the deferred sales charges and the distribution fees to cover the costs of marketing, advertising and compensating the Merrill Lynch Financial Consultant or other securities dealer who assists you in purchasing Fund shares." (Prospectus, Ex. A at 18; *see also* SAI, Ex. B at 22.) It similarly explains what percentage of D share sales charges is used to compensate dealers. (Prospectus, Ex. A at 17.)

[9] The Funds have a distribution agreement with FAM Distributors, which in turn has dealership agreements with dealers, including MLPF&S. These agreements are attached to the Registration Statements. (*See* Trenchard Decl. Exs. D-J.) The agreements do not disclose how those dealers expect to use the money they receive to compensate their brokers. (*Id.*)

10(b) of the '34 Act, and Rule 10b-10 thereunder, against MLPF&S and ML & Co. (*id.* ¶¶ 185-190); and (5) Section 20(a) of the '34 Act against all defendants (*id.* ¶ 176).

As noted, Plaintiff's key contention is that the Registration Statements should go beyond truthful, comprehensive information directed to all potential investors, and provide focused advice tailored to the narrow category of people who invest over $100,000, and thus qualify for reduced sales charges in Class D shares, because "B Shares never make economic sense" for these investors. (Complaint ¶ 9.) Plaintiff's theory proceeds from the premise, based on "information and belief" (*id.* at 1), that Class B shares "are out performed over longer holding periods by Class D Shares and over shorter periods by Class C Shares." (*Id.* ¶ 76; *see also id.* ¶ 133.)

What's missing is telling. The Complaint does *not* allege that the share class data in the Registration Statements are false, or that any reasonable investor could not use the data provided to weigh the relative costs and benefits of B shares.

The Complaint instead quarrels with the "placement" and "emphasis" of disclosures that are concededly made in the Registration Statements, asserting that they "cast Class B Shares in an unduly positive light" for investors purchasing over $100,000 worth of shares. (*Id.* ¶ 129.) In that vein, Plaintiff tries his hand at line-editing the Registration Statements to tailor them to the unique circumstances of these wealthy investors. (*Id.* ¶¶ 130-50.)

Plaintiff also complains that the Registration Statements fail to disclose that MLPF&S brokers purportedly received higher commissions for selling B shares than other share classes in situations where investors qualified for breakpoints. (*Id.* ¶ 9.) He acknowledges, however, that the Registration Statements do disclose that "[s]ales personnel may receive different compensation for selling different classes of shares"

(*id.* ¶ 149), but labels this straightforward statement as "cryptic" (*id.*). He conspicuously does not allege, however, that any of the Movants here — who were the authors of the Registration Statements, *not* the brokers selling the Funds — knew how the broad array of separate brokerage entities, including brokers other than MLPF&S, would compensate their brokers for selling Fund shares.

As for Plaintiff's purported fraud claim, the only apparent theory of *scienter* in the Complaint is that Movants supposedly "benefited from the sale of Class B Shares . . . because [those shares] put more assets in the Merrill Lynch Funds than a comparable sale of Class A or Class D shares would, thereby increasing assets under management and the fees collected by these defendants from the Merrill Lynch Funds." (*Id.* ¶ 177; *see also id.* ¶ 92.) Of course, this supposed motive for fraud is taken directly from the Registration Statements themselves, which disclose this information. (SAI, Ex. B at 14, 22.) Although, as shown below, this allegation is far too generic to adequately plead *scienter*, the Complaint does not explain how this open and public part of Movants' business could simultaneously be a secret motivation to defraud B share investors.

Finally, the Complaint canvasses several economic studies, regulatory proceedings, and pieces of regulatory history, purportedly in support of the notion that investors do not fully appreciate the differences between share classes. (*Id.* ¶¶ 77-88, 110-22.) But none of these references suggests that the solution to any consumer confusion that might exist is to put more information into Registration Statements. To the contrary, to the extent they address the issue, they all expressly argue for *less* information in Registration Statements and more disclosure at (and after) the point

of sale.[10] These citations are relevant here for yet another purpose not intended by Plaintiff: As shown below, they demonstrate that the investing public, including Plaintiff, was on inquiry notice of the very issues Plaintiff seeks to litigate well over two years before filing this lawsuit.

## ARGUMENT

I.   **The Complaint Fails To State A Claim Because The Registration Statements Concededly Set Out The True Facts About Share Classes, And The Supposedly Omitted Information Is Simply Wrong As A Matter Of Mathematics.**

The existence of a misstatement or omission of material *fact* is the most basic, threshold requirement of Sections 11 and 12 of the '33 Act and Section 10(b) and Rule 10b-5 of the '34 Act. *See* 15 U.S.C. § 77k (liability exists where disclosure "contain[s] an untrue statement of a material *fact* or omit[s] to state a material *fact* . . .") (emphasis added); 15 U.S.C. § 77*l*(a)(2) (same); 17 C.F.R. § 240.10b-5 (disclosure actionable only if it is an "untrue statement of a material *fact* or omit[s] to state a material *fact* necessary in order to make the statement[] made . . . not misleading")

---

[10] For instance, the 1998 speech by former SEC chairman Arthur Levitt quoted in the Complaint (Complaint ¶ 3) urges that the solution to shareholder confusion over share classes was to *reduce* the amount of information in registration statements and to improve investors' financial literacy. (Trenchard Decl. Ex. K at 2.) (Ironically, in this regard, Chairman Levitt complimented Merrill Lynch's investor-education efforts. (*Id.*)) Likewise, the two Government Accounting Office ("GAO") studies cited by Plaintiff (Complaint ¶¶ 74, 78-79) say that the solution is to enhance disclosure in investors' periodic account statements, not in registration statements. (Trenchard Decl. Ex. L at 97-98; Ex. M at 57.) And the Complaint cites a recent SEC proposal to enhance disclosure regarding share classes (Complaint ¶ 88), but that proposal, too, is specifically directed at disclosures at the point of sale, not in registration statements (*see* below page 23). Similarly, the National Association of Securities Dealers (the "NASD") and the SEC enforcement actions and settlements cited in the Complaint (*id.* ¶¶ 110-22) all concern alleged failures to disclose at the point of sale. None has anything to do with registration statements. (Trenchard Decl. Exs. N-T.)

