**Example 2:** The second illustration is the same as the first, except it assumes that the investor is eligible for a deferred sales charge waiver, because, for example, the shares were held in a qualifying IRA retirement account, or were redeemed upon the death or disability of the investor (factors that Plaintiff conveniently ignores). As shown in Appendix B, in such circumstances, B shares outperform D shares in years 1 through 4, though not thereafter, and they are equal to C shares from the outset, and outperform them from year 8 onward. This example demonstrates not simply that Plaintiff's "never rational over $100,000" theory is mistaken, but that even his premise that that C shares always outperform B shares for short-term periods is wrong. For an investor who was eligible for a deferred sales charge waiver and who thought that she was likely to sell her shares in the next five years, but wanted the option of holding longer, B shares would be not only rational, but the optimal choice. They would perform as well as C shares, but better than D shares if redeemed within the first five years, and better than C shares in the event she decided to hold for a longer period.

These examples could be varied in virtually limitless ways: the expected rate of return could be changed; the amount invested could be changed; the application of different waivers or reductions could be included. But these examples suffice to destroy Plaintiff's case because the theory that B shares are never rational in amounts over $100,000 — the purported "omission" here — is simply wrong as a matter of mathematics.

### B.     The Complaint Fails Under Rule 9(b)

This defect affecting all of Plaintiff's claims also renders them defective under Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "in all averments of

fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) plainly applies to Plaintiff's claim under Section 10(b) of the '34 Act, as do analogous provisions of the PSLRA, 15 U.S.C. § 78u-4(b)(1)(B). And the Third Circuit has held that Rule 9(b) also applies to claims under Sections 11 and 12 of the '33 Act where such claims "are grounded in fraud, rather than negligence." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 288 (3d Cir. 1992); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). That standard is easily met here, where the Section 11 and 12 claims are based on precisely the same factual averments as the Section 10(b) fraud claim.[12] (*See, e.g.*, Complaint ¶¶ 2, 8, 129, 133, 147, 179-180.)

Rule 9(b) and the PSLRA both require that claims of a misstatement or omission made on "information and belief," like those here, be backed up by particularized facts.[13] Such facts must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak v. Kasaks*, 216 F.3d

---

[12] *See Shapiro*, 964 F.2d at 287 (Section 11 and 12 claims grounded in fraud because the factual allegations upon which they were based "repeatedly aver that defendants 'intentionally,' 'knowingly,' or 'recklessly' misrepresented and omitted to represent certain material information."); *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996) (plaintiff's argument that it "specifically disclaimed any allegations of fraud with respect to its Section 11 claims" was "unconvincing where the gravamen of the complaint is plainly fraud"); *Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 487 (D.N.J. 1999) (Section 11 and 12(2) claims sound in fraud because they are based on allegations of "intentional misconduct").

[13] *See, e.g.*, 15 U.S.C. § 78u-4(b)(1)(B) (Complaint shall "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."); *Shapiro*, 964 F.2d at 285 (Rule 9(b) requires plaintiffs to "accompany such an allegation with a statement of fact upon which their allegation is based"); *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 530-33 (3d Cir. 1999).

300, 314 n.1 (2d Cir. 2000).[14] Plaintiff has not met this burden because the notion

that B shares are "never" rational for investments over \$100,000 is belied by the

Registration Statements themselves. Thus, the Complaint fails in its entirety under

Rule 9(b), too.

## II.   The Complaint Fails To State A Claim Because There Is No Duty To Provide Personalized Investment Advice In A Registration Statement.

Even if, contrary to fact, it were true that B shares were never suitable for

investments over \$100,000, the Complaint still fails to state a claim because there is

simply no legal duty to disclose in a Registration Statement whether shares are

suitable for particular sub-groups of investors. To the extent any such duty of

disclosure exists at all, it resides at the point of sale, where the particular needs,

assumptions, and risk tolerance of the investor can best be addressed.

An alleged omission is actionable only if there is a duty to disclose the allegedly

omitted information. 15 U.S.C. §§ 77k, 77l, 78j; *Chiarella v. United States*, 445 U.S.

