**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                )
THOMAS J. DEBENEDICTIS          )
on behalf of himself and all    )
others similarly situated,      )
                                )
        Plaintiffs,             )        Civil Action No.: 04-cv-404 (JLL)
                                )
v.                              )
                                )        **OPINION AND ORDER**
MERRILL LYNCH & CO, et al.,     )
                                )
        Defendants.             )
_____)

**LINARES**, District Judge.

        This matter comes before the Court on the motion of Defendants FAM Distributors, Inc.,

Merrill Lynch Investment Managers, L.P., Fund Asset Management, L.P., and Princeton

Services, Inc. (collectively, the "Fund Defendants") to dismiss the Amended Complaint and Jury

Demand pursuant to Federal Rule of Civil Procedure 12(b)(6).  The remaining Defendants,

Merrill Lynch & Co., Inc., Merrill Lynch Group, Inc., and Merrill Lynch, Pierce, Fenner &

Smith, Inc. (collectively, the "Non-Fund Defendants") have filed a separate motion to dismiss

under Rule 12(b)(6), which also joins in the motion of the Fund Defendants.  Plaintiff Thomas J.

DeBenedictis is a purchaser of mutual funds sponsored by Defendant Merrill Lynch & Co., Inc.

through its affiliates.  Plaintiff alleges securities law violations by Defendants, mutual fund

operators and affiliated entities, in connection with the sale of a certain class of shares in mutual

funds.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.  This motion is resolved without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendants are subsidiaries, affiliates, or employees of Defendant Merrill Lynch & Co., Inc. (hereinafter "Merrill Lynch & Co."), a publicly owned holding company that provides broker-dealer, financing, advisory, wealth management, asset management, insurance, lending and related products and services though its subsidiaries and affiliates.  Defendant Merrill Lynch Group, Inc.  (hereinafter "Merrill Lynch Group"), is a wholly owned subsidiary of Defendant Merrill Lynch & Co.  Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter "MLPF&S"), a wholly-owned subsidiary of Merrill Lynch & Co., was a broker and dealer in securities registered with the Securities and Exchange Commission ("SEC").  Defendant FAM Distributors, Inc. (hereinafter, "FAM Distributors"), an indirect wholly-owned subsidiary of Defendant Merrill Lynch & Co., and a wholly owned subsidiary of Merrill Lynch Group, was a distributor for the Merrill Lynch Funds.[1]  Defendant Merrill Lynch Investment Managers, L.P. (hereinafter "ML Investment Managers"), a limited partnership of Merrill Lynch & Co., served as an investment adviser registered with the SEC.[2]  Defendant Fund Asset Management, L.P. (hereinafter "Fund Asset Management"), a limited partnership of Merrill Lynch & Co., was an investment advisor.  Defendant Princeton Services, Inc. (hereinafter "Princeton Services"), is the

---

[1]Previously, FAM Distributors did business as Princeton Funds Distributors, Inc., and as Merrill Lynch Funds Distributor, Inc.

[2]ML Investment Managers previously did business as Merrill Lynch Asset Management, L.P.

general partner for ML Investment Managers and Fund Asset Management.

Many of the mutual funds that Defendant Merrill Lynch & Co. sponsors are known as "multiple class funds." (Am. Compl. ¶ 1). Potential investors can choose among different classes of shares in the same investment portfolio. (Id.). The different classes of shares in each fund utilize the same investments; however, they use various methods to collect sales charges associated therewith. There are three methods to collect sales charges from investors: (1) "front-end loads," which are collected at the time of the initial investment; (2) contingent deferred sales load ("CDSL"), which are "back-end loads," collected if the fund shares are redeemed within a specific period after they are purchased; and (3) Rule 12b-1 fees, sales charges that are periodically deducted from the assets of the fund to contribute to distribution expenses. (Am. Compl. ¶ 1).

