**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1867

_____

THOMAS J. DEBENEDICTIS,
ON BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY SITUATED,

Appellant

v.

MERRILL LYNCH & CO., INC.;
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INCORPORATED;
MERRILL LYNCH GROUP, INC.;
FAM DISTRIBUTORS, INC.;
MERRILL LYNCH INVESTMENT MANAGERS, L.P.;
FUND ASSET MANAGERS, L.P.;
PRINCETON SERVICES, INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 04-cv-00404
(Honorable Jose L. Linares)

_____

Argued April 23, 2007

Before: SCIRICA, *Chief Judge,*
FUENTES, and ALARCÓN,[*] *Circuit Judges.*

(Filed: June 18, 2007)

JAMES R. MALONE, JR., ESQUIRE (Argued)
JOSEPH G. SAUDER, ESQUIRE
Chimicles & Tikellis LLP
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
        Counsel for Appellant


LORI A. MARTIN, ESQUIRE (Argued)
SAMUEL J. LIEBERMAN, ESQUIRE
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
30th Floor
New York, NY 10022


MARC T.G. DWORSKY, ESQUIRE
Munger, Tolles & Olson
355 South Grand Avenue, 35th Floor

---

[*]The Honorable Arthur L. Alarcón, Senior Judge of the United
States Court of Appeals for the Ninth Circuit, sitting by designation.

2

Los Angeles, CA 90071

BRIAN F. AMERY, ESQUIRE
Bressler, Amery & Ross
325 Columbia Turnpike
Florham Park, NJ 07932

JEFFREY J. GREENBAUM, ESQUIRE
Sills, Cummis, Epstein & Gross
One Riverfront Plaza
Newark, NJ 07102
            Counsel for Appellees

_____

OPINION OF THE COURT

_____

ALARCÓN, *Circuit Judge*.

        Thomas DeBenedictis appeals from the order of the
District Court for the District of New Jersey dismissing, as time-
barred, his securities class action claims pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure against Merrill
Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith, Inc.;
Merrill Lynch Group, Inc.; Fam Distributors, Inc.; Merrill Lynch
Investment Managers, L.P.; Fund Asset Management, L.P.; and
Princeton Services, Inc. (collectively "Merrill").    Mr.
DeBenedictis's central claim is that Merrill's Fund Registration

3

Statements ("Registration Statements"), which are comprised of the Merrill Lynch Global Growth Fund, Inc. Prospectus ("prospectus") and a separate Statement of Additional Information ("SAI"), misled investors by failing to disclose that Class B shares were never a rational choice of investment for them and that Merrill brokers received larger commissions on sales of such shares. Mr. DeBenedictis filed this action on January 30, 2004.

Mr. DeBenedictis argues that the District Court erred in determining that the Registration Statements, certain news articles, and NASD press releases constituted "storm warnings" sufficient to trigger inquiry notice to Mr. DeBenedictis of his claims prior to January 30, 2002. We will affirm the decision of the District Court because we conclude that each of Mr. DeBenedictis's claims is time-barred.

## I

## A

Mr. DeBenedictis filed this action on January 30, 2004. He alleged in his complaint that he purchased $500,000 Class B shares through his broker at Merrill in five funds between February 1999 and August 1, 2001. Between January 30, 1999 and April 2003, Merrill offered four classes of mutual fund shares: Classes A, B, C, and D (collectively, the "Merrill Funds").

The prospectus described these shares as follows:

4

The fund offers four share classes, each with its own sales charge and expense structure, allowing you to invest in the way that best suits your needs. Each share class represents an ownership interest in the same investment portfolio. When you choose your class of shares you should consider the size of your investment and how long you plan to hold your shares. Your Merrill Lynch Financial Consultant can help you determine which share class is best suited to your personal financial goals.

For example, if you select Class A or Class D shares, you generally pay a sales charge at the time of purchase. If you buy class D shares, you also pay an ongoing account maintenance fee of 0.25%. You may be eligible for a sales charge waiver.

If you select Class B or Class C shares, you will invest the full amount of your purchase price, but you will be subject to a distribution fee of 0.75% and an account maintenance fee of 0.25%. Because these fees are paid out of the Fund's assets on an ongoing basis, over time these fees increase the cost of your investment and may cost you more than paying an initial sales charge. In addition, you may be subject to a deferred sales charge when you sell Class B or Class C shares.