(emphasis added). Because the Registration Statements set out, truthfully, all the facts they are legally required to disclose, and all the facts that are necessary for an investor to make a rational choice among share classes, the Complaint is fundamentally defective, as a matter of logic and of pleading under Rule 9(b).

### A.   The Complaint Fails On Its Face

As discussed above, the Registration Statements set out in detail all of the material facts about share classes, including:

- All of the basic financial facts about the different share classes, including the sales charges that apply depending on the amount of the investment (for D shares) or the length of the holding period (for B and C shares), the 12b-1 fees, B share conversion into D shares, and the circumstances in which sales charges may be waived or reduced (*see* above at 7-8);

- A discussion of the factors an investor should consider in weighing the costs and benefits of the share classes, such as the different rates for 12b-1 fees, the different schedules for sales charges, and the different points in time when sales charges come due (*see* above at 8-9); and

- How Movants compensate brokerage companies that sell the Funds, as well as the risk that those brokerage companies might compensate their brokers differently for different share classes (*see* above at 9-10).

Any reasonable investor could use these facts to understand the full impact of the various charges and fees and thus make a rational choice among the share classes suited to his or her particular circumstances. Indeed, Plaintiff concedes that Movants made these disclosures and that they *were truthful.*

Nonetheless, he alleges that the Registration Statements also should have disclosed that B shares are not "rational" investments in amounts over $100,000. This allegation fails to state a claim because, among other things, its premise is wrong on its face. A court is not obligated to credit such flawed allegations on a motion to dismiss. *See Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (a court "need not accept as true 'unsupported conclusions and unwarranted

inferences'" and should address a plaintiff's allegations in a "realistic, rather than a slavish, manner") (quoting *Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir.1998)).

The sole basis offered for the theory that B shares are "not rational" is that, for investments over $100,000, "they are out-performed over longer holding periods by Class D Shares and over shorter periods by Class C Shares." (Complaint ¶ 76.) Two simple illustrations, based solely on information in the Registration Statements themselves, illustrate how this thesis is incorrect. (The following are summaries of the examples, which are set out in detail in Appendix B.)

**Example 1:** The first example assumes (a) a growth rate for the Fund at the historic Nasdaq growth rate from 1990 to 2000 of 24.6%;[11] (b) that no sales charge waivers apply (for example, those applicable upon death, certain retirement accounts, etc.); and (c) that the shares are redeemed in each year of the example. As set forth in Appendix B, under this scenario, B shares (i) outperform D shares in years 2, 3 and 4, but underperform D shares thereafter; and (ii) underperform C shares in years 1, 2 and 3, match C shares in years 4, 5, 6 and 7, and outperform them thereafter. Equipped with these facts, an investor uncertain about how long to hold shares might well wish to invest in B shares. Such a choice would reflect the entirely rational

---

[11] Between January 2, 1990 and December 31, 1999, the Nasdaq Composite Index increased from 452.9 to 4069.3. <http://finance.yahoo.com/q/hp?s=^IXIC>. This translates into an average annualized rate of return of 24.6%, which can be checked simply by multiplying the opening index level by 124.6%, then multiplying that resulting number by 124.6%, and so on for a total of ten times. Aside from the Nasdaq, there were Funds that earned returns in the 1990s in this range, such as the Merrill Lynch Fundamental Growth Fund, one of the Funds listed in Exhibit A to the Complaint. (*See* Trenchard Decl. Ex. U at 6.)

calculus that it is better to forego the opportunity C shares offer of making an extra $2,000 in year 2, in order to avoid the risk they offer of earning $8,724 less than B shares in year 9, and to forego the opportunity D shares offer of making an extra $11,861 in year 9, at the risk of earning $432 less than B shares in year 2, or $702 less in year 3, or $513 less in year 4.

In the real world, rational people make such risk-balancing trade-offs on a daily basis. For instance, many rational people purchase convertible mortgages — home loans with an interest rate that is fixed for a period of time — *e.g.*, 5 years — and then adjusts annually. These loans have a higher interest rate than pure adjustable-rate mortgages, and a lower rate than fixed-rate mortgages. In the investment climate of much of the past decade, where interest rates have been at historical relative lows, Plaintiff's logic would hold that, for a purchaser who expects to live in the home for only a few years, the adjustable mortgage is "always" the rational choice, and for one who expects to remain there forever, the fixed-rate alternative is "always" the rational choice. But it certainly does not follow that the millions of people opting for neither are irrational, much less that they have been duped. They simply prefer the certainty of doing reasonably well under all scenarios than opting for the ostensibly greatest payoff at the peril of the greatest loss.

The fallacy in Plaintiff's argument is that it ignores that investing is quintessentially a forward-looking endeavor and that many investors seek to balance the prospect of gain against the risk of loss. That an investor might prove, in retrospect, to have been a long- or short-term investor tells us nothing about his or her intent or level of certainty at the time of investing.