222, 235 (1980) ("When an allegation of fraud [under Section 10(b)] is based upon

nondisclosure, there can be no fraud absent a duty to speak."); *Oxford Asset Mgmt. v.*

*Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002), *cert. denied*, 124 S. Ct. 205 (2003)

("[T]he duty question is properly stated as 'whether the defendants had a specific

obligation to disclose information of the type that the plaintiffs complain was omitted

from the registration statement and prospectus.'") (citing *Shaw v. Digital Equip.*

---

[14] *See also Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir. 1991)
("Where allegations of fraud are explicitly or, as in this case, implicitly, based only on
information and belief, the complaint must set forth the source of the information
and the reasons for the belief," and the "factual allegations [must] support a
reasonable inference" that there was a material misstatement or omission.).

*Corp.*, 82 F.3d 1194, 1202 (1st Cir. 1996)). A duty to disclose may exist where there is a statutory or common law disclosure obligation, or where it is necessary in order to make an existing statement not misleading. *See Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).

Here, not only is there no statute mandating the disclosure called for in the Complaint, but the existing regulatory framework — with which Movants complied entirely — specifically dictates how fees should be described, and even how their application should be illustrated *for the average investor*. This regulatory framework does not require disclosure of the alleged suitability of any share class for any sub-group of investor, and appropriately places that duty on brokers at the point of sale. Moreover, because the Registration Statements contain all of the information necessary for an investor to evaluate the share classes for him or herself, the additional disclosure sought by Plaintiff, even if it were an accurate statement of economics (and as shown above it is *not* accurate), adds nothing material to the Registration Statements, and there is no duty to disclose immaterial information.

## A.  SEC Policy Is To Require Advice About Suitability At The Point Of Sale, Not In A Registration Statement.

The SEC has repeatedly rejected the notion that personalized investment advice of the sort requested by Plaintiff should, or even can, be provided via Registration Statements, and instead has insisted that such tailoring occur through investor education and enforcement of disclosure obligations by brokers at the point of sale.

The SEC's policy in this regard is longstanding and consistent. The disclosure format for mutual fund Registration Statements was established in 1983, when the SEC adopted Form N-1A. That Form divided disclosure into a prospectus and an SAI.

The prospectus was to describe only "the fundamental characteristics of the fund," aimed at "an unsophisticated readership." The SEC's rationale was that, under the former regime, "mutual fund prospectuses [we]re not effective disclosure documents for most investors because they [we]re too long and complex."[15]

Similarly, in 1995, when the SEC expressly authorized fund companies to offer multiple share classes, it affirmatively declined to require Registration Statement disclosure about sales and service charges, even though the topic was "of concern" to the SEC: while the SEC "recognize[d] that the complexity of distribution charge options can be confusing to some investors," it determined that, "[i]nstead of relying on prospectus disclosure . . . the [SEC] . . . [would] address[] these concerns through consumer education and the promotion of good sales practices."[16]

And in 1997, the SEC proposed, and later adopted, a revised form for mutual fund prospectuses, in response to criticism that prospectuses had become "unintelligible, tedious and legalistic."[17] As it explained: "Prospectus disclosure relating to a fund tends to be overly complex and difficult to follow and should be revised to focus on essential information about the fund"; the redesigned prospectus was designed to be "less technical and easier to read," and "to eliminate prospectus

---

[15] *Registration Form Used by Open-End Management Investment Companies; Guidelines*, 48 Fed. Reg. 37,928, 37,929 (Aug. 22, 1983).

[16] *Exemption for Open-End Management Investment Companies Issuing Multiple Classes of Shares; Disclosure by Multiple Class and Master-Feeder Funds; Class Voting on Distribution Plans*, 60 Fed. Reg. 11,876, 11,881-82 (Mar. 2, 1995).

[17] *Registration Form Used by Open-End Management Investment Companies*, 63 Fed. Reg. 13,916, 13,916 (Mar. 23, 1998).

clutter that tends to obscure information that could help an investor make an investment decision."[18]

The new Form N-1A nowhere requires that mutual funds say whether B shares are sensible investments for any particularized sub-set of potential investors. Precisely the opposite is true: the SEC mandated that the Registration Statement include one illustration, and one illustration only — an example showing how different share classes would fare for an investment of $10,000 growing at 5% annually.[19] As it explained, it chose this example because it approximated the "average" fund investment level of $10,000 to $25,000.[20] In so doing, the SEC clearly underscored its philosophy that striking the right balance between investor education and informational overload ("prospectus clutter") required that the Registration Statement be oriented to the *average* investor.