Between January 30, 1999 and April 2003, Defendant Merrill Lynch & Co., through its affiliates, offered four classes of mutual funds: Class A, Class B, Class C, and Class D (hereinafter, collectively the "Merrill Lynch Funds").[3] Class A shares and Class D shares both carried front-end loads. The front-end load was 5.25% for investments less than $25,000, which decreased incrementally as the investment amount increased. The maximum front-end load applicable to Merrill Lynch Funds that invested in fixed-income investments was 4%. The charge was eliminated altogether for investments of at least one million dollars. Class B shares, which are the focus of the instant litigation, and Class C shares, were subject to a back-end load,

_____

[3]After April 14, 2003, Merrill Lynch offered five classes of shares: Class A shares (formerly known as Class D shares), Class B shares, Class C shares, Class I shares (formerly known as Class A shares) and Class R shares. For purposes of the instant motion, the Court will continue to refer to the various classes by their historical names.

or CDSL.  The standard CDSL for Class B shares was 4%, which did not vary with the size of

the investment.  The CDSL applicable to Class B shares decreased as the shares were held over

longer periods of time.  Class C shares carried a lowed CDSL of 1%, which only applied if the

shares were redeemed within one year after purchase.

Plaintiff claims that he purchased over $500,000 of Class B shares in five funds between

February 1999 and August 2001 through his broker at Defendant MLPF&S.  Plaintiff alleges that

Class B shares do not make economic sense, as they are outperformed over longer periods by

Class D shares, and over shorter periods by Class C shares.  Plaintiff further contends that

Defendant MLPF&S brokers received higher commissions for selling Class B shares than other

share classes.

Plaintiff initiated the instant action on January 30, 2004, asserting claims under federal

securities laws on behalf of himself and all others who purchased Class B shares of Merrill

Lynch mutual funds in amounts over $100,000, between January 30, 1999 and December 31,

2003, as well as a subclass of purchasers who made purchases between January 30, 2001 and

December 31, 2003.  On July 9, 2004, Plaintiff filed an Amended Complaint.  Plaintiff alleges

the following: (1) Count I asserts a claim under Section 11 of the Federal Securities Act of 1933

(the "'33 Act"), 15 U.S.C. § 77l (a)(2), against Defendants FAM Distributors and Defendant

MLPF&S as alleged "underwriters," and a claim against Defendants Merrill Lynch & Co. and

Merrill Lynch Group as controlling persons under Section 15 of the '33 Act; (2) Count II asserts

a claim under Section 12(a)(2) of the '33 Act against Defendants FAM Distributors and

MLPF&S as "sellers," and a claim against Defendants Merrill Lynch & Co. and Merrill Lynch

Group as control persons; (3) Count III asserts claims against all Defendants pursuant to Section

Page 4 of  17

10(b) of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the '34 Act, 15 U.S.C. § 78t(a); and (4), Count IV asserts that Defendant MLPF&S violated Section 10(b) of the '34 Act and Rule 10b-10, based on an alleged failure to disclose the nature of the commissions received from the sales of Class B shares.  Plaintiff further claims that Defendant Merrill Lynch & Co. is also liable as a control person under Section 20(a) of the '34 Act.

The Fund Defendants presently move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Non-Fund Defendants join in all the arguments made by the Fund Defendants, and also move separately to dismiss under Rule 12(b)(6).

## LEGAL STANDARDS

### A.    Motion to Dismiss

The applicable inquiry under Federal Rule 12(b)(6) is well-settled. Courts must accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).  The question is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be given an opportunity to offer evidence in support of their claims.  Scheuer, 416 U.S. at 236.  Dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 346 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The Third Circuit has further noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).  Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness.  In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

**B.      Statute of Limitations**

Plaintiff alleges violations of Sections 11, 12(a)(2), and 15 of the '33 Act.  Section 13 of the Act, which sets forth the applicable statute of limitations, provides in relevant part:

> No action shall be maintained to enforce any liability created under section 11 or section 12(a)(2) [of the '33 Act] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.

15 U.S.C. § 77m.[4]  Additionally, Plaintiff asserts violations of Sections 10b, Rule 10b-5 promulgated thereunder, and Section 20(a) of the '34 Act.  Plaintiff's claims under the '34 Act are subject to a two-year limitations period.  28 U.S.C. 1658(b).  In this Circuit, the limitations period begins to run when the plaintiffs have actual notice of the misstatement or omission giving rise to the cause of action, or, when the plaintiffs are placed on "inquiry" notice of such culpable behavior.  In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir. 2002).  Under the inquiry notice standard, the limitations period commences when the plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim against the