5

The prospectus contained the following description of the costs involved in purchasing Class B and Class C shares:

> If you select Class B or Class C shares, you do not pay an initial sales charge at the time of purchase. However, if you redeem your Class B shares within four years after purchase or your Class C shares within one year after purchase, you may be required to pay a deferred sales charge. You will also pay distribution fees of 0.75% and account maintenance fees of 0.25% each year under distribution plans that the Fund has adopted under Rule 12b-1. Because these fees are paid out of the Fund's assets on an ongoing basis, over time these fees increase the cost of your investment and may cost you more than paying an initial sales charge. The Distributor uses the money that it receives from the deferred sales charges and the distribution fees to cover the costs of marketing, advertising and compensating the Merrill Lynch Financial Consultant or other securities dealer who assists you in purchasing Fund shares.

The SAI also contained a discussion of the fees involved in acquiring Class B and Class C shares:

> Investors choosing the deferred sales charge alternatives should consider Class B shares if they intend to hold their shares for an extended period

of time and Class C shares if they are uncertain as to the length of time they intend to hold their assets in Select Pricing Funds.

Because no initial sales charges are deducted at the time of the purchase, Class B and Class C shares provide the benefit of putting all of the investor's dollars to work from the time the investment is made.  The deferred sales charge alternatives may be particularly appealing to investors that do not qualify for the reduction in initial sales charges.  Both Class B and Class C shares are subject to ongoing account maintenance fees and distribution fees; however, the ongoing account maintenance and distribution fees potentially may be offset to the extent any return is realized on the additional funds initially invested in Class B or Class C shares.   In addition, Class B shares will be converted into Class D shares of the Fund after a conversion period of approximately eight years, and thereafter investors will be subject to lower ongoing fees.

The SAI set forth the compensation payable to the financial consultants as follows:

Merrill   Lynch   compensates   its   Financial Consultants for selling Class B and Class C shares

at the time of purchase from its own funds.
Proceeds from the CDSC and the distribution fee
are paid to the Distributor and are used in whole
or in part by the Distributor to defray the expenses
of dealers (including Merrill Lynch) related to
providing distribution-related services to the Fund
in connection with the sale of the Class B and
Class C shares . . . . The combination of the
CDSC and the ongoing distribution fee facilitates
the ability of the Fund to sell the Class B and
Class C shares without a sales charge being
deducted at the time of purchase.  See
"Distribution Plans" below.  Imposition of the
CDSC and the distribution fee on Class B and
Class C shares is limited by the NASD asset-
based sales charge rule.  See "Limitations on the
Payment of Deferred Sales Charges" below.

The SAI contained the following information concerning
the compensation of Merrill's sales personnel:

Investors should understand that the purpose and
function of the initial sales charges with respect to
the Class A and Class D shares are the same as
those of the CDSCs and distribution fees with
respect to the Class B and Class C shares in that
the sales charges and distribution fees applicable
to each class provide for the financing of the
distribution of the shares of the Fund.  The

8

distribution related revenues paid with respect to a class will not be used to finance the distribution expenditures of another class.  Sales personnel may receive different compensation for selling different classes of shares.

The prospectus contained a table setting forth the fees and expenses for the different classes of shares:

This table shows the different fees and expenses that you may pay if you buy and hold the different classes of shares of the Fund.  Future expenses may be greater or less than those indicated below.

Shareholder Fees (fees paid directly from your investment):

| Class A | Class B(a) | Class C | Class D |
|---------|------------|---------|---------|

Maximum Deferred Sales Charge (Load)
(as a percentage of original purchase price or redemption proceeds, whichever is lower)

| Class A | Class B(a) | Class C | Class D |
|---------|------------|---------|---------|
| None(c) | 4.0%(b) | 1.0%(b) | None(c) |

Redemption Fee

| Class A | Class B(a) | Class C | Class D |
|---------|------------|---------|---------|
| None | None | None | None |

Maximum Account Fee

| Class A | Class B(a) | Class C | Class D |
|---------|------------|---------|---------|
| None | None | None | None |

9

Management Fee(d)

0.75%       0.75%       0.75%       0.75%

Other Expenses (including transfer agency fees)(f)

0.23%       0.24%       0.24%       0.22%

(a) Class B shares automatically convert to Class D shares about eight years after you buy them and will no longer be subject to distribution fees.