The SEC's emphasis on "consumer education and the promotion of good sales practices,"[21] rather than additional Registration Statement prolixity, as the means of providing individual investors tailored advice has continued to the present. It "has mounted an extensive investor education campaign to improve the financial literacy of investors with respect to mutual funds and their costs."[22] To this end, it has

---

[18] *Registration Form Used by Open-End Management Investment Companies*, 62 Fed. Reg. 10,898, 10,900 (proposed Mar. 10, 1997).

[19] *Registration Form Used by Open-End Management Investment Companies*, 63 Fed. Reg. 13,916, 13,924 (Mar. 23, 1998).

[20] *Id.* at 13,924 n.74.

[21] *Exemption for Open-End Management Investment Companies Issuing Multiple Classes of Shares*, 60 Fed. Reg. at 11882.

[22] SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses, Trenchard Decl. Ex. V at 13.

developed educational brochures that explain "the structures and expenses of multiple class" funds, and has published user-friendly resources for investors on its website. *See, e.g.*, SEC, *Invest Wisely: An Introduction to Mutual Funds, available at* http://www.sec.gov/investor/pubs/inwsmf.htm (last modified June 2, 2003). Furthermore, the SEC and NASD have initiated numerous enforcement actions for unsuitable sales practices involving B Shares *at the point of sale* (*see, e.g.*, Complaint ¶¶ 110-22; Trenchard Decl. Exs. O-T), never once so much as implying that the problem — or solution — resided in Registration Statement disclosure. And, recently, the SEC proposed new rules to improve disclosures of the relative costs of share classes at the point of sale.[23] But no part of this elaborate regulatory framework calls for the type of disclosure Plaintiff seeks here in a Registration Statement.

This consistent regulatory philosophy advanced by the SEC is entitled to judicial respect. "[T]he SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability is entitled to consideration." *Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1266 (10th Cir. 2001); *see also Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996).

But even if Plaintiff were not asking the Court to legislate in place of the SEC — indeed, to turn precisely upside-down the SEC's considered weighing of the competing policies at issue — basic principles of securities law dictate the same

---

[23] *Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds*, 69 Fed. Reg. 6438 (proposed Feb. 10, 2004).

result. If there were a duty to disclose in a Registration Statement when a share class was "not rational" for a particular investor or group of investors, the authors of Registration Statements would be forced to predict the preferences and needs of untold sub-groups of future potential investors, not to mention how brokerage houses might decide to compensate their dealers in the future. The courts, however, have held that such speculation is unnecessary as a matter of law. "Issuers cannot be expected to anticipate in their prospectuses or other offering papers the financial needs of every potential investor, the investment alternatives before each potential investor, . . . and the risk averseness of each potential investor." *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 351 (2d Cir. 1993); *see also Consol. Gold Fields, PLC v. Anglo Am. Corp. of South Africa Ltd.*, 713 F. Supp. 1457, 1470 (S.D.N.Y. 1989) (internal quotations omitted) (courts do not require disclosure of "educated guesses or predictions").

Indeed, any attempt accurately to predict the virtually limitless number of potential scenarios in which one share class or another might be "rational or irrational" would be doomed to failure, at worst, or require an ultimately unhelpful overwhelming volume of information, at best.[24]

---

[24] *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (expressing concern about "bury[ing] the shareholders in an avalanche of trivial information — a result that is hardly conducive to informed decisionmaking"); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) ("Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good.").

**B.    The Additional Disclosures Sought By Plaintiff, Even If True, Would Add Nothing Material To What Is Already Disclosed.**

In addition, even if it were true that B shares were not the best investment choice for those investing amounts over $100,000, there is more than enough information in the Registration Statements already for an investor to figure that out. The addition of the further disclosure would add nothing material to the Registration Statements.

To satisfy a duty to disclose, "[i]t is . . . sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction." *Consol. Gold Fields*, 713 F. Supp. at 1470; *see also SEC v. Texas Gulf Sulpher Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (finding that one need disclose only "basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions"). That is because "the primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow *them* to make informed investment decisions." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) (emphasis added). There simply is no obligation to tell investors what is best for them.

Squarely on point is *Benzon v. Morgan Stanley Distributors, Inc.*, No. 3:03-0159, 2004 WL 62747 (M.D. Tenn. Jan. 8, 2004) (attached at Appendix A), issued a few weeks before the filing of the first Complaint in this action. In *Benzon*, the plaintiff claimed that B shares sold by affiliates of Morgan Stanley were "never the best investment for anybody at any time under any rational investment strategy," and that Morgan Stanley had not disclosed that fact in its registration statement. *Id.* at *4. Also, the *Benzon* plaintiff, like Plaintiff here, claimed that Morgan Stanley had not

disclosed that its financial analysts were paid more for selling B shares than for selling other share classes.