---

[4]Plaintiff's claim under § 15 of the '33 Act is also governed by the one-year limitations period set forth in § 13 of the Act.  See Hill v. Equitable Bank, Nat'l Ass'n, 599 F. Supp. 1062, 1078 (D. Del. 1984)

defendant." Gruber v. Price Waterhouse, 697 F. Supp. 859, 863 (E.D. Pa. 1988).  It is an objective standard and focuses on whether a "reasonable investor of ordinary intelligence" would have discovered the questionable conduct and identified it as a storm warning. Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 252 (3d Cir. 2001).  To constitute "storm warnings," the information "must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003).  Information that may be deemed to constitute inquiry notice includes "substantial conflicts between oral representations of the brokers and the text of the prospectus, ... the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions have been made." NAHC, 306 F.3d at 1326 n. 5 (quoting Mathews, 260 F.3d at 252).  However, the plaintiffs need not have knowledge of all the details of the alleged fraud in order to trigger the statute of limitations period; "instead, the period begins to run from the 'time at which plaintiff[s] should have discovered the general fraudulent scheme.'" Id. at 1326 (internal citations omitted).

The defendant has the initial burden of establishing the existence of storm warnings. Mathews, 260 F.3d at 252.  When the limitations period is triggered by sufficient storm warnings, "plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." Gruber, 697 F. Supp. at 864 (citing Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127-28 (1st Cir. 1987); Robertson v. Seidman &

Seidman, 609 F.2d 583 (2d Cir. 1979); Cook v. Avien, Inc., 573 F.2d 685 (1st Cir. 1978)). If the

plaintiffs decide not to investigate existing storm warnings, they are deemed to be on inquiry

notice of their claims.  Mathews, 260 F.3d at 252 n. 16.

    In Benak v. Alliance Capital Management, Co., for example, mutual fund investors

commenced an action before this Court against mutual fund advisors alleging securities fraud in

connection with the purchase of Enron stock.  349 F. Supp. 2d 882 (D.N.J. 2004).  After

reviewing newspaper articles and other public information cited in the complaint, as well as

additional newspaper articles relied on by the defendants, this Court held that these sources,

combined with knowledge that the defendant fund held Enron shares prior to Enron filing

bankruptcy, sufficed to place the plaintiffs on inquiry notice of their fraud claims prior to one

year before the filing of the initial complaint.  Id. at 889-90.  The complaint was dismissed as

time-barred.  Id. at 891.

    On appeal, the Third Circuit affirmed.  See Benak v. Alliance Capital Management L.P., -

- F.3d - -, 2006 WL 73440, at *6 (3d Cir. Jan. 13, 2006).  There, the Third Circuit refined the

inquiry notice analysis previously set forth in NAHC, explaining that the inquiry notice standard

applies differently to direct investors compared to mutual fund investors.  Id. at *4.  The Third

Circuit reasoned that the mutual fund investor is treated differently because, arguably, there is

less of a need to monitor the companies in which he or she invests, and the investor is less likely

to have contemporaneous information concerning these investments.  Id. at *4.  Nonetheless, the

Third Circuit noted that "a mutual fund investor who sees numerous stories about troubles at his

or her fund is more akin to a direct investor confronted with reports about a company in which he

or she is invested[,]" and ultimately found that inquiry notice was triggered by media accounts in that case.  Id.

## LEGAL DISCUSSION

Based on the applicable legal principles, this Court must, as a threshold matter, address whether Defendants demonstrate that the information available to Plaintiff was sufficient to constitute storm warnings.[5]  As discussed above, the core of Plaintiff's Amended Complaint is that Defendants promoted the Class B shares, even with the knowledge that Class B share investors would incur greater fees and earn less profits if they had chosen either Class C or Class D shares.  Plaintiff further alleges that Defendants failed to disclose that Defendant MLPF&S brokers earned higher commissions for selling Class B shares than other share classes.  Plaintiff filed the initial Complaint on January 30, 2004.  Accordingly, anyone on notice prior to January 30, 2002 is precluded from bringing a claim under the '34 Act, and anyone placed on notice prior to January 30, 2003 cannot bring a claim pursuant to the '33 Act.  Plaintiff maintains that he was not put on notice of these claims until the publication of an October 20, 2003 *Standard and Poor's* report which concluded that Class B shares consistently underperformed Class A and Class C shares. Defendants counter that, through a series of SEC Registration Statements, news articles, and NASD press releases all pre-dating the *Standard and Poor's* report, Plaintiff was on notice of the claims arising from the purchase of the B class shares more than two years before