(b) Some investors may qualify for reductions in the sales charge (load).

(c) You may pay a deferred sales charge if you purchase $1 million or more and you redeem within one year.

(d) The Fund pays the Manager a fee at the annual rate of 0.75% of the average daily net assets of the Fund not exceeding $1.5 billion and 0.725% of the average daily net assets in excess of $1.5 billion.   For the period October 31, 1997 (commencement of operations) to August 31, 1998, the Manager received a fee equal to 0.75% of the Fund's average daily net assets.

(e) The Fund calls the "Service Fee" an "Account Maintenance Fee."  Account Maintenance Fee is the term used in this Prospectus and all other Fund materials.  If you hold Class B or Class C shares for a long time, it may cost you more in

10

distribution (12b-1) fees than the maximum sales charge that you would have paid if you had bought one of the other classes.

(f) The Fund pays the Transfer Agent $11.00 for each Class A and Class D shareholder account and $14.00 for each Class B and Class C shareholder account and reimburses the Transfer Agent's out-of-pocket expenses.  The Fund pays a 0.10% fee for certain accounts that participate in the Merrill Lynch Mutual Fund Advisor program. The Fund also pays a 50.20 monthly closed account charge, which is assessed upon all accounts that close during the year.  This fee begins the month following the month the account is closed and ends at the end of the calendar year. For the period October 31, 1997 (commencement of operations) to August 31, 1998, the Fund paid the Transfer Agent fees totaling $1,426,209.  The Manager provides accounting services to the Fund at its cost.  For the period October 31, 1997 (commencement of operations) to August 31, 1998, the Fund reimbursed the Manager $161,450 for these services.

(g) In addition, Merrill Lynch may charge clients a processing fee (currently $5.35) when a client buys or sells shares.

The prospectus also contained the following chart

11

illustrating the cost of Class B and Class D shares for varying periods of time:

These examples are intended to help you compare the cost of investing in the Fund with the cost of investing in other mutual funds.

These examples assume that you invest $10,000 in the Fund for the time periods indicated, that your investment has a 5% return each year, that you pay the sales charges, if any, that apply to the particular class and that the Fund's operating expenses remain the same. This assumption is not meant to indicate you will receive a 5% annual rate of return. Your annual return may be more or less than the 5% used in this example. Although your actual costs may be higher or lower, based on these assumptions your cost would be:

EXPENSES IF YOU <u>DID</u> REDEEM YOUR SHARES:

|         | 1 Year | 3 Years | 5 Years | 10 Years |
|---------|--------|---------|---------|----------|
| Class B | $602   | $824    | $1,073  | $2,123*  |
| Class D | $643   | $892    | $1,160  | $1,925   |

EXPENSES IF YOU <u>DID NOT</u> REDEEM YOUR SHARES:

12

|         | 1 Year | 3 Years | 5 Years | 10 Years |
|---------|--------|---------|---------|----------|
| Class B | $202   | $624    | $1,073  | $2,123*  |
| Class D | $643   | $892    | $1,160  | $1,925   |

\* Assumes conversion to Class D shares approximately eight years after purchase. See note (a) to the Fees and Expenses table above.

The SAI set forth information regarding how the fee structure for each class affects its long term desirability.

Investors not qualifying for reduced initial sales charges who expect to maintain their investment for an extended period of time also may elect to purchase Class A or Class D shares, because over time the accumulated ongoing account maintenance and distribution fees on Class B or Class C shares may exceed the initial sales charges and, in the case of Class D shares, the account maintenance fee.

**B**

On January 30, 2004, Mr. DeBenedictis filed his initial complaint individually and on behalf of class members similarly situated. His theory of liability is two fold: First, he alleged that Merrill made materially misleading statements in its Registration Statements in order to induce him and members of the class to purchase Class B shares that had higher expenses and lower

yields than available alternative shares.    Second, Mr. DeBenedictis alleged that Merrill failed to disclose that its brokers had a conflict of interest in connection with the sale of Class B shares because they received a higher rate of compensation from the sale of Class B Shares than Class A or Class D shares.  Mr. DeBenedictis filed an amended complaint on July 9, 2004.