The *Benzon* Court dismissed the case, because, like the Registration Statements here, "[t]he prospectus at issue discloses information which would permit any investor to determine the 'best' investment for him or her, under the circumstances." *Id.* As the *Benzon* court made clear, "[i]t is up to each investor to take the facts provided, evaluate options, make calculations, and decide on the best investment strategy for his or her particular circumstances, taking into account the myriad changes which occur daily, both in the market and in the individual's own financial situation." *Id.* (citing *Wallerstein v. Primerica Corp.*, 701 F. Supp. 393, 398 (E.D.N.Y. 1988) ("Full factual disclosures need not be embellished with speculative financial predictions.")).

In short, "[s]o long as [investment advisors] provide truthful information, then investors, with or without financial advisors, have the duty to decide what is 'best' for them." *Benzon*, 2004 WL 62747, at *4. In addition, the *Benzon* Court dismissed the conflict of interest claim on the ground that the plaintiff was aware that the defendants were being paid, and "[d]efendants had no duty to provide more specific information in the prospectus concerning specific allocations or incentives given to brokers." *Id.* at *4; *see also Castillo v. Dean Witter Discover & Co.*, 97 Civ. 1272 (RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998) (dismissing a claim for failure to disclose the terms of commissions paid to the broker's employees when plaintiff knew that brokers were generally being paid by commission).

The reasoning of *Benzon* is squarely applicable in this case. In fact, the allegations in *Benzon* (that B shares were never rational under any circumstances)

26

were more extreme than the allegations here, where Plaintiff implicitly acknowledges that B shares could be rational for many — indeed most — individual investors, including the average investor. If there was no duty to disclose in *Benzon*, then there plainly is no legal duty to disclose here. And the mere fact that an investor must employ basic math to make use of the information in the Registration Statements does not make the Statements materially misleading — reasonable investors are conclusively presumed to understand basic math.[25]

Even more than in *Benzon*, in fact, the Registration Statements here specifically alert investors to the tradeoffs involved in selecting one share class or another. So every specific alleged missing disclosure — whether cast as a non-disclosure or misrepresentation through misplaced emphasis — alleged in the Complaint actually is already addressed in the Registration Statement.

Thus, the Complaint says that the Registration Statements:

(1) allegedly fail to "highlight the impact of reduced front-end loads" (Complaint ¶ 133; *see also id.* ¶¶ 136, 147) — but the Registration Statements already fully explain the impact of breakpoints and urge investors to consider their effects (*see* above at 9);

---

[25] *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5 (2d Cir. 1983) (finding no duty to disclose information that "is obvious to anyone conversant with elementary mathematics"); *Howell v. Mgmt. Assistance, Inc.*, 519 F. Supp. 83, 90 (S.D.N.Y. 1981) (observing that missing cash flow calculations "could be easily made, as plaintiff testified he had done, from the data in the proxy materials"); *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1109, 1132 (C.D. Cal. 2002) (distinguishing the complexity of a real estate transaction from cases "where critical calculations could easily be made or certain conclusions were obvious to anyone conversant in basic mathematics").

(2) allegedly fail to "explain that the adverse effect of the higher 12b-1 fees attached to Class B and Class C Shares would be compounded if dividends were reinvested and that the total amount of the Rule 12b-1 fees would increase to the extent that the investment yielded positive returns" (*id.* ¶ 136; *see also id.* ¶¶ 142, 147) — but the Registration Statements set out exactly what the 12b-1 fees are and repeatedly urge investors to consider the financial effect of ongoing 12b-1 fees in making their investment decision (*see* above at 7-8, 9);

(3) allegedly fail to "place[] [less] emphasis on the fact that an investment in Class B or Class C Shares meant the 'entire purchase price is invested in shares of the Fund,' which served to cast the investment merits of Class B shares in a falsely positive light" (*id.* ¶ 139; *see also id.* ¶ 147) — but this is a concededly true statement, and the Registration Statements specifically urge investors to weigh this benefit against the costs of higher 12b-1 fees and CDSCs (*see* above at 9);

(4) allegedly fail to "disclose . . . that, as the amount of the available discount on front-end load shares increased, the possibility that an investment in Class B Shares would result in higher expenses shifted . . . to a certainty" (*id.* ¶ 142) — but the Registration Statements urge investors to weigh the significance of breakpoints specifically with regard to B shares, which have no such discounts, and they provide all the financial data necessary to do so (*see* above at 7-9); and

(5) allegedly "cast the decision over whether to select front-end load shares as a matter of personal preference, rather than economic substance" (*id.* ¶ 145) — but the Registration Statements' disclosures on this issue are entirely about the relative economic merits of the different share classes (see above at 7-9).