---

[5]To be sure, statute of limitations questions can be resolved on a motion to dismiss.  See, e.g., NAHC, 306 F.3d 1236-27; but cf. Gruber, 697 F. Supp. at 861 (finding that "[i]n the context of the statute of limitations defense, where contrary inferences may reasonably be drawn from the facts which are material to when the cause of action accrued, defendants bear a heavy burden of showing that the claims are untimely as a matter of law.") (citations omitted).

the commencement of the instant action.  For the reasons discussed below, Plaintiff plainly was on inquiry notice of his claims by January 30, 2002.

Defendants contend that the SEC Registration Statements, which are comprised of the Merrill Lynch Global Growth Fund, Inc. Prospectus ("prospectus") and separate Statement of Additional Information ("SAI"), both dated December 29, 1998, were sufficient to place the public on notice of the relative costs and benefits over time of the Class B, C and D shares, and differences in commissions.  "[I]nvestors are presumed to have read prospectuses, quarterly reports, and other information related to their investments."  Mathews, 260 F.3d at 252.  Here, the prospectus included, for instance, an illustration of the costs associated with each share class for varying holding periods based on a hypothetical investment of $10,000.  (Trenchard Decl. Ex. A at 5).  The prospectus also covered the initial sales charge alternatives, noting that:

> Investors not qualifying for reduced initial sales charges who
> expect to maintain their investment for an extended period of time
> also may elect to purchase Class A or Class D shares, because over
> time the accumulated ongoing account maintenance and
> distribution fees on Class B or Class C shares may exceed the
> initial sales charges and, in the case of Class D shares, the account
> maintenance fee.

(Trenchard Decl. Ex. B at 15).  It also addressed breakpoint discounts, stating that "[i]nvestors qualifying for significantly reduced initial sales charges may find the initial sales charge particularly attractive because similar sales charge reductions are not available with respect to the deferred sales charges imposed in connection with purchases of Class B or Class C shares."  (Id.).  Further, the prospectus provided a six-page narrative describing the differences between

the share classes.  (Id. at 15-20).  Additionally, the separate SAI disclosed that "[s]ales personnel

may receive different compensation for selling different classes of shares."  (Am. Compl. ¶ 149).[6]

Defendants also contend that Plaintiff was on inquiry notice of his claims based upon

numerous public documents addressing Class B shares.  Clearly, media reports and press articles

may constitute storm warnings sufficient to put investors on inquiry notice as to possible

securities claims; "[h]owever, there must be some reasonable nexus between the allegations

made in the article and the nature of the action subsequently brought."  DaimlerChrysler, 269 F.

Supp. 2d at 513-14.  Nonetheless, "[n]ews reports are not given weight by courts in a vacuum,

but rather have significance in cases where 'investors are presumed to have read prospectuses,

quarterly reports, and other information related to their investments.'"  Benak, 2006 WL 73440,

at *5 (quoting Matthews, 260 F.3d at 252); see also In re Initial Public Offering Sec. Litig., 341

F. Supp. 2d 328, 345 (S.D.N.Y. 2004) ("A plaintiff in a securities fraud case 'is charged with

knowledge of publicly available news articles and analyst's reports' to the extent that they

constitute storm warnings sufficient to trigger inquiry notice.") (citation omitted).  Here,

Defendants rely on a total of eleven such published documents.  Four of the documents relied

_____

[6]Plaintiff argues that this disclosure is "buried and opaque."  (Am. Compl. ¶ 149).  This
Court disagrees, as the statement is included as part of the introduction to section of the SAI
entitled "Purchase of Shares."  (Trenchard Decl. Ex. B at 15).

upon by Defendants were published after January 30, 2003, and accordingly, are irrelevant to the

Court's analysis.[7]  The Court now turns to the remaining exhibits.[8]

Three of the sources Defendants rely upon are pre-January 2002 news articles from *USA*

*Today, Time Magazine*,[9] and the *Wall Street Journal*.  On December 28, 1998, *USA Today*

_____

[7]The documents are: a June 25, 2003 NASD News Release; July 10, 2003 SEC Release; August 12, 2003 NASD News Release; and a November 17, 2003 SEC Release.  (Trenchard Decl. Exs. Q-T).