C

On November 19, 2004, Merrill filed a motion to dismiss Mr. DeBenedictis's amended class action complaint pursuant to Rule 12(b)(6).  Merrill argued that through the Registration Statements, news articles, and National Association of Securities Dealers ("NASD") press releases, Mr. DeBenedictis was on inquiry notice of the claims arising from the purchase of Class B shares more than two years before this action was initially filed.  Merrill attached to its motion articles from *USA Today* and *Time Magazine* that were not cited in the amended complaint.  The District Court took judicial notice of these articles.

The record before the trial court shows that *USA Today* published an article on December 28, 1998, which reported that "[b]rokers can get bigger commissions selling B shares for large purchases -- even though the funds' higher annual fees hurt the investor's returns in the long run."  The article further informed its readers that "B shares also typically mean lower performance in the long run."

14

On January 18, 1999, *Time Magazine* published an article entitled "B Shares Get Bad Grades."  It warned investors that "[i]f a broker tries to persuade you to buy class-B  mutual-fund shares instead of class A, make sure it's in your best interest, not just his.  The sec [sic] is investigating whether certain brokers favor B shares because of fatter commissions."  The article also stated that Class B shares "normally carry high early-redemption and annual fees and generate lower long-term returns than class-A shares."

On July 17, 2001, the *Wall Street Journal* published an article which stated: "'In most cases, . . . it's better for the client economically,' to buy A-class shares when investing more than $100,000[.]"

On April 18, 2001, the NASD published a news release announcing that it had censured and fined Stifel, Nicolaus & Co. for making unsuitable recommendations in selling B shares to customers in amounts over $100,000 when it would have been cost effective for these customers to purchase Class A shares.

On October 18, 2002, the NASD issued a news release in which it reported that it had charged the owner of Park South Securities, LLC with multiple violations of securities laws by purchasing large volumes of Class B mutual fund shares.  It stated this conduct "kept his customers from taking advantage of the lower sales charges available through different classes of funds."

In March 2002, the NASD published a report that it had

censured and fined Dain Rauscher, Inc. and Gary Franklin Hayden, a registered representative, based on findings that Mr. Hayden had

> recommended the purchase of Class B shares of growth funds to public customers and omitted to inform the customers that they would have benefited [sic] from investing in Class A shares because of the ability to receive discounts on sales charges of large purchases and the lower ongoing fees and expenses of the Class A shares.

Merrill also presented evidence that on August 13, 2002, NASD announced that it had disciplined a broker because he had made an unsuitable recommendation because the purchase of Class B shares, instead of Class A shares, resulted in significantly higher commissions.

### D

The District Court granted Merrill's motion to dismiss the amended complaint as untimely. It stated that it was "persuaded that the registration statements, coupled with the news articles and NASD press releases, sufficed to trigger inquiry notice." The District Court also determined that Mr. DeBenedictis failed to exercise the due diligence expected of reasonable investors of ordinary intelligence. It did not reach the merits of any of Mr. DeBenedictis's claims.

Mr. DeBenedictis has filed a timely appeal. We have

16

jurisdiction under 28 U.S.C. § 1291.

## II

## A

In his brief before this Court, Mr. DeBenedictis summarized his contentions as follows:

> In holding the Plaintiff's claims were untimely as a matter of law, the district court erred by construing the concept of inquiry notice too broadly, as the registration statements and news items cited by the defendants were not sufficient to put a reasonable investor on inquiry notice outside the relevant limitations period.

> *First,* the registration statements were insufficient to put a reasonable investor on inquiry notice because they did not disclose the conflict of interest that the commission structure for Class B Shares created.  The registration statements also did not disclose the magnitude of the risk that investors such as Plaintiff would pay excessive sales charges.

> *Second,* with the exception of a single article that cast the defendants in a positive light, the news items relied upon by defendants to support their limitations defense involved other brokerage firms and fund companies and were therefore

17

insufficient to put Plaintiff on notice of culpable conduct by the defendants in connection with their sale of the Funds.

This Court's review of a District Court's decision to grant a motion to dismiss is plenary. *Gallo v. City of Philadelphia*, 161 F.3d 217, 221 (3d Cir. 1998). We must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir 1989). The dismissal must be upheld "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *D.P. Enter., Inc. v. Bucks County Cmty. Coll.*, 725 F.2d 943, 944 (3d Cir 1984). Nevertheless, "a court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir 2005) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)).

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of --

(1) 2 years after the discovery of the facts

18

constituting the violation[.]