28

The analysis above applies equally to Plaintiff's assertion that the Registration Statements should have disclosed the compensation of brokers (including brokers employed by entities unaffiliated with Movants) for sales above $100,000. Plaintiff cannot show that the Registration Statements were misleading regarding broker compensation because, as the Complaint itself concedes, the Registration Statements *did disclose* that "[s]ales personnel may receive different compensation for selling different classes of shares." (Complaint ¶ 149.) Recognizing this obstacle, Plaintiff complains that this disclosure is "buried and opaque." (*Id.*) The disclosure appears, however, in the introduction of a section of the SAI prominently entitled "Purchase of Shares," and describes in detail the different share classes and the fees applicable to them. The statement is not "buried"; it is bluntly addressed where a reasonable reader would expect to find such disclosure. (SAI, Ex. B at 14.) Nor is the statement "opaque"; it is clear and easy to understand. The only possible interpretation of a statement that salespeople "may receive different compensation for selling different classes of shares" is that, for a given investment, a broker may get more money if the investor purchases one class of shares than another class. In other words, the statement communicates in plain English that one's broker may have a personal financial stake in which class of shares the investor chooses. Accordingly, this conflict of interest is not "hidden," but disclosed in prominent and blunt terms.

Nor does this conclusion change simply because Plaintiff would have liked an additional statement explaining how this conflict might operate with respect to the narrow group of investors purchasing more than $100,000 in shares. (Complaint ¶¶ 9, 148.) Having provided accurate information "from which a reasonable investor could reach his own conclusions as to the risks of the transaction," *Consol. Gold*

*Fields,* 713 F. Supp. at 1470, that it did not go further and speak to Plaintiff personally does not render it misleading.

Similarly, Plaintiff's "undisclosed conflict" theory is even less material than the same allegations were in *Benzon*. Plaintiff never explains the relevance of such allegations to the class he purports to represent. The ostensible point of these allegations is not that the purportedly "hidden" information is necessary to enable an investor to determine how much *he would have to pay*,[26] but whether the possibility of differential compensation *the broker would receive* (the conflict) might cause the broker to make a self-serving — *i.e., an unsuitable* — recommendation.[27] Plaintiff does not allege that even his own trades were solicited by a broker, much less that this was so of all putative class members. In fact, he concedes that some putative class members are not even clients of MLPF&S. (Complaint ¶ 1 (alleging that Fund shares were distributed "primarily," not exclusively, through MLPF&S).) Absent such allegations of tainted advice, however, this alleged nondisclosure, too, is utterly immaterial here.[28]

---

[26] The Complaint concedes that the fees that the investor had to pay were disclosed. (Complaint ¶¶ 42, 47, 49, 57, 59,137-38.)

[27] *See, e.g., Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds,* 69 Fed. Reg. 6438, 6442 (proposed Feb. 10, 2004) (noting that differential compensation may create incentives for brokers to limit choices presented to customers or affect brokers' recommendations).

[28] Yet another problem with trying to convert a suitability claim into a class action fraud claim is that, even for investors whose financial advisor did recommend B Shares, Plaintiff would further need to make the very individualized showing with respect to each such investor that that his or her financial advisor did not explain how their compensation might affect their recommendation.

III. **The Complaint Fails To State A Claim Because Plaintiff's Claims Are Time Barred.**

A wholly independent reason why this case should be dismissed is that Plaintiff's claims are barred by the applicable limitations periods. Plaintiff's '33 Act claims are governed by a one-year limitation period (15 U.S.C. § 77m), and his '34 Act claims are governed by, at most,[29] a two-year period (28 U.S.C. § 1658(b)). Both limitations periods run from the date Plaintiff discovered or should have discovered the claim. 15 U.S.C. § 77m; 28 U.S.C. § 1658(b). Under the federal securities laws, a plaintiff will be deemed to have "discovered" his claim for limitations purposes when a reasonable investor of ordinary intelligence would have discovered the alleged untrue statement or omission. *See, e.g., Dodds*, 12 F.3d at 350; *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983). As the Second Circuit said in *Armstrong*, "[t]he test as to when fraud should have with reasonable diligence been discovered is an objective one." *Id.* at 88; *see also Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992) ("The duty of inquiry having arisen, plaintiff is charged with whatever knowledge an inquiry would have revealed.").