[8]This Court finds unpersuasive Plaintiff's argument that these sources must be disregarded because none of the articles specifically referred to any of the Defendants herein. All that is required is that the information contained in the article have a "reasonable nexus" to the subsequent action.  DaimlerChrysler, 269 F. Supp. 2d at 513-14 (citation omitted); see also Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (finding that data must be such "that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.") (citation omitted).  Nor is the Court persuaded by Plaintiff's argument that the sources must be disregarded because prior to April 2003, Defendants' Class D shares were analogous to other mutual fund operators' Class A shares.  Clearly, as discussed more fully below, the import of these sources is that purchasers of large volumes of Class B shares incurred greater sales charges, expenses and higher commissions than other share classes. These are the central issues now before this Court.

[9]The Court will consider the *USA Today* and *Time* articles even though they were not cited in the Amended Complaint.  As the Court of Appeals for the Third Circuit has found, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted), cert. denied, 510 U.S. 1042  (1994).  Moreover, this Court has previously noted that "[t]he inquiry notice standard is objective, and plaintiffs may therefore be charged with knowledge of relevant public information."  Benak, 349 F. Supp. 2d at 889 n. 9 (internal citations omitted); see also Ieradi v. Mylan Labs, 230 F.3d 594, 598 n. 2 (3d Cir. 2000) (taking judicial notice of a publication not cited to in the complaint); In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 368 n. 9 (3d Cir. 1993) (noting that courts may consider documents attached to the defendant's motion to dismiss "if the plaintiff's claims are based on the document[s].").  "The rationale underlying this exception is that the primary problem raised by considering documents outside the complaint--lack of notice to the plaintiff--is dissipated where [the] plaintiff has actual notice and has relied upon the documents in framing the complaint."  Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 625-26 (D.N.J. 2003) (citation omitted).

reported that "[b]rokers can get bigger commissions selling B shares for large purchases -- even though the funds' higher annual fees hurt the investor's returns in the long run."  (Trenchard Decl. Ex. X).  Additionally, on January 18, 1999, *Time Magazine* warned that the SEC was investigating whether some brokers were favoring Class B shares because of higher commissions, and noted that "[e]ven though B shares bear no up-front sales charge, they normally carry high early redemption and annual fees and generate lower long-term returns than class-A shares."  (Trenchard Decl. Ex. Y).  And finally, on July 17, 2001, the *Wall Street Journal* noted that Prudential Securities, Inc. prohibited its brokers from purchasing more than $100,000 in class B shares for its clients.  (Trenchard Decl. Ex. W).  The article revealed that the SEC and the NASD took publicized disciplinary actions against other brokerage firms for selling class B shares to customers in amounts over $100,000.  (Id.).  The article also stated that Class A shares are a better alternative for long-term investors because of lower annual costs.  (Id.).

_____Plaintiff nonetheless contends that the *Wall Street Journal* article cannot serve as a basis for storm warnings because it paints Defendants in a positive light.  Specifically, the article stated that Merrill Lynch "handles such issues through broker training and education" and that it "take[s] suitability issues very seriously...."  (Trenchard Decl. Ex. W).  Investors may not be regarded to have been placed on inquiry notice where "'warning signs are accompanied by reliable words of comfort from management'" such that "'an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns,'"  DaimlerChrysler, 269 F. Supp. 2d at 515 (quoting LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003)); see also In re Exxon Mobil Corp. Sec. Litig., 387 F. Supp. 2d 407, 418 (D.N.J. 2005) (finding that a plaintiff could not rely on reassurances where there were direct contradictions