28 U.S.C. § 1658(b).  In addition,

> [n]o action shall be maintained to enforce any
> liability created under section . . . 77k or
> §77l(a)(2) [] [of [the Securities Act of 1933]
> unless brought within one year after the discovery
> of the untrue statement or the omission, or after
> such discovery should have been made by the
> exercise of reasonable diligence[.]

15 U.S.C. §77m.  Thus, if Mr. DeBenedictis was placed on inquiry notice of the basis of his claims prior to January 30, 2002, he is precluded from bringing his claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

A plaintiff in a securities fraud action is put on inquiry notice when a '"reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."' *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir 2006) (citing *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir 2002)).  "Plaintiffs cannot avoid the time bar simply by claiming they lacked knowledge of the details for narrow aspects of the alleged fraud.  Rather, the clock starts when they should have discovered the general fraudulent scheme." *Benak*, 435 F.3d at 400 (internal quotation marks and citations omitted).  For purposes of this determination, "'investors are presumed to have

19

read prospectuses, quarterly reports, and other information related to their investments.'" *Id.* (quoting *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir 2001). Information that may be deemed to constitute inquiry notice includes:

> substantial conflicts between oral representations of the brokers and the text of the prospectus, . . . the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.

*NAHC*, 306 F.3d at 1326-27 n.5 (quoting *Mathews*, 260 F.3d at 252). If "the existence of storm warnings [is] adequately established 'the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries.'" *NAHC*, 306 F.3d at 1327 (quoting *Mathews*, 260 F.3d at 252).

The Registration Statements provided Mr. DeBenedictis with information regarding his claims, which he should have recognized as storm warnings. It is undisputed that the Registration Statements disclosed the fee structure for Class A, B, C, and D shares. Therefore, investors could calculate on their own whether one class of shares is more economically attractive

than another.  In addition, the prospectus included an illustration of the costs associated with each share class for varying holding periods based on a hypothetical investment of $10,000.  The SAI noted the initial sales charge alternatives as follows:

> Investors not qualifying for reduced initial sales charges who expect to maintain their investment for an extended period of time also may elect to purchase Class A or Class D shares, because over time the accumulated ongoing account maintenance and distribution fees on Class B or Class C shares may exceed the initial sales charges and, in the case of Class D shares, the account maintenance fee.

Moreover, it  pointed out that "[i]nvestors qualifying for significantly reduced initial sales charges may find the initial sales charge particularly attractive because similar sales charge reductions are not available with respect to the deferred sales charges imposed in connection with purchases of Class B or Class C shares."  Finally, the SAI disclosed that "[s]ales personnel may receive different compensation for selling different classes of shares."  Thus, the Registration Statements placed investors on notice of the relative costs and benefits of the different shares, and the possibility that Appellees's sales personnel may receive different commissions in relation to the type of shares they sold.

**B**

21

Mr. DeBenedictis argues that the public documents addressing Class B shares did not put him on inquiry notice of his claims because they failed to mention Merrill and, in one case, painted Merrill in a positive light.  "News reports are not given weight by courts in a vacuum, but rather have significance in cases where 'investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments.'" *Benak*, 435 F.3d at 402 (quoting *Mathews*, 260 F.3d at 252).

More than two years before this action was filed, the articles in *USA Today*, *Time Magazine*, the *Wall Street Journal*, and NASD press releases were sufficient to place a reasonable investor of ordinary intelligence on inquiry notice that the purchase of more than $100,000 of Class B shares was not a suitable investment because brokers received a higher commission for selling Class B shares instead of Class A shares in spite of the fact that Class A shares are sometimes a more suitable investment because of lower annual costs.  *USA Today* warned its readers that brokers get higher commissions for selling Class B shares in large amounts.  *Time Magazine* noted that Class B shares "generate lower long-term returns than Class A shares."  The *Wall Street Journal* reported that the NASD had disciplined a brokerage firm for selling Class B shares in amounts over $100,000, notwithstanding the fact that Class A shares "are a good idea for long-term investors since they usually have the lowest annual expenses[.]"  The four NASD press releases considered by the District Court revealed that

22

brokers from several firms had been disciplined for recommending the purchase of large amounts of Class B shares over Class A shares because they received significantly higher commissions than they would have if they advised the acquisition of Class A shares.