This lawsuit was filed on January 30, 2004. Thus, anyone on notice of the claims before January 30, 2002 (over two years before this lawsuit was filed), can no longer bring a claim under the '34 Act, and anyone on notice of the claims more than one year before (*i.e.*, before January 30, 2003) can no longer bring a claim under the '33 Act.

---

[29] Plaintiff's purported class definition is overly ambitious because, among other things, class fraud claims that had expired under the one-year limitation by July 2002, when the Sarbanes-Oxley Act was enacted, would not be revived here. Since Movants believe all of the class claims are time-barred, it reserves this point for discovery or any motion regarding class certification, should that become necessary.

Plaintiff was on notice of his claims more than two years before filing suit in two different ways. First, the Registration Statements Plaintiff received at the time he invested from 1999 through 2001 put him on notice of everything he needed to know to make out his Complaint.[30] To the extent the Complaint has any validity at all (and Movants reiterate that it does not), all of Plaintiff's allegations are manifestly derived entirely from the information in the Registration Statements, including the relative costs and benefits over time of B, C and D shares, and the possibility of differential dealer compensation for selling different classes of shares. That is all it takes to put Plaintiff on inquiry notice. In *Dodds*, the Second Circuit found that the plaintiff, who claimed that her broker advised her to make unsuitable investments, was on inquiry notice of her claims under Sections 11 and 12, and Rule 10b-5, at the time she made the investments because all of her alleged complaints were addressed in the prospectuses. 12 F.3d at 350-52. Other cases similarly have held that inquiry notice is triggered upon purchase of a security when the existence of a plaintiff's claims could be ascertained from the language of the prospectus or other public disclosure documents.[31]

---

[30] Plaintiff alleges that the Registration Statements were issued "[t]hroughout the class period" (Complaint ¶ 128), which purports to commence on January 30, 1999 (*id.* ¶ 151).

[31] *See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (a prospectus's financial disclosures "provided actual notice of potential insolvency, much less the inquiry notice sufficient to trigger the duty to timely investigate and file the complaint"); *Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1993) ("[P]laintiffs were placed on inquiry notice of their claims by the very SEC-mandated disclosure documents they rely upon in their complaints."); *Farr v. Shearson Lehman Hutton, Inc.*, 755 F. Supp. 1219, 1225-26 (S.D.N.Y. 1991) (plaintiff was on inquiry notice of a Section 10(b) claim where defendant's financial report showed a risky, illiquid investment rather than the promised conservative one); *see also Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1168 (7th Cir. 1995) (where

Plaintiff concedes in the Certification attached to the Complaint that his first purchases of Class B Shares from any of the Funds occurred in February 1999, and his last purchases occurred in August 2001. His claims, therefore, are assuredly time-barred.[32]

Second, Plaintiff was on inquiry notice based on public documents. Plaintiff appears to recognize that he has a limitations problem, and seeks to deflect it by alleging that he learned of these issues only when he read a Standard & Poor's report in October 2003. (Complaint ¶ 167, 174.) What plaintiff tacitly concedes is that information of the sort contained in the Standard & Poor's report was enough to put a reasonable investor on notice. Yet there was nothing new in the Standard & Poor's report when published in October 2003. It was merely one of many articles on the subject of B shares and mutual fund share classification systems. Indeed, the Complaint itself highlights a wide range of publicly available information respecting the purported issues here, all of which is imputed to Plaintiff regardless of when he, personally, actually discovered such facts.

For instance, the *Wall Street Journal* published an article on July 17, 2001 — more than two years before this suit — describing Prudential Securities' new policy

---

plaintiffs alleged that a prospectus failed to disclose that only a portion of profits would be received, inquiry notice was triggered by disclosure of that detail in the registration statement).