between the defendants' representations and other materials which were available to the plaintiffs). Among the factors a court should consider in ascertaining whether the reassuring statements are sufficient to dissipate any storm warnings, is "how substantial are the 'reassuring steps'" of management. LC Capital, 318 F.3d at 155. In DaimlerChrysler, the plaintiff charged securities law violations by defendant, an auto manufacturer, in connection with a takeover by an another manufacturer. There were public reports, articles, and the defendants' own public and private statements that the merger was a merger of equals. That court specifically noted that the defendants "mounted an aggressive, all-out campaign to counter any assertions that the merger was not a merger of equals," which included "hiring experts, engaging in strategy sessions, and using the media and its most visible corporate figures to promote the merger of equals concept and ensure that the message 'sunk-in.'" DaimlerChrysler, 269 F. Supp. 2d at 515. Here, by contrast, Plaintiff points to isolated statements in the *Wall Street Journal* article concerning broker training and suitability. These comments are only tangentially related to Plaintiff's claims. More importantly, the statements are not substantial enough to allay the fears of a reasonable investor concerned about fees, costs and commissions associated with the Class B shares in comparison to the other share classes. As such, these statements fail to dissipate any such storm warnings in this case. ___

The remaining four sources all relate to NASD regulatory decisions. On April 18, 2001, the NASD announced that it censured and fined two brokers and their firm for multiple violations of NASD regulations in connection with the sale of Class B mutual fund shares. The article explained the differences in the share classes, specifically noting that Class B shares incurred "higher on-going distribution expenses" than Class A shares, and that the sales

commissions on the B shares would have been "less than half" had the brokers sold A shares. (Trenchard Decl. Ex. N).  The article further stated that: "NASD regulation found that recommendations to purchase over $250,000 in Class B shares exceeded the maximum purchase limitation and were unsuitable in light of the amount sold, the sales and distribution charges incurred and because the customers could have purchased the A shares with substantially lower sales charges." (Id.).  On October 18, 2002, the NASD reported that it charged a broker with multiple violations of NASD regulations in connection the purchases of large volumes of Class B mutual fund shares.  (Trenchard Decl. Ex. P).  The article stated that due to the large purchases of Class B shares, the broker prevented his customers from taking advantage of the lower sales charges available through different classes of funds.   In a March 2002 notice, the NASD reported various disciplinary actions for violations of NASD rules and federal securities laws. One such disciplinary action concerned fines imposed as a result of the sale of Class B shares where the broker failed to advise the customers that they would have "benefitted from investing in Class A shares because of the ability to receive discounts on sales charges of large purchases and the lower ongoing fees and expenses on the Class A shares." (Trenchard Decl. Ex. Z). Finally, Defendants point to an August 13, 2002, NASD decision, relating to disciplinary action for a broker's recommendation to purchase Class B shares over Class A shares.  The decision stated that the broker's recommendation was unsuitable because the purchase of Class B shares, instead of Class A shares, resulted in significantly higher commissions.

　　　This Court is persuaded that the registration statements, coupled with the news articles and NASD press releases, sufficed to trigger inquiry notice.  These sources directly relate to the claims now asserted by Plaintiff in the instant action.  A reasonable investor of ordinary

intelligence, in the exercise of reasonable diligence, would have discovered the basis of the claims asserted in this case prior to January 2002.  Because this Court has determined that storm warnings were present, the Court turns to whether the Plaintiff exercised the due diligence expected of reasonable investors of ordinary intelligence.  The Court concludes that he did not. Based upon the record, Plaintiff fails to allege any facts to "'show that [he] exercised reasonable due diligence and yet [was] unable to discover [his] injuries.'"  NAHC, 306 F.3d at 1327 (quoting Matthews, 260 F.3d at 252).  Therefore, Plaintiff's claims pursuant to the '33 Act, as well as the '34 Act, are untimely.  15 U.S.C. § 77m; 28 U.S.C. 1658(b).  Hence, Plaintiff's claims filed in January 2004, are time-barred.[10]

## CONCLUSION

For the foregoing reasons, it is on this 21st day of February, 2006,

**ORDERED** that the motion to dismiss [Docket # 33] on behalf of Defendants FAM Distributors, Inc., Merrill Lynch Investment Managers, L.P., Fund Asset Management, L.P., and Princeton Services, Inc. is hereby GRANTED; and it is further

**ORDERED** that the motion to dismiss [Docket # 30] on behalf of  Merrill Lynch & Co., Inc., Merrill Lynch Group, Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc. is hereby GRANTED; and it is further

**ORDERED** that this case is closed.

It is so ordered.

_____

[10]Because this matter is decided on statute of limitations grounds, the Court takes no position on the remaining arguments of the parties.

Page 16 of  17

DATED: February 21, 2006

/s/ Jose L. Linares
UNITED STATES DISTRICT JUDGE