Mr. DeBenedictis maintains that the news releases were not sufficient to serve as storm warnings, or to place him on inquiry notice, because the articles were not company-specific. He relies on the Second Circuit's decision in *Lentell v. Merrill Lynch & Co., Inc*., 396 F.3d 161 (2d Cir. 2005). In *Lentell*, the Court concluded that the District Court erred in determining that "numerous generic articles" had placed plaintiffs on inquiry notice of the frauds alleged against the defendants. *Id*. at 170. The articles cited by the District Court contained statements that "[a]nalysts routinely play up good news and sugarcoat the bad," and "[t]he analyst today is an investment banker in sheep's clothing[.]" *Id*. at 171 (internal quotation marks and citations omitted). The Court noted that these news releases say nothing about the defendants' conduct since none is "mentioned in *any* article relied upon by the district court." *Id*. The Second Circuit explained its rejection of the District Court's decision that the articles were sufficient to serve as storm warnings as follows:

> We do not mean to suggest that inquiry notice could never be established on the basis of non-specific public-pronouncements, but the level of particularity in pleading required by the PSLRA is such that inquiry notice can be established only

23

> where the triggering data "relates *directly* to the
> misrepresentations and omissions" alleged.

*Id*. (quoting *Newman v. Warnaco Group, Inc.*, 335 F.3d 187,
193 (2d Cir. 2003)).

Here, the news articles referred specifically to the
practice of many mutual fund brokerages of selling Class B
shares in amounts in excess of $100,000 at a higher commission
than that paid to brokers for the sale of Class A shares, which
required a lower annual cost to the purchaser. This warning to
investors was directly applicable to the representations or
omissions made by Merrill in its Registration Statements.

Citing *LC Capital Partners, LP v. Frontier Ins. Group,
Inc.*, 318 F.3d 148, 155 (2d Cir. 2003), Mr. DeBenedictis argues
that the *Wall Street Journal* article published on July 17, 2001,
cannot serve as a storm warning because it painted the
Appellees in a positive light. The *Wall Street Journal* states:

> Most brokerage firms, including Merrill Lynch &
> Co., Morgan Stanley & Co. and Edward D. Jones
> & Co., don't specifically cap sales of B-share
> mutual funds. Merrill, the nation's largest
> brokerage firm in terms of registered
> representatives, handles such issues through
> broker training and education. "We continue to
> take suitability issues very seriously," said a
> spokesman for the New York company. "They're
> a prime concern in terms of the distribution of

24

different classes of mutual funds shares."

The District Court concluded that this report is not directly related to Mr. DeBenedictis's claims and fails to contradict the storm warnings provided by this and the other news articles.  We agree.

The Second Circuit held in *LC Capital* that

[t]here are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management. . . . However, reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern. . . . Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the "reassuring" steps announced to avoid their recurrence.

318 F.3d at 155 (internal citations omitted).

It is clear that the statements in *The Wall Street Journal*

25

article are not directly related to Mr. DeBenedictis's claim regarding the alleged conflict of interest Merrill's brokers had in selling Class B shares.  In contrast, these statements do seem to relate to Mr. DeBenedictis's claims regarding the profitability of Class B shares for investors of $100,000 or more.  In light of the other news articles and the concerns expressed in *The Wall Street Journal* article, *The Wall Street Journal*'s reference to Merrill's suitability training was not enough to dissipate a reasonable investor's concerns about the fees and costs associated with Class B shares.

### Conclusion

The information provided in the Registration Statements, the news articles, and the NASD press releases were sufficient storm warnings to trigger inquiry notice.  A reasonable investor of ordinary intelligence, with the exercise of reasonable diligence, would have discovered the basis of the claims asserted in this matter prior to January 2002.  In the face of such inquiry notice, however, Mr. DeBenedictis failed to exercise the due diligence expected of a reasonable investor of ordinary intelligence.  Even if a mutual fund investor failed to read the Registration Statements when they were initially received and failed to run any independent calculations of the fees that would be incurred on Class B shares, the news articles questioning the profitability of such shares and highlighting the possible conflict of interest would urge the reasonable investor to return to the Registration Statements in order to evaluate the profitability of his or her own investments and investigate their broker's

26

conflict of interest.  In contrast, Mr. DeBenedictis failed to allege any facts that he "'exercised reasonable due diligence and yet [was] unable to discover [his] injuries.'"  *NAHC*, 306 F.3d at 1327 (quoting *Mathews*, 260 F.3d at 252).  Accordingly, we will affirm the dismissal of this action as time-barred.