[32] Where, as here, a class has not yet been certified, the action may continue only if at least one named plaintiff has stated a claim on which relief may be granted. *Bd. of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 130 (1975); *Nelsen v. King County*, 895 F.2d 1248, 1249-50 (9th Cir. 1990). Because Plaintiff's own claims are barred, he can not "seek relief on behalf of himself or any other member of the class." *Id.* at 1250 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

barring its brokers from buying more than $100,000 in B Shares for a client. (Complaint ¶ 106.) That article quoted a Prudential spokesperson as explaining the reason for this change: "In most cases, we found that it's better for the client economically, to buy A class shares when investing more than $100,000," and it further noted that the NASD had recently fined a brokerage firm, Stifel, Nicolaus & Co., for improperly selling B Shares where A Shares would have been preferable. (Trenchard Decl. Ex. W at 2.)

Other major publications publicized the same concerns even earlier, such as a December 1998 *USA Today* article saying that (1) brokers received higher commissions for selling large blocks of B shares than for similar amounts of A shares; (2) the SEC was "looking at" the issue of B share sales to large investors; (3) B shares "typically mean lower performance in the long run"; and (4) the SEC had recently filed a cease-and-desist order against a broker for selling clients B shares in amounts more than $100,000. (Trenchard Decl. Ex. X) And in January 1999, *Time Magazine* ran an article entitled "B Shares Get Bad Grades," warning its enormous readership that (1) B shares "generate lower long-term returns than class-A shares"; and (2) "If a broker tries to persuade you to buy class-B mutual fund shares instead of class A, make sure it's in your best interest, not just his." (Trenchard Decl. Ex. Y.) Like the earlier *USA Today* article, *Time* also noted that the SEC was investigating whether brokers were favoring B shares because of higher commissions.

This public debate was not confined to these widely-distributed sources of information. As the Complaint itself notes, more than two years before Plaintiff filed this lawsuit both the NASD and SEC had taken numerous, publicized disciplinary actions against brokerage firms for selling B shares to customers in amounts over

$100,000. *See, e.g.*, Complaint ¶ 111; Trenchard Decl. Ex. N (April 2001 NASD action against Stifel, Nicolaus & Co.). Outside of the one-year period applicable to Plaintiff's '33 Act claims, the regulatory effort only intensified. *See, e.g.*, Trenchard Decl. Ex. Z (March 2002 NASD disciplinary action against Dain Rauscher); Complaint ¶ 112; Trenchard Decl. Ex. O (August 2002 NASD action against Belden); Complaint ¶ 113; Trenchard Decl. Ex. P (October 2002 NASD action against Eberhard); *see also* Complaint ¶ 114; Trenchard Decl. Ex. Q (June 2003 NASD action against McLaughlin, Piven, Vogel Securities); Complaint ¶ 116-18; Trenchard Decl. Ex. R (July 2003 SEC action against Prudential Securities); Complaint ¶ 121-22; Trenchard Decl. Ex. T (November 2003 SEC action against Morgan Stanley DW); Trenchard Decl. Ex. S (listing five NASD B-share suitability actions in August 2003). These regulatory proceedings involved precisely the same B share issues that Plaintiff belatedly pursues here.

Hence, if the Standard & Poor's report was sufficient to put Plaintiff on notice of his claims here, then certainly these prior articles and regulatory materials were sufficient to put a reasonable investor on inquiry notice far earlier, and well before January 2002, two years prior to the Complaint here (thus precluding all '34 Act claims), and certainly by January 2003 (thus precluding all '33 Act claims).[33]

---

[33] There is another defect with Plaintiff's claims that would become relevant in the event this motion to dismiss is less than entirely successful, namely, that, as a matter of law, Plaintiff lacks standing to assert claims under §§ 11 and 12 with respect to Funds in which he was not personally an investor. Movants reserve this issue for class certification, should that become necessary.

IV.   **The Complaint Fails To State A Claim Because It Fails To Plead** *Scienter* **With The Particularity Required By The PSLRA For Section 10(b) Claims.**

Plaintiff's *scienter* allegation against Movants is based entirely on the claim that Movants' profitability was greater with B shares than other share classes because the entire amount of an investment in B shares goes into the Fund at the outset, increasing the assets under Movant's management slightly more than other share classes, and thus increasing Movants' fees from managing those assets. This allegedly gave Movants a "motive" to conceal that B shares were inappropriate investments in amounts over $100,000. (Complaint ¶ 177.) But that supposed "motive" was itself disclosed in the Registration Statements, which explain how the Movants are compensated — indeed, Plaintiff presumably derived this allegation solely from the Registration Statements. (SAI, Ex. B at 14, 22.) This alleged "motive," therefore, cannot form the basis of a fraud claim, as it reflects nothing more than Movants' publicly acknowledged and legitimate interest in being paid for services rendered.

*Scienter*, or intent to defraud, is a necessary element of a claim under Section 10(b). *Aaron v. SEC*, 446 U.S. 680, 695 (1980). To plead *scienter* under the PSLRA, a complaint must set forth with particularity sufficient facts to give rise to a "strong inference" of intentionally fraudulent conduct. 15 U.S.C. § 78u-4(b)(2). A "strong inference" may arise "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)).

First, this allegation does not establish a "strong inference" that Movants had both motive and opportunity to commit fraud. As the Third Circuit has held, one

36

cannot plead fraudulent motive under the PSLRA based simply on an alleged profit motive: "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999).[34] But this is all the Complaint here alleges.

Second, Plaintiff also fails to allege strong circumstantial evidence of conscious misbehavior or recklessness. Under the "conscious misbehavior" theory, a plaintiff must allege reckless conduct with specificity, which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Secs. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). As with motive and opportunity, the Complaint's allegations of a profit motive alone cannot support a finding of recklessness. *See, e.g., In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (the possibility of increased compensation is insufficient to support a finding of recklessness). And, in that regard, *scienter* cannot be found where plaintiffs have failed to allege "any facts that suggest defendants knew they had a duty to disclose . . . pursuant to statute or

---

[34] *See also In re Digital Island Secs. Litig.*, 223 F. Supp.2d 546, 554 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) ("[I]t is not enough to allege that the defendant was acting in his or her own economic self-interest"). It is well established that an interest in greater compensation is so general and universal that it is insufficient to plead scienter. *See, e.g., In re Party City Secs. Litig.*, 147 F. Supp. 2d 282, 314 (D.N.J. 2001) ("Incentive compensation, moreover, 'can hardly be the basis on which an allegation of fraud is predicated.'") (citation omitted).

regulation." *In re Canandaigua Secs. Litig.*, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996); *see also Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (refusing to infer recklessness to satisfy the *scienter* requirement of Section 10(b) claim because it was not clear whether defendants had a duty to disclose).

## CONCLUSION

Movants respectfully submit that the Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

SILLS CUMMIS EPSTEIN & GROSS P.C.

By: _____
Jeffrey J. Greenbaum (JG-9805)
Steven D. Gorelick
One Riverfront Plaza
Newark, NJ 07102-5400
(973) 643-7000
(973) 643-6500 (fax)

WILMER CUTLER PICKERING
HALE AND DORR LLP
Robert B. McCaw
Douglas F. Curtis
Robert W. Trenchard
Michael H. Park
399 Park Avenue
New York, NY 10022
(212) 230-8800
(212) 230-8888 (fax)

Attorneys for Defendants
FAM Distributors, Inc.,
Merrill Lynch Investment Managers, L.P.,
Fund Asset Management, L.P. and
Princeton Services, Inc.

Dated: September 10, 2004

38

## PROOF OF SERVICE

ROBERT W. TRENCHARD, being of full age, hereby declares as follows:

On September 10, 2004, I caused to be served copies of the Defendants' Notice of Motion, Declaration of Robert W. Trenchard, Brief Of Defendants FAM Distributors, Inc; Merrill Lynch Investment Managers, L.P.; Fund Asset Management, L.P.; And Princeton Services, Inc. In Support Of Their Motion To Dismiss The Amended Class Action Complaint and proposed form of Order, by Federal Express (with a duplicate copy of the Brief served by facsimile), on:

Arthur Penn, Esq.
**PELLETTIERI, RABSTEIN & ALTMAN**
790 Woodlane Road
Tarnsfield Plaza
Mt. Holly, NJ 08060

James R. Malone, Jr., Esq.
**CHIMICLES & TIKELLIS LLP**
361 West Lancaster Avenue
Haverford, PA 19041

Michael J. DeBenedictis, Esq.
**DEBENEDICTIS & DEBENEDICTIS**
41 South Haddon Avenue, Suite 5
Haddonfield, NJ 08033

Brian F. Amery, Esq.
**BRESSLER, AMERY & ROSS**
325 Columbia Turnpike
Florham Park, NJ 07932

Marc Dworsky, Esq.
David H. Fry, Esq.
**MUNGER, TOLLES & OLSEN LLP**
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2004

_____s/_____
ROBERT W. TRENCHARD, ESQ.

1